```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
                   MIAMI DIVISION
                   IN ADMIRALTY

             CASE NO. 1:21-cv-21452-CMA

GREAT LAKES INSURANCE SE,

          Plaintiff,

vs.

REYNOLDS LASSITER and AMI KIDS, INC.,

          Defendants.
                              /

                    VIA ZOOM
                    Miami, Florida
                    November 19, 2021
                    Friday, 10:05 a.m.



          DEPOSITION OF BERIC ANTHONY USHER



     Taken before Theresa M. Cohen, Florida

Professional Reporter and Notary Public in and for the

State of Florida at Large, pursuant to Notice of Taking

Deposition filed in the above cause.



                         -    -    -
```

Beric Usher
November 19, 2021

## Page 2

```
 1  APPEARANCES:
 2
            GOLDMAN & HELLMAN
 3          By:  JACQUELINE L. GOLDMAN, ESQUIRE
            jacquie.goldman@gmail.com
 4          and
            STEVEN GOLDMAN, ESQUIRE
 5          8751 West Broward Boulevard
            Suite 404
 6          Fort Lauderdale, Florida 33324
            On behalf of the Plaintiff.
 7
            FOWLER WHITE BURNETT
 8          By:  ALLAN R. KELLEY, ESQUIRE
            akelley@fowler-white.com
 9          1395 Brickell Avenue
            Fourteenth Floor
10          Miami, Florida 33131
            On behalf of the Defendant Reynolds Lassiter.
11
            ADAMS & REESE
12          By:  ADAM McNEIL, ESQUIRE
            adam.mcneil@arlaw.com
13          and
            RICHARD AGUILAR, ESQUIRE
14          701 Poydras Street
            Suite 4500
15          New Orleans, Louisiana 70139
            On behalf of the Defendant AMI Kids.
16
            HAMILTON, MILLER & BIRTHISEL
17          By:  TYLER J. TANNER, ESQUIRE
            ttanner@hamiltonmillerlaw.com
18          150 Southeast Second Avenue
            Suite 1200
19          Miami, Florida 33131
            On behalf of the Defendant Norman Russick.
20
21                     INDEX
22  WITNESS           DIRECT          CROSS
23  BERIC USHER          6              58
24                    (Kelley)       (McNeil)
25
```

## Page 3

```
 1              EXHIBITS
 2  Deposition Exhibit No. 26 Page 8
 3  (Notice of Taking Deposition)
 4  Deposition Exhibit No. 27 Page 14
 5     (CSR Website Document)
 6  Deposition Exhibit No. 28 Page 16
 7  (CSR U.S. Operating Instructions)
 8  Deposition Exhibit No. 29 Page 18
 9  (Global Insurance Brokers Application)
10  Deposition Exhibit No. 30 Page 19
11     (Certificate of "SHMILY")
12  Deposition Exhibit No. 31 Page 20
13     (Registration for "SHMILY")
14  Deposition Exhibit No. 32 Page 27
15       (Underwriting Manual)
16  Deposition Exhibit No. 33 Page 35
17  (Kolisch Marine Insurance Document)
18  Deposition Exhibit No. 34 Page 36
19  (Concept Special Risks Rating Guide)
20  Deposition Exhibit No. 35 Page 38
21    (Concept Special Risks Rate Sheet)
22  Deposition Exhibit No. 36 Page 41
23    (Rating Sheet/Unrelated Vessel)
24  Deposition Exhibit No. 37 Page 44
25  (Grant Preliminary Survey Report)
```

## Page 4

```
 1          EXHIBITS CONTINUED
 2  Deposition Exhibit No. 38 Page 51
 3     (Internal Claims Manual)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1  THEREUPON:
 2          THE REPORTER:  The attorneys participating in
 3      this proceeding acknowledge that I am not physically
 4      present in the proceeding room and that I will be
 5      reporting this proceeding remotely.
 6          The parties and their counsel consent to this
 7      arrangement and waive any objections to this manner
 8      of reporting.
 9          Please indicate your agreement by stating your
10      name and your agreement on the record.
11          MS. GOLDMAN:  Jacqueline Goldman, counsel for the
12      plaintiff and we agree.
13          MR. GOLDMAN:  Steven Goldman, co-counsel for
14      plaintiff, yes.
15          MR. KELLEY:  Allan Kelley, counsel for Reynolds
16      Lassiter.  Agreed.
17          MR. McNEIL:  Adam McNeil for AMI Kids and we are
18      in agreement.
19          MR. TANNER:  Tyler Tanner, attorney for Captain
20      Norman Russick.  I'm also in agreement.
21          THE REPORTER:  Raise your right hand.
22          Do you swear the testimony you're about to give
23      is the truth, the whole truth and nothing but the
24      truth?
25          THE WITNESS:  I do.
```

Beric Usher
November 19, 2021

Page 6

1           BERIC ANTHONY USHER
2   called as a witness on behalf of the Defendant Reynolds
3   Lassiter herein and, having been first duly sworn, was
4   examined and testified as follows:
5                 DIRECT EXAMINATION
6   BY MR. KELLEY:
7       Q   Please tell us your name and address.
8       A   My name is Beric, B-e-r-i-c, Anthony with an H
9   Usher, U-s-h-e-r.
10          My address is Woodroyd, which is W-o-o-d-r-o-y-d,
11  Woodroyd, Pateley Bridge, P-a-t-e-l-e-y, Bridge,
12  H-a-r-r-a-g -- I'm sorry.  H-a-r-r-o-g-a-t-e and that's in
13  North Yorkshire in the United Kingdom and the zip code is
14  HG 35QE.
15      Q   Okay.  When did you arrive in the United States?
16      A   Last Friday.
17      Q   What have you been doing since then?
18      A   I've had numerous business meetings and working
19  from my home in Coral Springs.
20      Q   When were you last at the home in Coral Springs?
21      A   February 2020.
22      Q   So good to get back home?
23      A   Very much so.
24      Q   Welcome back.
25          MS. GOLDMAN:  Before we get into it I just want

Page 7

1   to say that, of course, we're prepared to answer any
2   and all questions you may have.
3           However, I would just ask that all counsel keep
4   in mind that we do have to return our client to his
5   house after the deposition and then we have a flight
6   to catch and so we could go until 5:00 p.m., possibly
7   later.
8           I don't know how long you plan on questioning
9   him, but just be aware that is our schedule.
10          MR. KELLEY:  I don't think we should go that
11  late, but you never know once we get going.
12  BY MR. KELLEY:
13      Q   You are here today as the corporate
14  representative of Great Lakes Insurance?
15      A   That's correct.
16      Q   And have you seen the notice of deposition for
17  the taking of this deposition?
18      A   I believe I have.
19      Q   And have you reviewed the areas of inquiry and
20  the documents we'll be discussing today?
21      A   Yes.
22      Q   Did you do anything to prepare for the deposition
23  besides reviewing the notice of deposition?
24      A   I reread the underwriting file and also the
25  claims file.

Page 8

1       Q   MR. KELLEY:  I'm going to mark as Exhibit 26 the
2   notice of deposition.
3           (The document was marked "Deposition Exhibit No.
4   26 for Identification.")
5   BY MR. KELLEY:
6       Q   By whom are you employed?
7       A   A company called Concept Special Risks.
8       Q   How long have you been employed by Concept
9   Special Risks?
10      A   It's a history thing.
11          The company was initially a company called T.L.
12  Dallas Special Risks.
13          It was majority owned by a company called T.L.
14  Dallas & Company Limited.
15          In 2007 I purchased the stock of T.L. Dallas and
16  then merged with a company called Osprey Underwriting
17  Limited and the company then became Osprey Special Risks.
18      Q   You pronounced it --
19      A   Osprey, O-s-p-r-e-y, like the bird.
20          So in 2013 we did a structural de-merger from
21  Osprey Special Risks and became Concept Special Risks.
22          So Concept Special Risks has only existed since
23  2013.  However, all the staff, myself as director and
24  owner have been involved in special risks since 1999, and
25  prior to that T.L. Dallas & Company Limited since 1993.

Page 9

1       Q   And what is the CSR relationship with Great
2   Lakes?
3       A   We are a managing general agency.
4       Q   What do you do as the managing general agency for
5   Great Lakes?
6       A   Effectively we perform all the duties that a
7   branch office would do for this particular line of
8   business, for yacht insurance, which means that we receive
9   offers of business from independent brokers.
10          We assess those offers, decide whether we're
11  going to offer terms, issue quotations.
12          If we receive an order for coverage, we bind the
13  policy.  We issue the policy documentation, collect the
14  premium, look over all the information for reporting
15  purposes to Great Lakes, deal with all claims and report
16  on the claims, manage and monitor exposures of vessels.
17          So effectively we're doing the entire job an
18  insurance company would do if they did not retain an MGA.
19      Q   What is the basis of the MGA's compensation of
20  Great Lakes?
21      A   We received a fixed management fee.
22          In addition to the fixed management fee we would
23  then share in any net profit that is made by the company
24  as a result of our activity on their behalf.
25      Q   So the fewer claims against premiums, the greater

Beric Usher
November 19, 2021

Page 10

1  the profit for both Great Lakes and for CSR?

2          MS. GOLDMAN:  Objection.  Just give me a moment.

3          THE REPORTER:  I didn't hear an answer.

4          MR. KELLEY:  He said yes.

5          MS. GOLDMAN:  I believe he said correct, but,

6  yes.

7  BY MR. KELLEY:

8      Q    Has the relationship between CSR and Great Lakes

9  changed this year?

10     A    Yes.

11     Q    How has it changed?

12     A    Great Lakes elected not to renew our contract.

13         We have underwritten for Great Lakes for

14  seventeen years and they decided that they did not have an

15  ongoing appetite for every wind exposed business.

16     Q    What happened to CSR after the discontinuation of

17  the relationship with Great Lakes?

18     A    We continue to handle the book of business and

19  act on their behalf and we negotiated a deal with a

20  different insurer.

21     Q    Who is that insurer?

22     A    That insurer is called Clear Spring Property &

23  Casualty Company.

24     Q    Is that related to the Allied Group?

25     A    No.  You might be referring to Applied.

Page 11

1      Q    Applied, yes.

2      A    Yes.  Concept Special risks were purchased by

3  Applied Underwriters on the 1st of June 2021.

4      Q    And Applied Underwriters are based in Omaha,

5  Nebraska?

6      A    That's correct.

7      Q    How long have they been in operation in Omaha,

8  Nebraska, if you know?

9      A    Since the '90s, I believe.

10     Q    And are you still administering the same book of

11  business for Applied, underwriting that you had done

12  through the years for Great Lakes, for Osprey or T.L.

13  Dallas?

14     A    I think you may be mischaracterizing.

15         Applied owns Concept Special Risks, but they're

16  not an insurer of the yacht business.

17         They may subsequently become insurers of the

18  yacht business, but not at this time.

19     Q    Do you have any ongoing ownership of the Concept

20  Special Risks after the purchase by Applied Underwriters?

21     A    No.

22     Q    The CSR yacht club program at the time of this

23  policy with Mr. Lassiter and AMI, was the Florida market

24  one of its strongest markets?

25     A    Yes, I would think we probably had more business

Page 12

1  in the State of Florida than we did in any other state.

2      Q    Did you ever have an office in the State of

3  Florida?

4      A    We briefly had an office in the State of Florida.

5  Not involved in this business, but we had a contract

6  through a bank that was going to do referral business.

7          They had a lot of money on yachts and we formed a

8  company called Concept Special Risks Limited, Inc.

9          The company, the formation company that we have

10  used was somewhat confused about the special limited.  Of

11  course, limited is not almost the same as incorporated,

12  but they felt they needed to have an identical name.

13         As a consequence, the company was called Concept

14  Special Risks Limited, Inc.

15         That company, of course, has been inactive now

16  for some five, six years.

17     Q    Before COVID came into effect how much time did

18  you spend in the State of Florida as opposed to England?

19     A    Around twelve weeks a year.

20     Q    Did Concept Special Risks at the time of this

21  policy and in the preceding years actively solicit

22  business in Florida by attending various seminars, like

23  the Mariners seminar, the Fort Lauderdale Boat Show and

24  similar events?

25         MS. GOLDMAN:  Objection.

Page 13

1          THE WITNESS:  We certainly attended those

2  seminars.

3          I'm not sure that you would describe it as with

4  the purpose of procuring business.  It was more for

5  the purpose of meeting the brokers that we were

6  transacting business with already.

7          It would be fair to say it is the only

8  advertisement that we had because we were sponsors at

9  the Fort Lauderdale Mariners seminar.

10         As a consequence by virtue of being sponsors we

11  were granted an advertisement in their magazine.

12  BY MR. KELLEY:

13     Q    For how many years were you a sponsor for the

14  Mariners boat show program?

15     A    I believe we started sponsoring in around 2003 or

16  four, but I've been attending the seminar since 1993.

17     Q    The sponsorship has continued through this year's

18  seminar of 2021?

19     A    Yes.  We didn't attend.  We still sponsored.

20     Q    No one was able to attend this year?

21     A    I believe some people did.

22         There was an opportunity apparently to obtain

23  what was called an NIE certification, which was a national

24  interest exemption certification.

25         It would appear that the criteria that it was in

Beric Usher
November 19, 2021

**Page 14**

1 the Americans' national interest, not in our national
2 interest. As a consequence I was unable to obtain that
3 certification.
4     Q     Did anyone from CSR attend this year?
5     A     No.
6     Q     Let me show you a document we'll mark as Exhibit
7 27.
8           (The document was marked "Deposition Exhibit No.
9 27 for Identification.")
10 BY MR. KELLEY:
11    Q     Do you recognize that document?
12    A     Well, it's certainly one of our documents.
13    Q     Does it appear to be one of the pages out of the
14 CSR website which references the yacht club event?
15    A     Yes, it would appear to be.
16    Q     The CSR website states we have a strong presence
17 in both the Florida and Caribbean marketplaces?
18    A     That's correct.
19    Q     You mentioned that you do business through
20 brokers. Is that correct?
21    A     That's correct.
22    Q     And you only do business through brokers who have
23 been authorized to bind you?
24    A     Approved by us, yes, and there is an application
25 process whereby we secure their financial statement, their

**Page 15**

1 professional indemnity insurance, a copy of their surplus
2 lines license, and we provide them with what is referred
3 to as operating instructions which details exactly what
4 their position is in the chain of information; that they
5 are acting as the agent of the insured and not for either
6 Concept or Great Lakes.
7     Q     But any broker who does business or can do
8 business with CSR must have been approved by CSR and
9 signed the operating form that you submit to them?
10    A     That's correct.
11    Q     One of the brokers that you have done business
12 with over the years is the Kolisch marine Insurance Group?
13    A     Yes.
14    Q     How long have you done business with them?
15    A     Certainly since the '90s, mid '90s, I would say.
16 A long time.
17    Q     Approximately how many risks or vessels do you
18 think you would have insured with them, say, in the last
19 ten years?
20          MS. GOLDMAN: Objection.
21          THE WITNESS: I really don't have any idea other
22          than to say that Kolisch, which is a very small
23          brokerage house, I believe there's just Joe Kolish
24          and an assistant but there might be two, they're not
25          a big producer of business.

**Page 16**

1     A     I guess I would think maybe twenty policies a
2 year over a ten-year period, 200 policies. They're
3 not a major broker.
4 BY MR. KELLEY:
5     Q     Let me show you what we'll mark as Exhibit 28 to
6 your deposition.
7           (The document was marked "Deposition Exhibit No.
8 28 for Identification.")
9 BY MR. KELLEY:
10    Q     This is the CSR U.S. operating instructions
11 signed by Joe Kolisch on February 26th, 2015.
12          Are you familiar with that document?
13    A     Yes.
14    Q     This is the document that you would provide to
15 Mr. Kolisch to review and upon providing you with the
16 information you desired he would sign this, return it to
17 you and if it's acceptable you would then start doing
18 business with him?
19    A     That's correct.
20    Q     And part of the responsibilities of Mr. Kolisch
21 as a broker approved by you is to assist the assured in
22 the presentation of any claim and to assist your claims
23 department in communicating with the assured?
24    A     That's correct.
25    Q     You mentioned that this business is written

**Page 17**

1 through the Florida surplus lines program. Is that
2 correct?
3     A     That's correct.
4     Q     And how does the Florida surplus line program
5 work for CSR?
6     A     Well, because Great Lakes is an eligible surplus
7 lines insurer the only way we can transact our business
8 with Great Lakes and bind business on their behalf is in
9 the event that the broker has the appropriate surplus
10 lines license.
11          So all the brokers we deal with must have that
12 surplus lines license in order to export the business to
13 Great Lakes by the offices of Concept.
14    Q     As part of that surplus line program the Florida
15 taxes have to be paid on each policy that's issued?
16    A     That's correct. I understand in Florida it's
17 five percent.
18    Q     And that's one of the responsibilities that you
19 place on the broker is to ensure that tax is paid?
20    A     That's correct.
21    Q     Do you also have a business manual that is sent
22 to the brokers?
23    A     Yes.
24    Q     Do you have a copy of that manual?
25    A     Not with me.

Beric Usher
November 19, 2021

Page 18

1   Q   Can you get us a copy of that?

2   A   Yes.

3   Q   Thank you.

4       Have you used different forms of the application

5   for approval of producers or brokers over the years?

6   A   I don't believe there's been any material change.

7       The basic criteria if you look at the producer

8   application form, it's pretty much identical.

9       The only thing that has changed to some extent

10  are these U.S. operating instructions and only that really

11  to the extent that it has Concept Special Risks at the top

12  as opposed to Osprey Special Risks or T.L. Dallas Special

13  Risks.

14  Q   Let me show you a document that we'll mark as

15  Exhibit 29 and it's a CSR application for approval of a

16  different producer.  This one is for the Global Insurance

17  Brokers.

18      (The document was marked "Deposition Exhibit No.

19  29 for Identification.")

20  BY MR. KELLEY:

21  Q   Are you familiar with that company and that

22  application?

23  A   Well, I'm familiar with obviously the application

24  form.

25      I'm not immediately familiar with the one

Page 19

1   completed by Global Marine inasmuch as the content of the

2   percentages and so on.

3       But, yes, this is an application for approval of

4   a producer.

5   Q   How much work have you done with that Global

6   Marine Group?

7   A   Probably less than Kolisch.  It's much smaller.

8       MS. GOLDMAN:  Do you have a copy of Exhibit 29

9   for me?

10      MR. KELLEY:  Yes.

11  BY MR. KELLEY:

12  Q   The vessel that we're here today to discuss is

13  the "SHMILY".

14      Are you familiar with that risk?

15  A   Yes.

16  Q   And the "SHMILY" was a U.S. documented vessel?

17  A   I believe so, yes.

18  Q   Let me show you what we'll mark as Exhibit 30.

19      (The document was marked "Deposition Exhibit No.

20  30 for Identification.")

21  BY MR. KELLEY:

22  Q   Do you recognize that to be the certificate of

23  documentation for the "SHMILY"?

24  A   Yes, I believe so.

25  Q   And does that show the vessel is owned by and

Page 20

1   managed by Florida based owners AMI Kids, Inc.?

2   A   That's what I see.

3   Q   And does it also show that the home port, the

4   hailing port is in Florida?

5   A   Yes.

6   Q   Let me show you what we'll mark as Exhibit 31.

7       (The document was marked "Deposition Exhibit No.

8   31 for Identification.")

9   BY MR. KELLEY:

10  Q   Do you recognize that as the Florida registration

11  for the "SHMILY" vessel?

12  A   Yes.

13  Q   The vessel which we're discussing today was U.S.

14  documented, Florida registered based in Florida and was

15  expected to be navigating within the applicable waters of

16  the State of Florida?

17  A   Well, I think the navigational limits on the

18  policy allow the vessel to go up to 150 miles offshore.

19      It probably would have incorporated the Bahamas

20  as well.  Primarily Florida.

21  Q   How many depositions have you given over your

22  career?

23  A   A lot.  I was trying to work it out because I get

24  asked that question quite frequently.

25      I believe it's somewhere between 150 and 200.

Page 21

1   Q   How about trial testimony?

2   A   Nineteen.  That's easier to remember.

3   Q   How many of those would have occurred in the

4   State of Florida or with a case that was in Florida?

5       MS. GOLDMAN:  Objection.

6       THE WITNESS:  I would think the majority.  Twelve

7   maybe.

8   BY MR. KELLEY:

9   Q   And how about for the depositions?  Same sort of

10  percentage?

11  A   Roughly 50 percent.

12  Q   I usually do the introduction in depositions, but

13  you've been through a number of them and so you've done

14  beautifully and the court reporter much appreciates the

15  help you've given her.

16      Great Lakes, CSR's first involvement with this

17  vessel would have been with an outreach from Mr. Kolisch?

18  A   That's correct.

19  Q   Previously an e-mail from Mr. Kolisch to the

20  quote team at CSR was marked as Exhibit 3.

21      Are you familiar with this document?

22  A   Yes, I am.

23  Q   And what is that?

24  A   This is an application form that is being used by

25  Kolisch Marine Insurance and it provides very basic

Beric Usher
November 19, 2021

Page 22

1  information which is adequate for us to determine whether
2  the risk is an acceptable risk for the program and the
3  very basic information about the vessel which enables us
4  to provide an indication of what the terms would be.
5      Q    And at the bottom of the first page of that
6  application information is provided as follows.
7           "Have you ever been convicted of a felony or
8  DUI?"
9           Is that information you were interested in?
10     A    This is information we're interested in, but we
11  will not proceed to insure a policy unless they complete
12  our application information form with our specific
13  questions.
14     Q    Another question on this same document at the
15  bottom it is asking if you've had any driving violations
16  within the past three years.
17     A    Yes.
18     Q    Now let me show you a document which was
19  previously marked as Exhibit 3.  The application is
20  Exhibit 2.
21          Exhibit 3.  Do you recognize this as the CSR
22  application form?
23     A    Yes, it is the Concept Special Risks form.  The
24  top has been slightly cut off it would appear in the
25  photocopying process, but it says at the bottom CSR,

Page 23

1  slash, at /slash, one which is a CSR application form.
2      Q    The last page of that application form contains
3  another warning from CSR to any applicant that the Florida
4  law regarding misrepresentation to insurance companies is
5  a felony.  Is that correct?
6      A    That's correct.
7      Q    So if you had any Florida applicant who has
8  violated that Florida law, you would possibly prosecute
9  them?
10     A    No, we wouldn't prosecute them.
11     Q    But you could refer them to the appropriate
12  authorities for prosecution?
13     A    We could.
14     Q    In this particular case that warning would have
15  applied to Mr. Lassiter and to AMI Kids.  Is that correct?
16          MS. GOLDMAN:  Objection.
17          MR. McNEIL:  Objection.
18          THE WITNESS:  Yes.
19  BY MR. KELLEY:
20     Q    In the application there's a question that asks
21  whether the owner or the operator have presented any
22  losses in the past ten years.  Is that correct?
23     A    That's correct.
24     Q    Why do you limit it to ten years?
25     A    We just think that's reasonable.

Page 24

1      Q    Again you ask another question about whether any
2  insurance has been declined, cancelled or not renewed in
3  the last five years.
4           Why do you use that period?
5      A    Because we're trying to determine whether or not
6  there have been an active nonrenewal by a previous
7  insurer.
8      Q    Another question is whether the applicant or the
9  named operator has been convicted of a criminal offense or
10  pleaded no contest to a criminal action.  Is that correct?
11     A    That's correct.
12     Q    There's no limitation as to time on that.  Why is
13  that?
14     A    Because we're not interested in a limitation of
15  time on criminal convictions.
16     Q    Do you make any distinction between whether it's
17  a felony or misdemeanor?
18     A    Only inasmuch as it would determine what
19  additional premium we would charge.
20     Q    Do you make any distinction between whether it's
21  a felony or a parking offense?
22     A    A parking offense wouldn't be deemed material.  A
23  felony would.
24     Q    Do you make any distinction between the type of
25  offense, whether it is, say, a murder versus a parking

Page 25

1  violation?
2      A    Yes.  A parking violation as far as I'm concerned
3  would not be a criminal conviction so we're really driving
4  towards criminal convictions.
5           The nature of the criminal conviction would
6  determine whether we will proceed to write the business
7  and, if so, what premium we would charge for the business.
8           All criminal convictions are referred to me
9  personally.  I will then make a personal assessment and
10  determine how much additional premium I'm going to levy
11  based on the nature of the conviction and the time lapse
12  since the conviction.
13     Q    Have you ever been convicted or pled nolo
14  contendere to a criminal offense?
15     A    Yes.  I was convicted of a drunk driving charge
16  in 1997.
17     Q    Do you own a boat?
18     A    No.
19     Q    Have you ever owned a boat?
20     A    No.
21     Q    Has that DUI conviction affected your driving
22  rates in 2020?
23     A    They certainly initially affected my driving
24  insurance premiums for about fifteen years.
25     Q    Who evaluated these applications, Exhibits 2 and

Beric Usher
November 19, 2021

Page 26

1  3 to set a premium?
2      A    One of my underwriting team.  I don't immediately
3  recall who it was.
4           It would be shown on the quote document as to who
5  did the analysis.
6      Q    On Exhibit 4 Neil Burton shows as the sender of
7  the quotation.
8           What does that mean?
9      A    That means he's the person who prepared the
10 quotation based on the information presented to him as a
11 member of the quote team.
12     Q    And how would he go about making the quote?
13     A    We have internal rating guidelines as a surplus
14 line insurer.
15          So we provide them with guidelines as to how to
16 view the vessel, how to amend the basic rating matrix
17 which is built into our computer system.
18          So if you'd like to describe that, when you put
19 in the type of vessel and the value of the vessel, the
20 computer has a matrix in there that starts with a base
21 premium and then everything to do with the rating
22 structure, the location of the vessel, the age of the
23 vessel, the length of the vessel and all the other
24 determining factors are factors that change to correlate.
25     Q    Did you have any involvement with setting the

Page 27

1  premium for this particular risk?
2      A    No.
3      Q    Was anyone besides Neil Burton involved in
4  setting the premium for this risk?
5      A    No, probably not.
6      Q    Is Mr. Burton still working for CSR?
7      A    Yes.
8      Q    How long has he been there?
9      A    Twenty-four years.
10     Q    I'll show you a document that we'll mark as
11 Exhibit 32.
12          (The document was marked "Deposition Exhibit No.
13 32 for Identification.")
14 BY MR. KELLEY:
15     Q    Do you recognize that document?
16     A    Yes.  This is, again, an internal document that
17 is provided to our staff to give them guidance as to how
18 to approach a risk.
19          MR. McNEIL:  Is there a Bates number?
20          MR. KELLEY:  There is not.  You have it because
21     it's on your list.
22          MR. McNEIL:  What is the name of the document,
23     please?
24          MR. KELLEY:  Underwriting manual.
25          MR. McNEIL:  Okay.

Page 28

1          THE WITNESS:  Because Mr. Burton has been with
2     the company for twenty-four years I very much doubt
3     he found it necessary to refer to this document.
4          However, it's also used for training purposes
5     when we have newer staff members and provides
6     additional guidelines as to how to approach a risk
7     and when to a refer a risk.
8  BY MR. KELLEY:
9      Q    The particular guidelines that have been marked
10 as Exhibit 32, those were revised as of January 31, 2019
11 and would have been in effect at the time of taking on
12 this risk?
13     A    That's correct.
14     Q    Ultimately the risk selection and rating are left
15 up to the individual underwriter based on your current
16 rates and guides?
17     A    Providing there are no convictions, yes.
18     Q    Would you agree that there are two principle
19 aspects of any yacht risk, the vessel itself and the
20 owner-operator?
21     A    Yes.
22     Q    When you're looking at assessing the risks of the
23 owner or the operator do you look for patterns of
24 behavior?
25     A    Yes, certain kinds of behavior.  That's also why

Page 29

1  you're looking for the loss record to establish whether
2  there's any kind of loss activity.
3          So, yes, and a lot of it goes to the character of
4  the owner and/or the operators on the vessel.
5      Q    What's your understanding of any criminal action
6  involving Reynolds Lassiter?
7      A    My understanding was that he was convicted of a
8  domestic violence offense in 2005.
9      Q    That would have been more than fifteen years
10 before the application for this vessel.  Correct?
11     A    Yes.
12     Q    Are you aware of any criminal activity of any
13 nature involving Mr. Lassiter since that 2005 incident in
14 a Seattle airport?
15     A    I don't believe so, no.
16     Q    Do you have any DUIs or any offenses since your
17 1999 conviction?
18     A    No.
19     Q    Would you agree with me that spanking a daughter
20 in public is a bad thing, but it does not effect the
21 ability of someone to be a yacht owner fifteen years
22 later?
23          MS. GOLDMAN:  Objection.
24          THE WITNESS:  I believe that it is material
25     because it shows an anger issue, a loss of temper.

Beric Usher
November 19, 2021

Page 30

BY MR. KELLEY:

1
2    Q   And if there is no other incident for more than
3 fifteen years, you'd still consider that a relevant
4 consideration?
5    A   Yes.
6    Q   You would apply the same standard to yourself?
7    A   Yes.
8    Q   Did you give any -- well, you didn't do the
9 premium.
10       If that box had been marked yes, what was Mr.
11 Burton supposed to do?
12    A   Refer it to me.
13    Q   And if you saw the box was marked yes, what would
14 you have done?
15    A   I would have said what is the base premium we
16 would charge and then determine what additional premium to
17 log on to it.
18    Q   Would you have asked what the offense was, when
19 the offense was?
20    A   Frequently we ask for more details.
21    Q   But you assessed a higher premium before even
22 getting the answer to the question?
23    A   If it just said yes, we would say what was the
24 offense and when was the offense.
25    Q   In your guidelines you talk about owner-operator

Page 31

1 acceptability.  Is that correct?
2    A   Yes.
3    Q   And in the guidelines it says there's a question
4 of what's a material fact.  You look for patterns of
5 behavior.  Correct?
6    A   Yes.
7    Q   Mr. Lassiter's was in 2005 and nothing since
8 then.
9       Is there a pattern?
10    A   No.
11    Q   The other things you look at is a conviction
12 involving dishonesty.  Isn't that important?
13    A   Yes, that's important to us.
14    Q   Do you see any dishonesty element of a spanking
15 incident?
16    A   No.
17    Q   You also agree that in looking to take on risk
18 you don't want anyone with drug and alcohol convictions.
19 Correct?
20    A   That's correct.
21    Q   Unless there are extenuating circumstances then
22 you might consider something else?
23    A   Yes, and frequently do.
24       We've had numerous applicants that have either at
25 the point of application or at the point of binding

Page 32

1 subsequent to the application disclosed a DUI and the
2 result is I would look again when the offense occurred,
3 including frequently the age of the individual when the
4 offense occurred and then determine what additional
5 premium I would charge, but there would always be an
6 additional premium.
7    Q   You look at the past loss records of boats as
8 well as the operators?
9    A   Yes.  I mean, obviously we don't ask questions
10 about previous incidents on a vessel, for example, if it's
11 a secondhand vessel.
12       We're not asking questions about the previous
13 owner on that vessel.  We're asking for the information
14 about the applicant.  He's making application for
15 insurance with us so we are interested in any losses he
16 has had on either this vessel or any previous vessels.
17    Q   And, again, aren't you seeking patterns of
18 behavior and losses?
19    A   That's part of it.  That would determine
20 acceptability of the risk in its entirety.
21       If, for example, an insured has suffered two or
22 three groundings, even if they were minor, then we
23 probably would not want the risk at all because the next
24 grounding may be major.
25       If, however, he has just had losses of maybe he

Page 33

1 had a lightning strike and a fire loss or a submerged
2 object and a minor collision.  They're still losses so it
3 would still affect his premium.  It just means that it
4 does not preclude it from a level of acceptability.
5    Q   When you look at that do you consider whether one
6 incident is unfortunate or one off, whereas two maybe look
7 like something of a pattern?
8    A   Yes.
9    Q   Ultimately do you sign all the policies that are
10 issued through CSR?
11    A   Either myself or Leon Gilhooly, G-i-l-h-o-o-l-y.
12       We are the only two people authorized to sign
13 policies on behalf of Great Lakes.
14    Q   I'll refer you to Exhibit 4, the quotation, Page
15 2 and can you tell us what warranties were placed in the
16 quotation?
17    A   Warranty that a professional licensed captain
18 must be on board whenever the vessel is navigating, and
19 warranty that the scheduled vessel is not to navigate
20 south of the Tropic of Cancer from July 1st to November
21 the 1st.
22    Q   Let me show you now what is marked as Exhibit 10
23 to this litigation.
24       Do you recognize that document?
25    A   Yes.

Beric Usher
November 19, 2021

Page 34

1  Q   What is that document?
2  A   This is the policy documents that was issued by
3  Concept Special risks, albeit there appears to be some
4  pages missing at the back which would be the claims
5  handling advice and the treating customers fairly
6  statement.
7      This is the policy as regards coverage.
8  Q   Who signed that policy for CSR?
9  A   I did.
10 Q   Mr. Lassiter with an address in North Carolina is
11 the assured under the policy?
12 A   That's correct.
13 Q   And AMI Kids at St. Petersburg, Florida is added
14 as both an additional insured and the loss payee?
15 A   That's correct.
16 Q   And the navigation you mentioned earlier, east
17 coast U.S.A., Florida and the Bahamas not to exceed 150
18 miles offshore?
19 A   That's correct.
20 Q   What are the warranties that were actually put on
21 this particular policy?
22 A   Warranty that a professional licensed captain
23 must be on board whenever the vessel is navigating.
24     Warranty that the scheduled vessel is not to
25 navigate south of the Tropic of Cancer from July 1st to

Page 35

1  November 1st, and warranty that all surveyor's
2  recommendations are complied with prior to operation of
3  the scheduled vessel.
4  Q   Page 17 of the policy contains a choice of form
5  clause which requires any dispute between the parties to
6  be in the Federal courts in the United States and the
7  district court where either the assured resides or the
8  assured's broker resides.  Is that correct?
9  A   Is that for assist and service?
10 Q   No.  That's for any litigation must be in the
11 United States District Court in Florida for a Florida
12 assured or broker.
13 A   Yes.  There is a choice, is there not?
14 Q   That's another question.
15     Let me show you another document that we'll mark
16 as Exhibit 33.
17     (The document was marked "Deposition Exhibit No.
18 33 for Identification.")
19 BY MR. KELLEY:
20 Q   This document is from Kolisch Marine Insurance.
21 It is AMI Kids 1082114.
22     Do you recognize that document?
23 A   Well, AMI Kids 108?  No, I'm not familiar.
24     This would have been a Kolisch Marine Insurance
25 document.

Page 36

1      The subsequent pages 1019 through 114 I am
2  familiar with as they were ours.
3  Q   Referring to the first page of Exhibit 33 that
4  would show that this insurance was issued pursuant to the
5  Florida Surplus Lines Law?
6  A   I believe so, yes.
7  Q   It would also show the premium that was set by
8  CSR?
9  A   Yes.
10 Q   Included with the charges for the premium are the
11 Florida surplus lines taxes, fees and the Hurricane Cat
12 Fund?
13 A   Yes.  The Cat Fund is not applicable.
14 Q   Let me show you a document that we'll mark as
15 Exhibit 34.  This does not have any Bates stamps.  It is
16 the Concept Special Risks rating guide.
17     (The document was marked "Deposition Exhibit No.
18 34 for Identification.")
19 BY MR. KELLEY:
20 Q   Are you familiar with that document?
21 A   Yes.
22 Q   Explain the purpose of that document?
23 A   It's providing again, as I mentioned earlier,
24 these are our base rates as a surplus lines insurer, and
25 the insurer is entitled to charge whatever rate he

Page 37

1  believes is appropriate.
2      However, this is a guideline that is provided to
3  the people in my office, and, again, going back to my
4  earlier testimony, we have a base rate that is built
5  within the computer that is then moderated depending upon
6  its location, its age and so.
7  Q   What was the applicable base rate for this
8  vessel?
9  A   I have no idea.  It's a matrix in the computer.
10 Q   The facts that went into calculating the premium
11 for this vessel would have included the length, which is
12 over 50 feet?
13 A   Yes.
14 Q   Another factor to include would be the age of the
15 vessel, which was in that sixteen to twenty-year range?
16 A   Correct.
17 Q   You have an age loading for a certain age vessel?
18 A   That's correct.
19 Q   You also consider the location that this would be
20 gulf coast U.S.A. and Florida?
21 A   Yes.
22 Q   Going through this rating guide I don't see
23 anywhere in it a reference to a criminal conviction of any
24 kind.
25 A   No, because criminal convictions are referred to

Beric Usher
November 19, 2021

Page 38

1  me personally.
2      Q     Let me show you another document which is Concept
3  Special Risks' underwriting rate sheet.
4          MR. KELLEY:  We'll mark this as Exhibit 35.
5          (The document was marked "Deposition Exhibit No.
6  35 for Identification.")
7  BY MR. KELLEY:
8      Q     The first page of which is Lassiter 5.  Are you
9  familiar with this document?
10     A     Yes.  This is, again, an internal document.
11         This is placed on the computer so that in the
12  event of the underwriter who established the rate and
13  calculated the premium was away from the office and an
14  amendment was required or whatever, it gives guidance to
15  any subsequent person looking at the file as to how the
16  risk was originally rated.
17     Q     And the navigation for this individual was gulf
18  coast U.S.A. and Florida?
19     A     That's correct.
20     Q     The rating adjustments include a number of items,
21  some of which we discussed:  The navigation, age, fuel,
22  speed, variable charter, vessel construction and those
23  items listed on Page 2.  Correct?
24     A     Correct.
25     Q     Is any criminal conviction in there?

Page 39

1      A     No, because all criminal convictions are referred
2  to me personally.
3      Q     Has that always been the case?
4      A     Yes.
5      Q     Have you reviewed the underwriting rate sheet for
6  this particular risk?
7      A     Yes, I probably glanced at it.
8      Q     So was the premium properly set based on the
9  information that was submitted?
10     A     Based on the information submitted, yes.
11     Q     If you had been advised that Mr. Lassiter had
12  pled guilty to a fourth degree misdemeanor involving a
13  public spanking of a daughter more than fifteen years
14  before he was applying to have insurance for this vessel
15  which was to be operated by an experienced and licensed
16  master mariner, what, if any, premium change would you
17  have suggested?
18     A     Probably would have been the normal, 350, maybe
19  $500.
20     Q     Why would you have made that change in premium?
21     A     Because there was a conviction and because I
22  always charge an additional premium in the event of a
23  conviction.
24         I then establish how long ago the conviction was,
25  the seriousness of the conviction to determine how much

Page 40

1  I'm going to charge unless the conviction was so severe
2  that I do not wish to proceed.
3      Q     Do you take into consideration in your analysis
4  of claims whether something is inadvertent nondisclosure?
5      A     No, I don't believe so.  In claims, no, I don't
6  believe so.
7      Q     Did you have any involvement in evaluating this
8  claim before it was denied?
9      A     No, not before it was denied.  That would have
10  been handled between my claims team and Great Lakes.
11     Q     When did you first become involved in this claim?
12     A     The moment the declaratory action was filed.
13     Q     Did you approve the filing of the declaratory
14  action?
15     A     It was based upon legal opinion and had been
16  approved by Great Lakes.
17         My only reason for involvement at that stage is
18  because I am virtually always to be the corporate
19  representative.
20     Q     Now, you understand the original complaint in
21  this action did not mention this criminal conviction.  Is
22  that correct?
23     A     That's correct.
24     Q     Did you approve the filing of the amended
25  complaint to include the criminal conviction as a basis

Page 41

1  for denial?
2      A     Yes.
3      Q     Did you take into consideration that any
4  nondisclosure was inadvertent, unintentional and involved
5  something that was more than fifteen years earlier?
6          MS. GOLDMAN:  Objection.
7          THE WITNESS:  No.
8  BY MR. KELLEY:
9      Q     Let me show you a document that we'll mark as
10  Exhibit 36.
11         MS. GOLDMAN:  I think you're on 35.  Pardon me.
12         MR. KELLEY:  Thirty-five should be the rate
13     sheet.
14         (The document was marked "Deposition Exhibit No.
15  36 for Identification.")
16  BY MR. KELLEY:
17     Q     This is a CSR rating form for another vessel.
18         I'm going to ask you.  This is a different form.
19  Are you familiar with that form?
20     A     Probably just a new form that we're using.  I
21  notice this is dated April 2021.
22         The system is constantly being updated and so on
23  and somebody obviously decided to do some artwork.  A very
24  similar document.
25     Q     Is there anywhere on this document the mention of

Eric Usher
November 19, 2021

Page 42

1  a criminal conviction?
2      A    No, because the underwriter using this document
3  would not be authorized to write a risk where a criminal
4  conviction had been exposed.
5          It would be referred to me personally.
6          MR. KELLEY:  We've been going a little over an
7      hour.  If you want to take a break for any reason,
8      I'm happy to do it or if you want to keep going, I'll
9      just give you the opportunity.
10         THE WITNESS:  Ten minutes would be good.
11         MR. KELLEY:  You got it.
12             (A brief recess was taken.)
13  BY MR. KELLEY:
14     Q    This policy was delivered to Kolisch Marine?
15     A    That's correct.
16     Q    Where did the grounding and sinking occur?
17     A    Marco Island, I believe, in Florida.
18     Q    Insofar as you are concerned was the grounding
19  and sinking a fortuitous event?
20         MS. GOLDMAN:  Objection.
21         THE WITNESS:  I believe so, yes.
22  BY MR. KELLEY:
23     Q    Insofar as you're concerned but for the defenses
24  alleged regarding breach of warranty and misrepresentation
25  the grounding and sinking and related damages would be

Page 43

1  covered under the policy?
2          MS. GOLDMAN:  Objection.
3          THE WITNESS:  Yes.
4  BY MR. KELLEY:
5      Q    And those items which would be covered under the
6  policy but for those defenses are the agreed value of the
7  vessel of $815,000, the salvage of $90,000 and the
8  mitigation and similar charges?
9      A    That's correct.  I think less the policy
10  deductible.
11     Q    The deductible would not apply to the agreed
12  value, but only to the other items?
13     A    That's correct.
14     Q    Is it your understanding that Captain Norman
15  Russick was a professional and licensed captain?
16     A    Yes.
17     Q    Is it also your understanding that Captain Norman
18  Russick was aboard the vessel while it was navigating at
19  the time of the grounding?
20     A    That's correct.
21     Q    Did Great Lakes receive timely notice of the
22  loss?
23     A    Yes.
24     Q    Did Great Lakes appoint an adjuster/surveyor from
25  Sedgwick to adjust the claim?

Page 44

1      A    Yes.
2      Q    Did Mr. Boulon appoint a quality marine
3  consultant, particularly Michael Grant to conduct an
4  investigation on their behalf?
5      A    Yes.  He prepared the field survey.
6      Q    Michael Grant was acting on behalf of CSR and
7  Great Lakes?
8      A    Ultimately, yes.  He was contracted by Sedgwick.
9      Q    Mr. Grant's reports were provided to CSR?
10     A    Yes.
11     Q    Let me show you a document we'll mark as Exhibit
12  37.  It does not have Bates stamps, but it's the Quality
13  Marine Consulting Michael Grant preliminary survey report
14  of February 18th, 2021.
15             (The document was marked "Deposition Exhibit No.
16  37 for Identification.")
17  BY MR. KELLEY:
18     Q    Do you recognize that document?
19     A    Yes.  This was provided to us by the offices of
20  Sedgwick.
21     Q    I'd like to direct your attention to Page 7 of
22  that report.
23             According to Mr. Grant's report, which was
24  provided to you, he met with Captain Norman Russick on
25  February 10th, 2021?

Page 45

1      A    That's correct.
2      Q    At the time Mr. Grant met with Captain Russick he
3  interviewed him about what happened at the time of the
4  accident.  Is that correct?
5      A    That's correct.
6      Q    Did Captain Norman Russick tell Mr. Grant that he
7  was acting as master with Captain Mike Kutner at the helm
8  at the time of the grounding?
9      A    That's correct.
10     Q    Do you agree that Captain Norman Russick was
11  acting as the master at the time of the grounding?
12     A    That's correct.
13     Q    If you'd go to Page 8 of that same report, Mr.
14  Grant reported to Mr. Boulon and to CSR that Captain
15  Norman Russick, a USCG 200 ton master license holder was
16  acting as the master and paid crew member and that Captain
17  Michael Kutner, USCG 100 ton master license holder was
18  acting as the helmsman for the captain.
19     A    Yes.
20     Q    Do you agree with those facts?
21     A    I do.
22     Q    Would you also agree that having Captain Norman
23  Russick aboard the vessel acting as captain at the time
24  the vessel was navigating and grounded complied with the
25  additional warranty specifically mentioned on Page 2 of

Eric Usher
November 19, 2021

Page 46

1  the policy, Lassiter 4?
2      A    Yes.
3      Q    Has Mr. Russick ever been an approved operator
4  for any other vessel?
5          MS. GOLDMAN:  Objection.
6          THE WITNESS:  I wouldn't know.
7  BY MR. KELLEY:
8      Q    Has Michael Kutner been an approved operator for
9  any other vessel for CSR?
10         MS. GOLDMAN:  Objection.
11         THE WITNESS:  I wouldn't know.
12 BY MR. KELLEY:
13     Q    Have you reviewed Mr. Kutner's resume?
14     A    Yes.
15     Q    Based on your review of his resume and his
16 mariner's license would he be an approved operator of this
17 vessel?
18     A    If it had been requested, then we would have
19 asked for him to complete an operator's form.
20         His qualifications were certainly adequate.  We
21 would have gone on to ask background information as to
22 whether he had been involved in a loss in the previous
23 five years and whether he had ever been convicted of a
24 criminal offense.
25         If the answers to both of those questions had

Page 47

1  been no, then we almost certainly would have approved him,
2  but we weren't given the opportunity to ask those
3  questions.
4      Q    As of February 10th CSR either directly or
5  through its agents Michael Grant and Revel Boulon knew
6  that Captain Michael Kutner was at the helm under the
7  direction of Captain Norman Russick.  Is that correct?
8          MS. GOLDMAN:  Objection.
9          THE WITNESS:  That's correct.
10         MS. GOLDMAN:  Objection to characterizing them as
11     agents.
12 BY MR. KELLEY:
13     Q    Did anyone from or on behalf of CSR inform Mr.
14 Kolisch, Mr. Lassiter, AMI Kids that CSR would not
15 consider that to be within any warranty in the policy and
16 that a request for retroactive approval should have been
17 submitted within seven days of the grounding?
18     A    No.  We highlighted that we had noticed that the
19 person at the helm was not a named operator because the
20 policy only had one named operator.
21     Q    A reservation of rights letter was ultimately
22 issued by Mr. Boulon.  Correct?
23     A    That's correct.
24     Q    And that reservation of rights letter was issued
25 on February 21, 2021?

Page 48

1      A    That's correct.
2      Q    So at the time that the letter was issued it
3  would have been more than seven days after the grounding.
4  Correct?
5      A    Correct.
6      Q    So why was it that no one informed the insured
7  that CSR would be taking the position that a retroactive
8  application would be required?
9      A    On the application form we make a warning that
10 this is a named operator policy, and both within the
11 policy form itself and within the claims handling
12 procedures there are a number of FAQs that specifically
13 state that this is a named operator policy, and one of the
14 FAQ proposed questions is can anyone else operate this
15 vessel.  We specifically tell them not without our
16 specific approval.
17     Q    But the policy also includes the ability for a
18 retroactive application within seven days of it happening.
19 Correct?
20     A    Yes.
21     Q    Why didn't CSR ask if they wanted a retroactive
22 application of approval of that named operator if CSR was
23 going to require a different interpretation than the
24 insured as to what met the requirements of your named
25 operator provision?

Page 49

1      A    Why anyone would have a different interpretation
2  of a named operator?  The policy specifically states that
3  there is one named operator.
4      Q    Why do you believe Captain Norman Russick was not
5  the operator of this vessel at the time since he was the
6  captain in command?
7      A    We provide a definition of operation within the
8  policy language which states that you must be in physical
9  control of the vessel and at the helm to be operating the
10 vessel.
11     Q    Do you acknowledge that there is an inconsistency
12 between the warranty on the policy Page 2 which refers to
13 the captain being aboard the vessel whenever navigating?
14     A    I don't think there's an inconsistency.
15         What that allows is in the event that it's not
16 the owner to be named as the operator or if there's
17 another operator who's been requested for approval, that
18 we would still maintain that the captain had to be on
19 board at all times to supervise any other operator.
20     Q    And you acknowledge that the captain was aboard
21 and supervising Mr. Kutner at the time of this grounding?
22     A    Yes.  He just wasn't operating the vessel.
23     Q    Are you familiar with what was previously marked
24 as Exhibit 18?  It's Mr. Boulon's report dated February
25 22, 2021.

Beric Usher
November 19, 2021

Page 50

1    A    I'm almost certain I am, but I don't have a
2  photographic memory, of course.
3    Q    On Page 4 of 8 of the report Mr. Boulon reports
4  to you that Captain Russick was present on the bridge
5  while the vessel was navigating the channel.
6    A    Yes.
7    Q    Did Mr. Boulon ever tell you that in his opinion
8  the vessel complied with the named operator requirement by
9  virtue of Captain Russick being on the bridge and in
10  control with Mr. Kutner at the helm?
11       MS. GOLDMAN:  Objection.
12       THE WITNESS:  I don't believe he did say that,
13  no.
14  BY MR. KELLEY:
15    Q    Mr. Russick has made that statement in this case.
16  Do you have any reason to doubt his statement?
17    A    I have no reason to doubt the veracity of his
18  statement.
19       That doesn't say I agree with his statement that
20  Captain Norman Russick was operating the vessel at the
21  time of the incident.
22    Q    As part of the claims process does your adjuster
23  Mr. Boulon make the reserve recommendation to you for the
24  potential exposure of the claim?
25    A    Yes.

Page 51

1    Q    In his report, Exhibit 20, did he on Page 2 give
2  you an assessment of the loss consisting of the declared
3  value, the salvage costs, the mitigation and similar costs
4  less the deductible?
5    A    Yes.
6    Q    What was that overall exposure?
7    A    870,000 estimate.
8    Q    Now I'll show you what we will mark as the next
9  exhibit.
10       (The document was marked "Deposition Exhibit No.
11  38 for Identification.")
12  BY MR. KELLEY:
13    Q    Do you recognize that document?
14    A    Yes.  This appears to be the internal claims
15  manual.
16       This would have also been provided to Great Lakes
17  for their overview.
18    Q    Who prepared the claims manual?
19    A    Most certainly Mr. Mark Thomas, who's my claims
20  director in concert with Sara Lacey Simms, who is his
21  assistant.
22    Q    Who prepared the underwriting manual?
23    A    I prepared it in conjunction with a chap called
24  Nick Brown, who is no longer with the company.
25    Q    Going through the claims manual is it CSR's or

Page 52

1  Great Lakes' policy to make payment within thirty days of
2  an agreement?
3    A    Yes, once the claim has been agreed it's normally
4  quicker than that.
5       MR. McNEIL:  Allan, have you marked this as an
6  exhibit yet?
7       MR. KELLEY:  Yes, I did.  Thirty-eight.
8       MR. McNEIL:  Thank you.
9  BY MR. KELLEY:
10    Q    Would you agree that the policy wording for this
11  particular policy is an all risks policy?
12    A    All risks with exclusions, yes.
13    Q    So any accident of fortuity which was unforeseen
14  or unexpected would be considered accidental and covered?
15    A    That's correct.
16    Q    And for any claim the initial burden is on the
17  assured to demonstrate that this was an accidental loss.
18  Is that correct?
19    A    That's correct.
20    Q    In this case the insured presented a claim that
21  showed it was an accidental loss and would be covered
22  under the policy?
23    A    That's correct.
24    Q    Once that has been done then according to your
25  claims policy you either accept the claim or try to show

Page 53

1  that the loss is excluded?
2    A    Yes.  We determine effectively if there is any
3  impediment to proceeding to pay the claim.
4       If we discover issues which give rise to
5  coverage, then the matter would have been referred to
6  Great Lakes.  The claims person at Great Lakes is a
7  gentleman called Steven Sensibar.
8    Q    With a V or a p-h?
9    A    With a V.
10    Q    Sensibar the court reporter may need help with
11  that.
12    A    S-e-n-s-i-b-a-r.
13       So because of the issues related to the claim and
14  the content of the claim then we would approach Great
15  Lakes highlighting the issues as we saw them and asking if
16  they approved us to seek a legal opinion.
17    Q    So you received a valid claim and then you look
18  to determine if there's a way to exclude the claim or if
19  there's a breach of any condition of the policy and that
20  was done here.
21       MS. GOLDMAN:  Objection.
22  BY MR. KELLEY:
23    Q    Is that correct?
24    A    That's not the way I would phrase it.
25       We establish if there is any reason why the claim

Eric Usher
November 19, 2021

Page 54

1  may not be paid.
2       Q    You've identified several grounds for rejecting
3  the claim.
4            Did any of those grounds cause the grounding and
5  sinking?
6       A    No.
7       Q    Did any of the grounds for which denied the claim
8  contribute to the cause of the grounding and sinking and
9  loss in this case?
10           MS. GOLDMAN:  Objection.
11           THE WITNESS:  I don't believe so.
12           I'm not going to argue that an unnamed operator
13           was sufficiently unqualified so as to have caused the
14           grounding.
15           It was co-negligence, but at the end of the day
16           if the issue is that he was not a named operator, not
17           that he was completely incompetent.
18  BY MR. KELLEY:
19       Q    Pages 7 and 8 of the claims manual discusses the
20  applicable law for your claims and you identify that as
21  the Federal admiralty law.  Is that correct?
22       A    That's correct.
23       Q    Go to Page 9, misrepresentations, nondisclosures.
24           The second from the last paragraph doesn't it say
25  the policy is, I'll quote, "Where it has been shown that

Page 55

1  there was no intention to mislead, this may be a
2  mitigating factor"?
3       A    Yes.
4       Q    Has that been considered at all in this case with
5  respect to any of the basses for denial?
6            MS. GOLDMAN:  Objection.
7            THE WITNESS:  I think it's fair to say that
8            because of ex gratia we do have an option of a
9            without prejudice settlement.
10           So in the event that there was one minor
11           infraction, then we may well have suggested to Great
12           Lakes that they consider without a prejudice
13           settlement.
14  BY MR. KELLEY:
15       Q    In this case you have filed an action to have the
16  policy declared void and cancelled from the inception.
17  Correct?
18       A    That's correct.
19       Q    Now, when that's the case, is all premium to be
20  returned to the insured?
21       A    Yes.
22       Q    Has the premium been returned to the assured in
23  this case?
24       A    I don't know.
25       Q    The claims manual on Page 13 says CSR's authority

Page 56

1  from Great Lakes is up $350,000.
2            Is that true for this one?
3       A    Yes.
4       Q    So above 350 Great Lakes itself must approve any
5  payment?
6       A    That's correct.
7       Q    Does CSR have any other policies with AMI Kids?
8            MS. GOLDMAN:  Objection.
9            THE WITNESS:  I'm not aware of any.
10  BY MR. KELLEY:
11       Q    Would you agree that any declination of coverage
12  for nondisclosure of a fact or circumstance must be
13  material to acceptance or continuation of the insurance?
14       A    Yes.
15       Q    Do you agree that CSR and Great Lakes agreed to
16  insure the vessel without certain survey items having been
17  completed?
18           MS. GOLDMAN:  Objection.
19           THE WITNESS:  The form we require, which is
20           referred to as a letter of compliance form, allows
21           the insured to veto any recommendations that have not
22           yet been complied with, and if we are satisfied we
23           proceed to insure the vessel without those specific
24           recommendations being complied with, then we will
25           proceed or we will respond and say all those

Page 57

1  reconciliations those must be complied with prior to
2  the vessel operation.
3  BY MR. KELLEY:
4       Q    And in this case you received the Volney survey
5  which did list the condition of the vessel and made
6  certain recommendations?
7       A    Yes.
8       Q    And you also received that list of survey items
9  from the assured?
10      A    That's correct.
11      Q    And with those two items you agreed to insure the
12  vessel, but with a warranty that the items would be
13  repaired before the vessel had --
14      A    That's correct.
15      Q    CSR issued first a quote which you discussed
16  earlier.  Then there was a temporary binder which was
17  issued to be effective for thirty days?
18      A    Correct.
19      Q    And thereafter the policy was issued?
20      A    That's correct.
21      Q    And the policy terms and conditions should have
22  been the same in all three of those documents?
23      A    That's correct.
24      Q    Has CSR regularly used Nautilus Investigations to
25  conduct background investigations after a loss has

Eric Usher
November 19, 2021

Page 58

1  occurred?
2      A    Yes.
3          MR. KELLEY:  Off the record.
4          (Discussion had off the record.)
5          MR. KELLEY:  That's all I have at this time, if
6  anybody else has any.
7          MR. McNEIL:  Mr. Usher, do you want to take a
8  ten-minute break?
9          THE WITNESS:  That sounds very attractive, yes.
10         MR. McNEIL:  Let's do that.
11              CROSS EXAMINATION
12 BY MR. McNEIL:
13     Q    Mr. Usher, my name is Adam McNeil, I'm an
14 attorney for AMI Kids, the additional insured under the
15 policy.
16          I have a few follow-up questions to some
17 questions that were raised by Mr. Kelley and then I'll
18 have another set of questions so if it seems like I'm
19 jumping around, I apologize in advance.
20          I think he's given you previous instructions.  I
21 know you've given many depositions, but I'll just caution
22 you that if at any time you don't understand my question,
23 please ask me to rephrase it and I'll be happy to do so.
24          Also it's important for us to finish before
25 speaking so please let me finish my question before you

Page 59

1  start to answer even if you know what that question is
2  going to be and, likewise, I'm going to allow you to
3  finish your answer before moving on to the next question.
4  Fair enough?
5      A    Yes, sir.
6      Q    So we heard you testify today about denial of
7  reservation of rights, denial of coverage under the
8  policy.
9          Can you outline for me very briefly what are the
10 reasons that Great Lakes is contesting coverage under the
11 policy?
12     A    There is a breach of warranty as regards to named
13 operator.
14          There is a breach of warranty as regards to the
15 compliance with certain recommendations and there is a
16 nondisclosure of a criminal conviction.
17     Q    Are those the only reasons?
18     A    I believe so, yes.
19     Q    Named operator I get.  Nondisclosure I get.
20          What are the items that Great Lakes is
21 maintaining were not performed in the survey that are
22 prohibiting coverage?
23     A    There are a list of items that were not complied
24 with according to the field survey and indeed the document
25 is already entered as an exhibit.

Page 60

1          One of the principle ones, of course, is the fire
2  extinguisher and fire suppressant systems where there is a
3  specific warranty in the policy language that states that
4  it is warranted that these fire suppressant systems are
5  checked, weighed and tagged annually in accordance with
6  ABYC regulations and U.S. Coast Guard regulation.
7      Q    Any other recommended survey items that had not
8  been carried out?
9      A    There were some listed.  I cannot immediately
10 recall all the items listed by Michael Grant and referred
11 to by Revel Boulon of Sedgwick.
12         MR. McNEIL:  Allan, if you can show Mr. Usher the
13 Michael Grant survey that you referenced earlier
14 today.  And, I apologize, I forget which exhibit is
15 that we marked?
16         MR. KELLEY:  We had two surveys.  Which one do
17 you want?
18         One is Exhibit 17, which is the March 4th one,
19 and then I had one which was the earlier survey.  I
20 think you're looking for Exhibit 17.
21         MR. McNEIL:  I think that's right.  Would you
22 mind showing that to him?
23 BY MR. McNEIL:
24     Q    Mr. Usher, if would you take a few moments to
25 familiarize yourself with Exhibit 17, the Michael Grant

Page 61

1  survey and if you could tell me very briefly or recite for
2  the record what are the items that you are maintaining
3  were not performed for which you're basing your denial of
4  coverage?
5      A    They start on Page 7, and what Mr. Grant has done
6  is gone through the list of recommendations contained
7  within the survey provided to us by the surveyor.
8      Q    The Volney survey?
9      A    So what Michael Grant has done is gone through
10 the surveyor's recommendations and determined which ones
11 had been done, which ones it was unclear whether they had
12 been done and which ones had not been done.
13     Q    Okay.  And if I can get you to review this list,
14 can you tell me which of those items for which Great Lakes
15 is basing its denial of coverage on?
16     A    The primary one is the fire extinguishers.
17     Q    Is that --
18     A    I'm sorry.  And the fire suppressant systems.
19     Q    What page are the fire extinguishers and fire
20 suppression systems noted on the survey that you're
21 looking at, which is Exhibit 17?
22     A    It was the emergency fire pump, which was
23 recommendation number eighteen.  It appears to have not
24 been complied with.
25     Q    Okay.

Eric Usher
November 19, 2021

Page 62

1    A    And the recommendation number twelve, which was
2  where the surveyor had noted that the tags were out of
3  date and suggested that they should be checked, weighed
4  and currently tagged.
5    Q    Okay.
6    A    There were other more minor recommendations.
7        For example, there was a portside stabilizer leak
8  and it appeared to still be leaking.
9    Q    And which number is that?
10   A    That is number eight.
11   Q    Okay.
12   A    And there was a recommendation to have five more
13 CO2 detectors and according to the onsite survey there
14 were none sighted.
15   Q    Okay.
16   A    I believe this is better analyzed by Revel
17 Boulon.
18       This is literally the field surveyor's comments.
19   Q    Right.  My question to you is of these items that
20 we're speaking about today, the ones you just listed,
21 which of those survey items which you contend were not
22 completed is Great Lakes basing its denial of coverage on?
23   A    Primarily the fire extinguisher systems,
24 including the fire extinguisher system and the fire alarm.
25   Q    So that would be recommendation number twelve and

Page 63

1  number eighteen?
2    A    Yes, I believe so.
3    Q    Okay.  Any other bases for denial of coverage as
4  they relate to survey items that were not completed?
5    A    Those are the warranty in the policy whereby
6  there was a warranty that all surveyor recommendations are
7  complied with prior to navigation of the vessel.  Then
8  arguably any one of those could be deemed breach of
9  warranty.
10       However, we would not take an unreasonable
11 position in the event that it was deemed to be a cosmetic
12 issue.
13   Q    Okay.  So as we sit here today is it your
14 testimony that the denial of coverage as it relates to the
15 survey items that were outstanding are only items number
16 twelve and number eighteen?
17       MS. GOLDMAN:  Objection.  You have his responses
18 to interrogatories as well.
19       MR. McNEIL:  I do not.
20       MS. GOLDMAN:  You mean not as an exhibit or you
21 never received them?
22       MR. McNEIL:  I propounded discovery, but it
23 hasn't been responded to.
24       MS. GOLDMAN:  I see.  Sorry.  Responses to
25 Lassiter's discovery.

Page 64

1        MR. McNEIL:  All right.
2  BY MR. McNEIL:
3    Q    But, Mr. Usher, you can still answer.
4    A    Sure.  As far as I'm concerned I believe that the
5  principle, the most important item is the fire suppressant
6  purely simply because there's a specific warranty within
7  the policy language.
8        So there are effectively two breaches as regards
9  the fire extinguishers.  One the breach of the expressed
10 warranty in the policy language and the other being the
11 general warranty that all the recommendations were
12 complied with prior to the navigation of the vessel.
13   Q    So --
14   A    And I find it unlikely that if there had been one
15 minor breach of a surveyor's recommendation that we would
16 proceed to denial based purely on that, but it is
17 collective regardless.
18   Q    So is it your testimony that had the survey items
19 listed as recommendation number twelve, the fixed fire
20 system and number eighteen, the emergency fire pump, had
21 those been completed or complied with Great Lakes would
22 not be denying coverage based on its failure to complete
23 the survey items?
24   A    I can't absolutely guarantee that.
25       It's just that our recommendations to Great Lakes

Page 65

1  would be if they were minor in nature or cosmetic in
2  nature, that that would not be sufficient grounds in and
3  of itself to warrant declination of coverage.
4    Q    Okay.  So generally speaking the three reasons
5  for denial of coverage as I understand it is a breach of
6  warranty as relates to the named operator.  Correct?
7    A    Correct.
8    Q    The failure to carry out the recommended survey
9  items which we've just discussed.  Correct?
10   A    Correct.
11   Q    And the nondisclosure of the prior misdemeanor in
12 2005.  Correct?
13   A    That's correct.  But in addition, of course, the
14 specific warranty in the policy, breach of warranty as
15 regards to the fire suppressant systems in isolation as
16 opposed to all the other recommendations.
17   Q    What do you mean by that?
18   A    In the policy language itself there's a specific
19 warranty that deals with fire extinguishers and fire
20 suppressant systems.
21   Q    I'll come back to that.
22       Okay.  And other than those three general bases
23 for denial are there any other reasons that Great Lakes is
24 denying coverage?
25   A    I don't believe so, no.

Eric Usher
November 19, 2021

Page 66

1    Q    Of those three items which of those has Great
2  Lakes provided written notice to Mr. Lassiter and AMI Kids
3  for their bases for denial of coverage?
4    A    Within our denial letter and within our
5  declaratory judgment pleadings.
6         The initial pleadings did not include the
7  nondisclosure because we weren't aware of it at that time.
8  That became apparent during the period of further
9  discovery.
10   Q    So in the pleadings you're contending that you
11 provided notice to Lassiter and AMI Kids of this
12 additional reason for denial of coverage?
13   A    In our amended pleadings we did.
14        Our initial pleadings were on the breach of named
15 operator and the breach of the survey warranties and fire
16 extinguishing warranty.
17   Q    And prior to initiating this lawsuit had you
18 provided written notice to Lassiter and AMI Kids of those
19 first two bases for denial of coverage?
20   A    In our initial pleadings, yes, and then
21 subsequently the amended pleadings the nondisclosure.
22   Q    Right.  But prior to filing the lawsuit did you
23 provide written notice to Lassiter and AMI Kids of the
24 reasons for denial of coverage, specifically the named
25 operator exclusion and failure to complete the recommended

Page 67

1  survey items?
2    A    As far as I can recall from the file the
3  chronology would have been the reservation of rights.
4         At the time the reservation of rights was issued
5  we were aware of the named operator breach.
6         Subsequently when we had the field survey we then
7  established that there were recommendations that had not
8  been complied with so that would have been incorporated
9  within the denial letter.
10        Subsequent to that we then established that there
11 was a nondisclosure of a criminal offense and we therefore
12 amended our pleadings.
13        I don't think we then sent a revised denial.
14   Q    I'm sorry.  You did or did not send a revised
15 denial letter?
16   A    As far as I'm aware we did not send a revised
17 denial letter because we were already in the process of
18 litigation at that time.
19   Q    I'd like to go a little bit out of order here and
20 ask you a little bit about the last reason for denial, the
21 breach of warranty concerning the nondisclosure of the
22 misdemeanor.
23        It's my understanding that you yourself were
24 convicted or cited for a DUI several years ago.  Is that
25 correct?

Page 68

1    A    Yes.  A little more than several, but, yes.
2  1997.
3    Q    And I believe was it your testimony that it
4  affected your rate of premium you were paying for
5  automobile insurance for approximately fifteen years?  Is
6  that correct?
7    A    That's correct, yes.
8    Q    And is it also your testimony that had you known
9  about Mr. Lassiter's misdemeanor pleading guilty to a
10 misdemeanor fifteen years ago, would you have still
11 written coverage or approved coverage?
12   A    Yes.
13   Q    And I believe it was your testimony that it may
14 have affected his -- he would have been charged with a
15 nominal increase in the premium?
16   A    That's correct.
17   Q    Also it's your testimony that if anyone answers
18 yes to the question on the application regarding a
19 criminal conviction, that that needs to be brought to your
20 attention for CSR?
21   A    Yes.  Normal procedure would be prior to
22 submitting it to me for approval and to establish what the
23 additional premium would be the underwriter or the
24 administrator in the event it was disclosed post
25 underwriting would then establish what the background of

Page 69

1  the incident was, when it occurred, what had happened.
2         Just get a brief synopsis of what gave rise to
3  the conviction, and that would be submitted to me advising
4  me of the conviction and for me to determine what
5  additional premium would be appropriate.
6    Q    And does -- Concept Specialty Risks, are they
7  charged with determining what the premium is going to be
8  when there is a conviction that's been disclosed in an
9  application?
10   A    Yes.  Inasmuch as that we are the underwriters on
11 behalf of Great Lakes, we are therefore providing -- we
12 charge at least the minimum premiums that we've agreed
13 with them.
14        The additional premium we charge is pretty much
15 down to us to determine what we would charge over and
16 above.
17        So the rate structures that we have are minimum
18 rates, not maximum rates.
19   Q    Understood.  But I believe it was your testimony
20 that if someone responds yes or in the affirmative as to a
21 prior criminal conviction that that is brought to your
22 attention.  Right?
23        Is that typically the standard operating
24 procedure for CSR?
25   A    Yes.  Once we discover what the details of the

Eric Usher
November 19, 2021

Page 70

1 conviction were then it would be submitted to me for
2 approval and to proceed to issue the policy and how much
3 additional premium or indeed to deny issuing the policy.
4        So it depends how egregious a conviction and how
5 recent the conviction was.  I may say that I am willing to
6 write the insured or not approve that.  If I am willing,
7 then I will charge an additional premium.
8    Q    At the time this policy was written were you the
9 sole person in charge of determining whether to accept
10 coverage or charge an additional premium?
11    A    In the event of a conviction, yes.
12    Q    That's what I meant, yes.
13        Okay.  Does CSR have any policies, procedures or
14 written guidance concerning what the increase in that
15 premium would be?
16    A    No.  It's purely done to my sole discretion.
17    Q    So it's at your whim to charge an additional
18 premium or not?
19    A    Inasmuch as I always charge an additional
20 premium.  No matter how long ago the conviction was
21 there's always going to be an additional premium charged.
22    Q    And are there any policies or procedures
23 specifically addressing that any time someone answers in
24 the affirmative to a prior conviction that CSR is going to
25 charge an additional premium?

Page 71

1    A    No.  It's an internal decision and my staff know
2 to bring it to me.
3        It's to some extent in the underwriting manual,
4 underlying guidelines that are provided to my staff, but
5 these are all internal documents.
6    Q    Well, we've talked about the underwriting guide
7 earlier today.  Mr. Kelley questioned you about that.
8        Are there any other internal policies or
9 procedures for CSR governing the underwriting standard for
10 CSR?
11    A    No.  Purely and simply it would be the issue of
12 in the event that there are two or more losses, it would
13 have to come to me.
14        In the event there's a criminal conviction, it
15 would have to come to me.
16        So my staff deals with the bulk of the day-to-day
17 underwriting, but anything that is abnormal or unusual,
18 especially with regards to frequency of claim, size of the
19 claim or criminal conviction it's referred to me
20 personally.
21    Q    But as it relates to a 15-year-old misdemeanor
22 conviction there's no policy or procedure governing what,
23 if any, increase in premium there would be?
24    A    No, because it would be too complicated because
25 the number of convictions, period between convictions and

Page 72

1 so on is so vast that it would be almost impossible to
2 come up with a rating structure as to what you would apply
3 which is why it's left to the senior underwriter to
4 determine how much additional premium would be
5 appropriate.
6    Q    It would be fair to characterize it as it's a
7 subjective analysis because it's really just based on your
8 experience.  Correct?
9    A    That's correct.
10    Q    Next what I'd like to do is --
11        MR. McNEIL:  Allan, if you can provide Mr. Usher
12    with a copy of Exhibit 10, a copy of the policy.
13        MR. KELLEY:  Will do.
14 BY MR. McNEIL:
15    Q    We've talked a little bit about this document
16 today.
17        First if I can get you to identify the policy
18 number for us for the record.
19    A    Yes.  It's Policy No. CSRYP/184540.
20    Q    And that's the policy at issue in this
21 litigation.  Correct?
22    A    That's correct.
23    Q    Okay.  And the insured is Reynolds Lassiter.  Is
24 that correct?
25    A    That's correct.

Page 73

1    Q    If I could get you to flip the page to the next
2 page, Page 2 at the bottom there's a schedule of
3 additional assureds.  Do you see that?
4    A    Yes.
5    Q    And is AMI Kids listed as an additional insured?
6    A    Yes, it is.
7    Q    And AMI Kids also has a pending claim under this
8 policy with CSR.  Is that correct?
9    A    So I understand, yes.
10    Q    Flipping back to Page 1 can you tell me the total
11 premium paid for this policy?
12    A    It was $19,255 plus a $35 certificate fee.
13    Q    Mr. Kelley asked you earlier today about
14 additional warranties, terms and conditions, and if I
15 could get you to turn to Page 2 of the policy again for
16 us.
17        It says warranted that a professional licensed
18 captain must be on board whenever the scheduled vessel is
19 navigating.
20        Do you remember that?
21    A    I do.
22    Q    And I believe it was your testimony that Captain
23 Russick was aboard the vessel at the time that the
24 incident occurred?
25    A    That's correct.

Beric Usher
November 19, 2021

Page 74

1    Q    And for future reference when I say incident, I
2 should clarify it's the grounding incident of the vessel
3 we're here about today.
4    A    Yes.
5    Q    Okay.  You earlier referenced named operator.
6 What is that?
7    A    Named operator is a -- there's a definition on --
8    Q    Okay.
9    A    It is Definition Q.  Operate, operation,
10 operating means to navigate or to be in physical control
11 of or to be at the helm of the vessel.
12    Q    I'm going to ask you about that in just a minute,
13 but if I can get you to turn to Page 16, please, of the
14 policy under Subsection X.  Do you see that?  It begins
15 with "it is warranted that the scheduled vessel."
16         I'll give you a few minutes to get there.
17    A    Yes.
18    Q    Do you need a few seconds to read that paragraph?
19    A    No.  I'm familiar with it.
20    Q    Very good.  So it says it is warranted that the
21 scheduled vessel will be operated only by covered persons.
22         Do you see that?
23    A    Yes.
24    Q    So do we agree that the scheduled vessel is the
25 "SHMILY", the vessel at issue in this litigation?

Page 75

1    A    Yes.
2    Q    Now, it says that will be operated.  Right?  So.
3         Let's go back to the definition of operate which
4 is on Page 4 under Subsection Q.
5    A    Yes.
6    Q    Can you read that definition for me, please?
7    A    "Operate, operations, operating means to navigate
8 or to be in physical control of or to be at the helm of
9 the scheduled vessel."
10    Q    Okay.  And I'm going to flip between Page 4 and
11 Page 16 so if you can hold on to both of those for me.
12         Going back to Page 16 under Schedule S it says it
13 is warranted the scheduled vessel will be operated only by
14 covered persons.  Do you see that?
15    A    Yes.
16    Q    And so if I could get you to look at Page 3 of
17 the policy and find the definition of covered person.
18    A    Yes.
19    Q    Covered person means you.  Is you Reynolds
20 Lassiter?
21    A    Yes.
22    Q    Okay.  Covered person Reynolds Lassiter and/or
23 any person detailed on your application form which has
24 been submitted by you and approved by us.
25         Is us CSR?

Page 76

1    A    Correct.  Well, insurers.
2    Q    Insurers.  "Provided that person has been
3 declared to us in writing as an operator of the scheduled
4 vessel."
5         Do you see that?
6    A    That is correct, yes.
7    Q    If I understand the warranty on Page 16 under
8 Subsection X it is warranted that the "SHMILY" vessel will
9 be operated only by covered persons and covered persons is
10 defined as either Mr. Lassiter, correct --
11    A    Correct.
12    Q    -- or anybody approved to operate the vessel.
13 Correct?
14    A    That's correct.
15    Q    All right.  And on the first page of the policy
16 the named operator is Norman Russick.  Is that correct?
17    A    That's correct.
18    Q    So is Norman Russick an approved operator of the
19 vessel?
20    A    Yes, he is.
21    Q    Okay.  Now I'd like to go back to the definition
22 of operator which is on Page 4, Subsection Q.
23         Do you see that?
24    A    Yes.
25    Q    It says "Operate, operation, operate means to

Page 77

1 navigate or to be in physical control of or to be at the
2 helm of the scheduled vessel."  Correct?
3    A    Yes.
4    Q    Okay.  And I think we agree that the evidence
5 shows that Mr. Russick was not at the helm of the vessel.
6         Do we agree?
7    A    We do.
8    Q    Now, what does the term navigate -- what is the
9 definition of navigate?
10    A    There is no definition in the policy wording of
11 navigate.
12         Navigate we assume to mean to steer, operate,
13 plot, chart, whatever the vessel.  When it's navigating it
14 would then be moving forward or it could be in reverse, I
15 suppose, but it's navigating.
16    Q    So you said navigate could mean plot or chart.
17 Is that correct?
18    A    Yes, but it's still moving it from Point A to
19 Point B.  Somebody has to physically move it.
20    Q    So if someone is plotting or charting while the
21 vessel is moving, you consider them to be navigating the
22 vessel?
23    A    They really have to be steering it or operating
24 it in order to navigate the vessel.
25    Q    Well, this definition says navigate or be at the

Eric Usher
November 19, 2021

Page 78

1  helm.  Right?  So wouldn't navigate be something different
2  than being at the helm of the vessel?
3      A    Not really.  I think they may be repetitive.
4      Q    But you said that the word navigate can mean to
5  plot or to chart while the vessel is moving forward.
6  Correct?
7      A    That's part of the process of navigating, but you
8  still have to -- in order to navigate it's to move from
9  Point A to Point B.
10     Q    So we agree the vessel was moving from Point A to
11 Point B at the time of the incident.  Correct?
12     A    Correct.
13     Q    Now, if Captain Russick was plotting or charting
14 at the time that the vessel was moving, do you agree that
15 he was navigating the vessel?
16     A    No.  Mr. Kutner was navigating the vessel.  He
17 was at the helm of the vessel and steering the vessel.
18     Q    But why would Great Lakes or CSR need to include
19 the term navigate when the term to be at the helm is
20 already in the definition of operate?
21     A    It's to be at the helm and to steer and to steer
22 the vessel on a particular course.
23          In this instance what we had was a situation
24 whereby because Mr. Russick was unfamiliar with the
25 channel and was tired he gave the control of the vessel to

Page 79

1  navigate into the channel to Mr. Kutner because Mr. Kutner
2  said that he was more familiar with that channel having
3  navigated there previously.
4      Q    I agree with you that Mr. Kutner was at the helm
5  of the vessel.  We agree on that point.
6          Now, earlier you testified that as the master of
7  the "SHMILY" he remained in control when he was on the
8  bridge.
9          Do you remember that testimony?
10         MS. GOLDMAN:  Objection.  That is not what he
11 said.
12         THE WITNESS:  No.  I said that he was not in
13 breach of the warranty because he was on board, so
14 therefore he would be deemed the captain of the
15 vessel in command at the time.  However, he was not
16 operating the vessel.
17 BY MR. McNEIL:
18     Q    But we agree that Captain Russick was in command
19 of the vessel at the time of the incident.  Correct?
20     A    Correct.
21     Q    And is command of the vessel in your mind
22 different than physical control of the vessel?
23     A    Yes.
24     Q    How so?
25     A    Inasmuch as you can be the captain of the vessel

Page 80

1  and taking a rest downstairs in the salon or checking the
2  engine and giving control of the vessel to operate the
3  vessel to another individual.
4          MS. GOLDMAN:  He's still answering.
5          THE WITNESS:  Under normal circumstances what
6      would be the case is that there would be a second
7      operator, especially on a vessel of this size, a
8      second operator that was approved to operate the
9      vessel along with the captain.
10         In the event, however, that the other operator
11     who's operating the vessel despite being approved but
12     the captain was not on board, then it wouldn't be in
13     breach of the specific warranty that the captain was
14     on board.
15 BY MR. McNEIL:
16     Q    Okay.  Who prepared the policy itself?  Was that
17 Concept Special Risks?
18     A    Yes.  You'll notice SYP/8/PPO, which stands for
19 standard yacht policy, Version 8, private pleasure only.
20     Q    I'm sorry.  Where is that listed?
21     A    If you look under it says the insuring agreement
22 wording on Page 2 of the policy, and it goes on to say
23 private and pleasure yacht insuring agreement, brackets,
24 SYP/8/PPO.
25     Q    Oh, okay.  I see it.

Page 81

1      A    So that is the particular policy wording that's
2  applying to this policy, and what that stands for is
3  standard yacht policy, slash, Version 8, slash, PPO,
4  private pleasure only.
5          This is the eighth version of the policy wording
6  that we've been using since 1995.
7      Q    Is this the standard form that CSR always uses
8  when writing yacht policies?
9      A    It depends on the age and the type of the vessel.
10         There are effectively four types of policies, all
11 of which are Concept Special Risks policies drafted and
12 prepared by us.
13         There is standard yacht policy 8/COM, which is
14 for charter vessels.
15         There is standard yacht policy 8 PPV, which is
16 for private pleasure vessels.
17         There is also PYP, premiere yacht policy.  That
18 is number five, and it's VPO and PYP number five COM.
19         It largely depends on the age of the vessel as to
20 whether it is entitled to receive a premiere yacht policy
21 option.
22     Q    So based on the specifics of this vessel you
23 opted to use the form that was ultimately used for Policy
24 No. CSRYP184540.  Correct?
25     A    Correct.

Page 82

1    Q    Turning back to the definition of operate,
2  operation or operating, would you agree with me that the
3  word navigate can have more than one meaning?
4    A    I suppose it could have more than one meaning
5  inasmuch as you could have a navigate that has nothing to
6  do with the operation of the vessel itself, but then that
7  would make a nonsense of the definition within this since
8  it is specifically referring to operate.
9         So I think the word navigation in conjunction
10  with the word operate is unambiguous and does not have two
11  meanings.
12    Q    But you said earlier navigate could mean plot or
13  chart.  Correct?
14    A    Yes, the word navigate could.  There's no
15  definition of the word navigate.
16         If you remember, we were looking at the
17  definition of the word navigate.  However, read in
18  conjunction with the definition being provided here it is
19  to do with what does operating mean.
20         Now, if you're going to be navigating operating
21  the vessel, then you are steering the vessel and
22  navigating the vessel into a specific area or through a
23  specific channel or whatever.
24    Q    Can you navigate the vessel without being in
25  physical control of the vessel in your mind?

Page 83

1    A    Not if you're an operator, no.
2    Q    But turning to Page 16, the warranty we were
3  discussing, it doesn't say operator.  Right?
4         It doesn't say it is warranted that the scheduled
5  vessel will be the named operator.  It says that it is
6  warranted that the scheduled vessel will be operated.
7         Do you see that?
8    A    Yes.
9    Q    Does that change your answer at all?
10    A    No.
11    Q    When I was asking you about the definition of
12  operating and the warranty referenced on Page 2 you
13  mentioned that sometimes there would be a second operator
14  approved for the vessel who may take the helm while the
15  master of the vessel is somewhere else on board.
16         I'm paraphrasing there, obviously, but you
17  referenced a second operator of the vessel.
18         Do you recall that?
19    A    Yes, we frequently issue policies with multiple
20  operators.
21    Q    Okay.
22    A    We would then determine the extent that
23  individual can operate the vessel.
24         For example, had Mr. Lassiter approached us, we
25  would have asked him about his boating experience.  If we

Page 84

1  did not think he adequate boating experience to operate an
2  85 foot vessel, then we would have said, well, okay.  You
3  can operate the vessel under the direct supervision of the
4  captain.  If the captain is standing right next to you,
5  we're not saying you can't touch the wheel.  We're saying,
6  yes, you can, but you don't have enough yacht experience
7  to operate the vessel.
8         So had we been asked to add an additional
9  operator, it would have been our determination to
10  establish their background, ability and so on and then
11  determine to what extent they could operate a vessel.
12    Q    But in this instance Mr. Lassiter didn't need to
13  be named as an operator if he wanted to operate the
14  vessel.  Correct?
15    A    He had no intention of operating the vessel.
16    Q    Right.  But if he had been at the helm, he still
17  would not have to have been named as a named operator
18  under the policy.  Correct?
19    A    No.  He would have been a covered person, but he
20  would not have been a named operator unless he detailed
21  himself as a named operator.
22         On the application form there was only one person
23  detailed as the named operator, which was Captain Norman
24  Russick.
25    Q    Let's look back at Page 16 of the warranty again.

Page 85

1         It says it is warranted that the scheduled vessel
2  will be operated only by covered persons.
3         Do you see that?
4    A    Yes.
5    Q    Let's go to the definition of covered persons.
6         On Page 3, Subsection C covered person means you.
7  Do you see that?
8    A    Correct.
9    Q    And you means Mr. Lassiter we said.  Correct?
10    A    Correct.
11    Q    So the warranty referenced in Item X on Page 16
12  it is warranted that the scheduled vessel will be operated
13  only by Captain Russick or Mr. Lassiter.
14         Is that a fair interpretation?
15    A    Not strictly, no, because the application form
16  forms part of the policy and the application form
17  specifically asks who is going to operate the vessel.
18         You still have to detail.  We could not permit
19  Mr. Lassiter to operate the vessel without providing us
20  with a form that tells us his boating experience.
21         MS. GOLDMAN:  Off the record for one second.
22         (Discussion had off the record.)
23         THE WITNESS:  I apologize, Adam.
24  BY MR. McNEIL:
25    Q    So if I understand your testimony, Mr. Usher,

Eric Usher
November 19, 2021

Page 86

1  that looking at Subsection X on Page 16 where it says it
2  is warranted that the scheduled vessel will be operated
3  only by covered persons and even though covered persons is
4  specifically defined to include Mr. Lassiter, that Mr.
5  Lassiter would still not be insured for losses where he is
6  operating the vessel?
7      A     That's correct, because of the application form
8  that specifically asks who is going to operate the vessel.
9      Q     Is the application form referenced at all in the
10  policy, Exhibit 10?
11      A     Yes, which is on Page 12, general conditions and
12  warranty, Section 9, Paragraph C.
13             "This insuring agreement incorporates in full
14  your application for insurance and together with any
15  endorsements issued herein constitutes the entire contract
16  between us.  At your request various provisions of this
17  insuring agreement may be varied by us, but only by our
18  prior agreement."
19      Q     Okay.  And we looked at a couple different --
20  which application does that refer to?
21      A     It refers to the signed application, the signed
22  Concept Special Risks application.
23      MR. MCNEIL:  Allan, is that Exhibit 6?
24      MR. KELLEY:  Yes, it is.
25      MR. MCNEIL:  Okay.  Can you hand Exhibit 6 to Mr.

Page 87

1  Usher, please?
2  BY MR. MCNEIL:
3      Q     First I'll ask you is the term navigate defined
4  in this application?
5      A     There is an expression on the application form --
6  well, only in what waters are to be navigated.
7      Q     And where do you see that?
8      A     It's on Page 2 of the application form.
9             This is a poor copy I'm afraid.  It will say all
10  waters to be navigated during the policy period.
11      Q     And that has the geographical references to east
12  coast U.S.A. Florida?
13      A     That's correct, and the Bahamas.
14      Q     Okay.  So that has to do where the vessel can go?
15      A     That is correct.
16      Q     Is the term navigate defined anywhere in this
17  application?
18      A     No, I don't believe so.
19      Q     Is there anything in this application that says
20  that if someone is not identified as an operator that
21  coverage under the policy will be excluded?
22      A     It specifically goes on to say on Page 3 of the
23  application form, "All operators must be detailed.  If
24  there are more than two operators, please request
25  additional operator sheets."

Page 88

1      Q     Does the application say what happens if the
2  applicant fails to include the details of a named
3  operator?
4      A     There's a warning on Page 3 that says, "Warning:
5  This is a named operator only policy."
6      Q     And where do you see that?
7      A     Directly under where we say all operators must be
8  detailed it then gives space for two operators and
9  suggests that if you want additional operators you can use
10  additional sheets.
11             Directly below that it says "Warning:  This is a
12  named operator only policy."
13      Q     And is the term named operator only policy
14  defined in this document?
15      A     In the application form?  I don't believe so.
16      Q     And is that term named operator policy defined in
17  the insurance policy that we referred to, Exhibit 10?
18      A     I believe it's referring to Paragraph X, operated
19  by covered persons and then leaving in the application
20  form which specifically states who will operate the
21  vessel.
22      Q     But you agree with me that Section X doesn't use
23  the term named operator, does it?  It uses the term
24  covered persons.
25      A     Yes, it does.

Page 89

1      Q     Did I understand your testimony earlier that you
2  were not denying coverage under the named operator
3  exclusion because you had any qualms about Mr. Kutner's
4  qualifications.  It was simply that he is not listed in
5  the insurance application?
6      A     If you recall, my testimony was that on the face
7  of it there was nothing wrong with Mr. Kutner's
8  qualifications, but we would have required him to complete
9  an operator questionnaire which would provide background
10  information in regards to his prior history.
11      Q     Would you have asked Mr. Kutner for any
12  information that's not called for in the application of
13  insurance under the operator section?
14             And I'm referring to page -- I'm sorry.  It is an
15  illegible copy.  Page 3 of the application, which is
16  Exhibit 6.
17      A     The questions would be identical.  Mr. Kutner
18  could have been just listed here as the second operator.
19      Q     Is this the application form that CSR typically
20  uses for insurance applicants?
21      A     Yes.  Of course, clearer copies.
22      Q     I was going to ask you.  It is very hard to read
23  and it is illegible, but to the best of your ability could
24  you tell me what the information is that is being sought
25  on Page 3 for the named operators?

Eric Usher
November 19, 2021

Page 90

1    A    A lot of memory involved here.
2         So the first thing is the date of birth.
3    Q    Okay.
4    A    Violations and suspensions, including also in the
5    last four years, years of boat ownership, years of boating
6    experience, boating qualifications.
7         Oh, lengths and manufacturers of vessels
8    previously owned or operated and then have you been
9    involved in a loss in the last ten years insured or not.
10   If yes, please give details.
11        Have you ever been convicted of a criminal
12   offense or pleaded no contest.  If yes, please give
13   details.
14        That's basically the questions on the application
15   form, and even in the event there were multiple operators
16   where it says use additional operator sheets, both would
17   be the same questions.
18   Q    So if he had answered no to the questions about
19   loss in the last ten years and no to the question about
20   criminal convictions, would he have been approved as an
21   operator under the application?
22   A    Providing -- yes.  We'd also want to know what
23   vessels he operated previously.
24   Q    Okay.
25   A    An 85 foot vessel.

Page 91

1         If he only had operated vessels up to 35 to 40
2    feet, we may have had issues, and then it would have
3    purely simply be we warranted that the captain was on
4    board at all times.
5         If Kutner had been named as an additional
6    operator, that wouldn't have been an issue.
7    MR. McNEIL:  Allan, if I can get you to hand Mr.
8    Usher a copy of Exhibit 14.
9    MR. KELLEY:  Done.
10   BY MR. McNEIL:
11   Q    On the first page of Exhibit 14 it lists some of
12   his experience with the different vessels.
13        Reviewing this list of experience that Mr. Kutner
14   has with these vessels, would that qualify him for his
15   approval on the application?
16   A    Yes.  Providing he had not been involved in
17   losses in the last ten years and not been convicted of a
18   criminal offense this would have been an entirely
19   acceptable CV.
20   Q    Excellent.  Perfect.
21        First let me ask, how are you doing?  Can you
22   keep going?  I probably have another thirty minutes or so.
23   Do you need a break or are you fine?
24   A    No, no.
25   Q    Next I'd like to ask you about Exhibit 38.

Page 92

1         I believe you testified that this is the Concept
2    Special Risks claims manual.
3    A    Yes.
4    Q    Were these prepared by Concept Special Risks?
5    A    Yes, they were.
6    Q    Are these the adjusting procedures that CSR or
7    Concept Special risks uses when investigating or reviewing
8    a claim?
9    A    Yes.
10   Q    And CSR isn't singling out Mr. Lassiter, AMI Kids
11   when adjusting this claim, is it?  These are the
12   procedures that are applicable to all loss investigations
13   by CSR?
14   A    That's correct.
15   Q    Do you ever make exceptions and say, hey, I know
16   our manual says X, but in this case I think we're going to
17   go in a different direction?
18   A    Only if we were instructed to by Great Lakes.
19   They can tell us to do whatever we want, but --
20   Q    For this particular loss did Great Lakes instruct
21   you to deviate from the CSR claims manual?
22   A    No.
23   Q    So it would be your expectation when making a
24   recommendation on either accepting or rejecting coverage
25   that the person making the determination would follow the

Page 93

1    policies and procedures contained in this claims manual
2    for CSR?
3    A    I would imagine they would do that.
4         Bear in mind there's a claims director and this
5    is, again an internal document that's been approved by
6    Great Lakes and is there for the guidance of the people in
7    the claims department, not necessarily the claims
8    director.
9         But I would imagine in most instances, yes, he
10   would follow the same procedures throughout.
11   Q    And did you or did CSR follow the procedures that
12   are contained in this claims manual, Exhibit 38?
13   A    As far as I'm aware, yes.
14   Q    If I can get you to turn to Page 5 under Section
15   4, claim file details and maintenance.
16        Do you see that section?
17   A    Yes.
18   Q    The first sentence says, "The claims file
19   represents a contemporaneous record of our handling and
20   management of the matter from notification to closure."
21        Do you see that?
22   A    Yes.
23   Q    So does CSR expect or require its personnel to
24   keep a contemporaneous record of whatever happens to be
25   going on with respect to adjusting the claim or loss?

Eric Usher
November 19, 2021

Page 94

```
1     A    Yes.
2     Q    And continuing on it provides an audit trail of
3  reserve movements and payments as well as providing a copy of
4  all inward and outward correspondence during the life of
5  the file.  Do you see that?
6     A    That's correct, yes.
7     Q    So will the claims file have communications
8  between CSR and Great Lakes?
9     A    Yes.
10    Q    And it says that a new file should be created
11 electronically and include at the absolute minimum the
12 notification by the insured or broker.
13         Do you see that?
14    A    Yes.
15    Q    Is that contained in the claims file?
16    A    Yes.
17    Q    Next item, a copy of the declaration page.  Do
18 you see that?
19    A    Yes.
20    Q    And that's contained in your claims file as well?
21    A    Yes.
22    Q    An acknowledgement to the broker.  In this case
23 would that be Kolisch?
24    A    That's correct.
25    Q    And is that contained in your claims file?
```

Page 95

```
1     A    Yes.
2     Q    The next item is a new claims summary form should
3  be completed by the broker/third party administrator of
4  CSR containing the evaluation of the merits from the
5  information available.
6         Do you see that?
7     A    Yes.
8     Q    And was a new claims summary prepared?
9     A    I don't think it's called that in the file.  I
10 think it's called a document which is literally a diary of
11 all the documents and correspondence as the claim
12 develops.
13    Q    When you say diary, would that include an index
14 of all the documents that are being put into the claims
15 file?
16    A    Technically, yes.  What it says is when the
17 document was received, who it was received from and what
18 the general text of the document was.
19    Q    Great.  And it also says payments should have the
20 appropriate backup document.
21         Fee bill, proof of loss.  Any outside expenses
22 would also be included in the claims file?
23    A    Yes.
24    Q    Proof of final payment.  That would assume that
25 the claim is ultimately paid.  Is that fair?
```

Page 96

```
1     A    That's correct.
2     Q    So do you expect all of these items to be
3  included in your claim file?
4     A    Except the last one, yes.
5     Q    Would you also expect in your claim file to
6  include all inward and outward correspondence relating to
7  the claim?
8     A    Yes.
9     Q    So if I had a copy of your claim file, I should
10 have all of this information.  Is that correct?
11    A    I believe so other than, of course, client
12 privilege with counsel.
13    Q    Absolutely.  I'm not asking about attorney-client
14 privilege documents.
15         The next item directly on that same page, the
16 next heading, diary management.
17         What is the diary system?
18    A    The diary system basically is a system whereby we
19 diarize rather than just being completely responsive.
20         So if, for example, we asked an adjuster or
21 surveyor to do something or, quite frankly, an attorney
22 and we have not heard something for fifteen days or thirty
23 days or whatever, they must send a chase for an update.
24    Q    Next I'd like to get you to turn to Page 10 of
25 the claims manual, Exhibit 38.
```

Page 97

```
1         I'm looking at Section 17, rejecting or denying a
2  claim.  Do you see that?
3     A    Yes.
4     Q    And it says, "We should not unreasonably reject a
5  claim made by an assured."
6         Is we CSR?
7     A    Within our claims authority.  In the event that
8  the amount exceeds $350,000 that claim would have to be
9  submitted to Great lakes.
10        I'm sure they would abide by the same standards,
11 but it would not be us that would be rejecting the claim.
12 It would be Great Lakes.
13    Q    Does this also govern your recommendations?  So,
14 in other words, if it's above your 350 authority, do these
15 govern what recommendation you're making to Great Lakes?
16    A    Absolutely, yes.
17    Q    And so the first part of the Section 17 says, "We
18 should not unreasonably reject a claim made by an assured
19 without good and sufficient reason and without providing
20 to the assured a full written explanation as to the basis
21 of our rejection."
22         Do you see that?
23    A    That's correct.
24    Q    And is that a true statement?
25    A    Yes.
```

Eric Usher
November 19, 2021

Page 98

1    Q    Picking up where I left off it says, "Or refuse
2  to meet a claim made by assured on the grounds."
3        What do you mean by meet a claim?  What does that
4  mean?
5    A    Pay, settle or agree.
6    Q    So picking up where I left off does it say, "We
7  should not refuse to meet or pay a claim made by an
8  assured on the grounds"?  Do you see that?
9    A    Yes.
10   Q    "A nondisclosure of a fact material to the risk
11 that the assured could or reasonably expected to have
12 disclosed."  Okay.  I understand that.
13       The second item is a misrepresentation of a fact
14 material to the risk unless we are satisfied that the
15 misrepresentation is at the very least negligent.
16       Do you see that?
17   A    Yes.
18   Q    And then the third item says, "In the case of a
19 breach of warranty or condition," and as I understand it
20 the reason for denial in this case is based on Mr.
21 Lassiter's breach of a warranty or condition.  Is that
22 correct?
23   A    Yes.  There are two breaches and obviously the
24 nondisclosure.
25   Q    Two breaches and a nondisclosure.

Page 99

1        "So in the case of a breach warranty or condition
2  where the only ground for rejection is the breach of
3  warranty unless the circumstances of the claim are
4  connected with the breach."
5        Do you see that?
6    A    Yes.
7    Q    Okay.  So looking at the first part of this
8  statement do I understand that it is CSR's policy that it
9  is not to refuse to pay a claim where the alleged breach
10 of warranty is not related to the claim itself?
11       MS. GOLDMAN:  Objection.
12       THE WITNESS:  That is the view of this page.
13       Essentially what would have happened in this
14   instance and would have happened in most instances is
15   that we would detail exactly what the nature of the
16   breach and what the concerns were to Great Lakes and
17   ask them if they think it is appropriate to seek a
18   legal opinion, which is what we did in this instance.
19 BY MR. McNEIL:
20   Q    Even if the breach, as you say in your policies
21 and procedures, are not related to the underlying claim?
22       MS. GOLDMAN:  Objection.
23       THE WITNESS:  Because it's above our settlement
24   authority.
25 BY MR. McNEIL:

Page 100

1    Q    So is it --
2    A    Sorry.  The ultimate denial, the ultimate
3  decision to seek a legal opinion and/or to deny the claim
4  subsequent to the legal opinion would be Great Lakes'
5  decision, not our decision.
6        So what we've done is we've been finders of fact.
7  We've now presented those facts to Great Lakes.
8    Q    But earlier, maybe I misunderstood your
9  testimony, I thought I understood that Great Lakes had
10 reviewed and approved these policies for claims handling
11 in your claims manual.
12   A    For us to use.
13   Q    So these are the rules that you have to operate
14 when adjusting claims.  They're going to operate under
15 their separate set of rules?
16   A    It would be exactly the same I suspect.
17       As far as I'm concerned, it wouldn't say I'm
18 going to make the risk this amount and they turn around
19 and say, well, we wanted to charge half that.
20       They can do whatever they like.  They're the
21 principal.
22   Q    Does Great Lakes have their own separate set of
23 policies and procedures relating to payment or adjustment
24 of claims?
25   A    I don't know.

Page 101

1    Q    Have you ever been told that they have a separate
2  set of policies or guidelines that they need to follow to
3  pay a claim?
4    A    No.  It wouldn't surprise me if they have, but I
5  haven't been told that they have.
6    Q    So am I correct when I review your claims manual
7  as it relates to this Section 17 in which your authority
8  is for claims under your authority, $350,000, that the
9  breach of warranty has to be connected to the underlying
10 incident, but if it's over $350,000, then all bets are
11 off.  Great Lakes can do whatever it wants to do?
12   A    If it's above 350, Great Lakes reserve the right.
13 This is a referral system.
14       As I stressed earlier in my testimony, this is an
15 internal document, so this is what my director, my claims
16 director is telling to his claims guy.
17   Q    And you mean the CSR claims director is telling
18 it to the claims guy?
19   A    Yes.
20   Q    To your knowledge, are there any other policies
21 or procedures utilized when determining whether to accept
22 or deny this claim?
23   A    Not that I'm aware of.
24   Q    You said it would not surprise you if Great Lakes
25 had its own set of policies and procedures.

Eric Usher
November 19, 2021

1   A   I'm sure, because Great Lakes are approved by the
2   Financial Conduct Authority in the United Kingdom it is
3   likely they would have all sorts of regulatory systems
4   and/or provisos.
5            Whether it would relate to marine in particular
6   or whether it's a general view of claims I have no idea.
7   Q   Who in Great Lakes would have that information?
8   A   I would imagine Mr. Sensibar, Steven Sensibar.
9   Q   Okay.  And where is he located?
10  A   He's located in London.
11  Q   The reason I ask is because I'm looking at the
12  notice of deposition that Mr. Kelley had sent and one of
13  the areas of inquiry specifically includes policies and
14  procedures utilized to decline a claim.
15           MR. McNEIL:  So I guess what I'd like to do is
16      maybe visit with counsel concerning whether there's a
17      better way to testify about that area, but I'll just
18      note my objection for the record and deal with it
19      later on.
20           MR. KELLEY:  I'll join in the objection.
21  BY MR. McNEIL:
22  Q   Turning back to Section 17 that we were reviewing
23  in your claims manual we didn't finish discussing it
24  because it also contains and/or.
25           I'll start from the beginning.  "Or refuse to

1   meet a claim", which we previously agreed means to pay a
2   claim made by an assured on the grounds.  Jumping down to
3   number three, "In the case of a breach of warranty or
4   condition where the only ground for rejection is the
5   breach of warranty unless the circumstances of the claim
6   are connected with the breach," which we already talked
7   about, "or unless the breach relates to the safety of the
8   vessel, its crew or a member of the public."
9            Do you see that?
10  A   Yes, I do.
11  Q   Okay.  And do we agree that having Mr. Kutner
12  instead of Mr. Russick at the helm did not affect the
13  safety of the vessel, its crew or a member of the public,
14  did it?
15  A   I don't believe it affected the safety.
16           Clearly Mr. Kutner was not as experienced and
17  knowledgeable as Mr. Russick, but I don't think it
18  affected the safety of the vessel, no.
19  Q   And as it relates to, I think, the third and most
20  recent reason for denying the claim it would be
21  nondisclosure of the fourth degree misdemeanor by Mr.
22  Lassiter in 2005.
23           Would you agree that his prior citation or arrest
24  for that incident would not affect the safety of the
25  vessel, its crew or member of the public?  Do you agree

1   with that statement?
2   A   Yes, I do.
3   Q   Okay.  As to the fire suppression system we
4   talked about earlier, does not having the fire
5   extinguishers tagged affect the safety of the vessel, its
6   crew or member of the public?
7   A   I think it probably does on the basis that it is
8   under the ABYC safety provisions that fire suppression
9   systems are checked and tagged so that certainly would go
10  to the safety of the vessel.
11  Q   Bear with me one moment, please.  I want to make
12  sure I get the verbiage right here.
13           The servicing of, I guess, the emergency fire
14  pump, Recommendation 18 in the Volney report, would that
15  affect the safety of the vessel, its crew or a member of
16  the public?
17  A   It could certainly affect the safety of the
18  vessel.
19  Q   And if it were ultimately determined that those
20  items were remedied in one way, shape or form, you would
21  agree in that instance that if they had been taken care of
22  then certainly they wouldn't be affecting the safety of
23  the vessel, the crew or a member of the public?
24  A   If they had been taken care of, yes.
25  Q   Does CSR track how much it pays out in claims on

1   an annual basis?
2   A   Yes.  I mean, it goes by underwriting year as
3   opposed by calendar year.
4   Q   How do they differ?
5   A   Well, the underwriting year is all risks are
6   attached from the 1st of January in any one year to the
7   31st of December anyone year.
8            As a consequence, claims can be incurred for the
9   two-year period but on that underwriting year.
10           The following underwriting year, for example,
11  would again be risks attaching from the January 1st to the
12  31st of December, but, therefore, you could have claims
13  incurred during the calendar relating to an earlier
14  underwriting year or a current underwriting year.
15  Q   Does CSR track statistics on the number of
16  insurance applications it receives each year?
17  A   Not strictly, no, because we would not have a
18  track of the applications that we received that we did not
19  quote.
20           Frequently we'll have an application form where
21  we say I'm sorry, we're not interested in that vessel.
22  Q   Okay.
23  A   We do keep because there's simply a numerical
24  count of the number of quotes that we issue, so regardless
25  of the applications received, we do track the number of

Eric Usher
November 19, 2021

Page 106

1  vessels we write.
2     Q   I'm sorry.  You track the number of vessels you
3  write?
4     A   Yes.
5     Q   And do you track that information geographically,
6  like where the applicant may be located or where the
7  vessel might be located?
8     A   Yes, in terms of because we monitor the aggregate
9  exposures by location.
10        That is done on two separate bases.  One on a
11 summary basis by general region.  The other is what's
12 called a catastrophe modeling plan which has the specific
13 GPS location of the vessel's principle mooring location
14 during the hurricane season.
15    Q   The ones you keep track by geographic location,
16 is that regionally, like southeast United States or is it
17 done by state or how do you break that down?
18    A   We break it down by areas.
19        For example, from Key West to Homestead.  From
20 Fort Lauderdale to Jupiter or Stuart and so on.  They're
21 broken into general areas.
22        The cat modeling report provides the actual GPS
23 location, the mooring location of the vessel during the
24 hurricane season so that is far more specific in terms of
25 density of exposure by marina, for example, by zip code

Page 107

1  and whichever way you want to do it, but GPS is the
2  easiest way to track it.
3     Q   If you wanted to put together a summary of
4  vessels insured in the State of Florida, is that something
5  that you can do?
6     A   Probably.  It's not the way that report is
7  designed to be read.
8        It's designed to be read by GPS location.  If we
9  entered in a search mode and we had the GPS location of
10 the whole State of Florida, for example, then I guess we
11 could provide a report of everything that was within those
12 GPS locations during the windstorm season.
13    Q   Would you also be able -- go ahead.
14    A   You may well have a vessel that is located in
15 Michigan during the windstorm season, but comes to Florida
16 during the winter season so it would not necessarily tell
17 you -- it will only tell you what vessels are located in
18 Florida between July 1st and November 3rd.
19    Q   So --
20        MS. GOLDMAN:  Adam, I'm sorry.  I don't know if
21    these questions are really within the parameters.
22    We're really starting to stray outside of the only
23    notice that was received, which was counsel for
24    Lassiter.
25        MR. McNEIL:  If it's all right I would like to

Page 108

1  ask one follow-up question based on what he testified
2  to understanding that he may not know the answer to
3  it.
4        MS. GOLDMAN:  As long as it's just one more.
5  BY MR. McNEIL:
6     Q   You keep this information in two different ways?
7        You said GPS and then you also talked about just
8  a key area.  Is that right?
9     A   Yes.
10    Q   Gotcha.
11        MR. KELLEY:  I'll just note for the record for
12    all concerned the areas of inquiry is nature and
13    extent and number of marine policies by or through
14    plaintiff and/or CSR for vessels in Florida.
15        MS. GOLDMAN:  Which was objected to, for the
16    record.
17        MR. McNEIL:  Can I ask the question or do we got
18    to go fight about that later?
19        MS. GOLDMAN:  Repeat the question or what is the
20    question?
21        MR. McNEIL:  I was going to ask him what
22    information they have available concerning the
23    vessels that are insured in Florida and how he keeps
24    that information.
25        MS. GOLDMAN:  We can respond to that generally

Page 109

1  with the understanding that no specific information
2    is being provided.
3  BY MR. McNEIL:
4     Q   Does CSR track the acceptance rate of its
5  applications?
6     A   Yes, in two ways.
7        The conversion of new business quotes to policies
8  and the retention of renewals.
9     Q   So on the claims side does CSR track which claims
10 or how many claims are denied each year?
11    A   Yes, as a percentage of overall number of claims.
12 Percentage is just under three percent.
13    Q   Do you track the reasons for denial?
14    A   No, I don't.  I don't know if my claims people
15 do.  I don't believe so from a reasoning prospective.
16        It's a very simple thing to look at a total
17 claims report to see the number of claims and in status if
18 it's denied it will have a D.
19        It will be C if it's closed, L if it's live and D
20 if it's denied.
21        So we could just look at the number of D's as a
22 percentage of the overall number of claims for that
23 underwriting year.
24    Q   For instance --
25        MS. GOLDMAN:  I'm sorry.  I thought there would

Eric Usher
November 19, 2021

Page 110

1  be one more follow-up question. We're now getting
2  into several more.
3      MR. AGUILAR: Then direct him not to answer.
4      MR. McNEIL: Hold on, Richard.
5      If it's identified in the notice of deposition, I
6  thought that would be fair game, but if you want to
7  tell him not to answer, we can certainly revisit it
8  at a subsequent time, but I may have to renotice his
9  deposition if I need the information.
10     MS. GOLDMAN: Understood. Finish your question
11 and I'll make objections if appropriate.
12 BY MR. McNEIL:
13     Q   Does CSR track statistics on the number of claims
14 that it denies based on post-accident criminal background
15 checks?
16     A   No, I don't believe so. As far as we're
17 concerned denial is just all one collective aspect.
18     Q   Are you aware of any other claims that have been
19 denied by CSR because of a post-accident criminal
20 background check being run on the insured?
21     MS. GOLDMAN: Objection, and I'm going to direct
22 my client not to answer because that is potentially
23 confidential information.
24     MR. McNEIL: I'm just asking --
25     MS. GOLDMAN: If I can confer with my client for

Page 111

1  a moment.
2      MR. McNEIL: Why don't we take a five-minute
3  break.
4      MS. GOLDMAN: That's not necessary.
5      MR. McNEIL: Okay.
6      THE WITNESS: As counsel mentioned, let me answer
7  it in this way, under the Data Privacy Act of the
8  United Kingdom I can't release information about each
9  individual insured and I cannot recall ones that have
10 gone through to litigation.
11     It would be a matter of public record. Suffice
12 it to say that it has happened before.
13 BY MR. McNEIL:
14     Q   It has happened before, okay.
15     Do you know approximately how many times it has
16 happened before?
17     A   No. I mean -- no, I wouldn't even hazard a
18 guess.
19     To give a field of scope, bear in mind we've been
20 operating this program for over thirty years. We've been
21 to trial nineteen times, but I don't recall one where a
22 criminal record was the issue. Of course, it might have
23 been.
24     There would be others where we were seeking
25 summary judgment where a criminal record was an issue, but

Page 112

1  I can't recall them.
2      But when you consider that we have over that
3  thirty years issued someone 170,000 policies and,
4  therefore, probably had over 25,000 claims and, therefore,
5  even at two percent it would impossible to give you any
6  kind of number.
7      Q   Does CSR as a matter of practice order criminal
8  background reports for its insureds after a loss has been
9  submitted?
10     A   I don't believe -- we don't do it automatically
11 on every single claim file, no.
12     I think it's where there has been cause for
13 concern. We look at it on the basis of in the event there
14 is something that is highlighted we may ask for a criminal
15 background check on that individual. If something came to
16 light in the investigation that gives rise to concern,
17 that may promulgate a criminal background investigation.
18     Q   Do you order criminal background checks during
19 the underwriting phase for your insureds?
20     A   No.
21     Q   It's only post claim?
22     A   Basically, yes.
23     Q   Does CSR have any policies or procedures in place
24 to make sure that it complies with the Fair Credit
25 Reporting Act when deciding whether to order a background

Page 113

1  check on its insureds?
2      A   I don't know.
3      Q   Do you know what the Fair Credit Reporting Act
4  is?
5      A   No.
6      Q   Are you aware that in some instances it may be
7  inappropriate for someone to order a background check of
8  another person?
9      A   Well, I would expect the investigators we utilize
10 to alert us in the event that we're doing something
11 inappropriate.
12     Q   And the investigators you're referring to, are
13 they paid by you?
14     A   Yes.
15     Q   And do you select the investigators?
16     A   Yes.
17     Q   And prior to this incident were you aware that
18 investigators were ordering background checks of insureds
19 as part of the claims investigation?
20     MS. GOLDMAN: Objection.
21     THE WITNESS: I don't know what within in the
22 mind of my claims director gave rise to the request
23 for a background collect.
24 BY MR. McNEIL:
25     Q   But earlier you testified that you were aware,

Eric Usher
November 19, 2021

Page 114

```
1  assuming prior to this incident, that background checks
2  haven't been requested for insureds that were making a
3  claimed loss under their policy.
4       A    What I'm saying is that it is not a standard
5  procedure to do background checks.
6            In this instance, as you will recall, we did not
7  amend our pleadings to incorporate the failure to disclose
8  a criminal conviction until much later.
9            We did an amended pleading and it was part and
10 parcel of the investigation and the investigation was done
11 through the offices of our attorneys.
12      Q    That's not my question.  I want you to listen
13 very carefully.  It's this.
14           Prior to this incident that we're here about
15 today, before this loss were you aware that CSR had
16 ordered background investigations of its insureds making
17 claims on their respective policies?
18      A    I'm sure we have done background checks, yes.
19      Q    And you were aware of this.  Is that correct?
20      A    Well, I was only aware if they became material
21 because I'm only aware because I'm the corporate
22 representative.
23           I don't get involved in the day-to-day claims
24 handling and investigation of claims.
25      Q    But you were aware of the fact that your
```

Page 115

```
1  investigators were ordering background checks of insureds
2  after the insured had made a claim on the policy?
3       MS. GOLDMAN:  Objection.  Foundation, number one.
4  Are these investigations being ordered by attorneys,
5  by investigators?
6       I believe you only established that this was
7  conducted during litigation so I'm not sure what
8  you're referring to.
9       MR. McNEIL:  That's not my question.
10 BY MR. McNEIL:
11      Q    My question is generally are you aware that
12 CSR --
13      MS. GOLDMAN:  You're characterizing it as --
14      MR. McNEIL:  I'll start over.  I'll ask a brand
15 new question.
16 BY MR. McNEIL:
17      Q    Are you aware that CSR has investigators ordering
18 background checks on insureds after a claim has been made
19 under their policy?  Yes or no?
20      A    We have appointed investigators to do background
21 checks as part of their investigation into the claim when
22 certain claims have happened.
23      Q    And you would agree that is not part of the
24 underwriting process.  That is part of the claims process?
25      A    That's correct.
```

Page 116

```
1       MS. GOLDMAN:  I hope that was clear.
2       MR. McNEIL:  It is.
3       THE WITNESS:  How many more you got, Adam?
4       MR. McNEIL:  I think I'm about done.  Do you want
5  to take a quick five-minute break and then if I have
6  any follow-up?
7       THE WITNESS:  So I'll have a go as well.
8            (A brief recess was taken.)
9       MR. McNEIL:  We can go back on the record.
10 BY MR. McNEIL:
11      Q    One last question for you.  You mentioned the
12 Data Privacy Act in the United Kingdom.  Forgive me if I'm
13 misquoting or paraphrasing it, but do you recall
14 referencing that act?
15      A    Yes.
16      Q    Are you treating this claim as if it's governed
17 by that particular act in the UK?
18      A    Well, it would only be in the event of the
19 discussion if it was somebody that was not a party to the
20 action.
21           What I'm saying is if it's a matter of public
22 record or indeed if it is anything to do with people in
23 this room, people involved in this claim or whatever, it
24 would not fall under the Data Privacy Act because I would
25 not be releasing information about Mr. Lassiter or anyone
```

Page 117

```
1  involved in this claim to another person.
2       Q    That was my question.
3       MR. McNEIL:  Thank you.  I don't have any other
4  questions.  Thank you so much for your time this
5  afternoon.
6       MR. TANNER:  I don't have any questions.
7       MS. GOLDMAN:  We don't have any, no.
8       THE REPORTER:  Read or waive?
9       MR. KELLEY:  The court reporter is asking whether
10 you want to read or waive?
11      THE WITNESS:  Waive.  Well, I don't know.
12      THE REPORTER:  Mr. Kelley, are you ordering it?
13      MR. KELLEY:  Yes, I am.
14      THE REPORTER:  Does anybody else want copies?
15      MS. GOLDMAN:  We do as well, the plaintiffs.
16      MR. McNEIL:  Yes, with exhibits.
17      THE REPORTER:  Can you send me the exhibits.
18      MR. TANNER:  Allan, you'll copy counsel with the
19 exhibits?
20      MR. KELLEY:  Yes.
21           (Thereupon, the deposition was concluded at 2:31
22 p.m.)
23           (Reading, signing and notice of filing were
24 waived.)
25
```

Beric Usher
November 19, 2021

Page 118

```
1              REPORTER'S DEPOSITION CERTIFICATE
2
3    STATE OF FLORIDA)
4                  : SS
5    COUNTY  OF  DADE)
6
7         I, THERESA M. COHEN, a Florida
8    Professional Reporter, certify that I was
9    authorized to and did stenographically report
10   the deposition of BERIC ANTHONY USHER; and that
11   the transcript is a true record of my
12   stenographic notes.
13        I further certify that I am not a
14   relative, employee, attorney, or counsel of any
15   of the parties', nor am I a relative or employee
16   of any of the parties' attorney or counsel
17   connected with the action, nor am I financially
18   interested in the action.
19        Dated this 24th day of November 2021.
20
21
22
23            Theresa M. Cohen
              Registered Professional Reporter
24
25
```

Page 119

```
1              CERTIFICATE OF OATH
2
3
     STATE OF FLORIDA)
4
                   : SS
5
     COUNTY  OF  DADE)
6
7
8
9         I, the undersigned authority, certify that
10   BERIC ANTHONY USHER personally appeared before
11   me and was duly sworn.
12
13
14
15        WITNESS my hand and official seal
16   this 24th day of November 2021.
17
18
19
20       Theresa M. Cohen
            Notary Public-State of Florida
21          Commission #GG 174339
            Expires March 28, 2022
22
23
24
25
```

Beric Usher
November 19, 2021

## Exhibits

EX 0026 BERIC
 ANTHONY USHE
R 111921
 3:2 8:1,3,4
EX 0027 BERIC
 ANTHONY USHE
R 111921
 3:4 14:6,7,
 8,9
EX 0028 BERIC
 ANTHONY USHE
R 111921
 3:6 16:5,7,8
EX 0029 BERIC
 ANTHONY USHE
R 111921
 3:8 18:15,
 18,19 19:8
EX 0030 BERIC
 ANTHONY USHE
R 111921
 3:10 19:18,
 19,20
EX 0031 BERIC
 ANTHONY USHE
R 111921
 3:12 20:6,7,
 8
EX 0032 BERIC
 ANTHONY USHE
R 111921
 3:14 27:11,
 12,13 28:10
EX 0033 BERIC
 ANTHONY USHE
R 111921
 3:16 35:16,
 17,18 36:3
EX 0034 BERIC
 ANTHONY USHE
R 111921
 3:18 36:15,
 17,18

EX 0035 BERIC
 ANTHONY USHE
R 111921
 3:20 38:4,5,
 6
EX 0036 BERIC
 ANTHONY USHE
R 111921
 3:22 41:10,
 14,15
EX 0037 BERIC
 ANTHONY USHE
R 111921
 3:24 44:11,
 12,15,16
EX 0038 BERIC
 ANTHONY USHE
R 111921
 4:2 51:10,11
 91:25 93:12
 96:25

## $

$19,255
 73:12
$35
 73:12
$350,000
 56:1 97:8
 101:8,10
$500
 39:19
$815,000
 43:7
$90,000
 43:7

## 1

1
 73:10
10
 33:22 72:12
 86:10 88:17
 96:24

100
 45:17
1019
 36:1
108
 35:23
1082114
 35:21
10th
 44:25 47:4
114
 36:1
12
 86:11
13
 55:25
14
 91:8,11
15-year-old
 71:21
150
 20:18,25
 34:17
16
 74:13 75:11,
 12 76:7 83:2
 84:25 85:11
 86:1
17
 35:4 60:18,
 20,25 61:21
 97:1,17
 101:7 102:22
170,000
 112:3
18
 49:24 104:14
18th
 44:14
1993
 8:25 13:16
1995
 81:6
1997
 25:16 68:2
1999
 8:24 29:17

1st
 11:3 33:20,
 21 34:25
 35:1 105:6,
 11 107:18

## 2

2
 22:20 25:25
 33:15 38:23
 45:25 49:12
 51:1 73:2,15
 80:22 83:12
 87:8
20
 51:1
200
 16:2 20:25
 45:15
2003
 13:15
2005
 29:8,13 31:7
 65:12 103:22
2007
 8:15
2013
 8:20,23
2015
 16:11
2019
 28:10
2020
 6:21 25:22
2021
 11:3 13:18
 41:21 44:14,
 25 47:25
 49:25
21
 47:25
22
 49:25
25,000
 112:4

Eric Usher
November 19, 2021

**26**
  8:1,4
**26th**
  16:11
**27**
  14:7,9
**28**
  16:5,8
**29**
  18:15,19
  19:8
**2:31**
  117:21

**3**

**3**
  21:20 22:19,
  21 26:1
  75:16 85:6
  87:22 88:4
  89:15,25
**30**
  19:18,20
**31**
  20:6,8 28:10
**31st**
  105:7,12
**32**
  27:11,13
  28:10
**33**
  35:16,18
  36:3
**34**
  36:15,18
**35**
  38:4,6 41:11
  91:1
**350**
  39:18 56:4
  97:14 101:12
**35QE**
  6:14
**36**
  41:10,15

**37**
  44:12,16
**38**
  51:11 91:25
  93:12 96:25
**3rd**
  107:18

**4**

**4**
  26:6 33:14
  46:1 50:3
  75:4,10
  76:22 93:15
**40**
  91:1
**4th**
  60:18

**5**

**5**
  38:8 93:14
**50**
  21:11 37:12
**5:00**
  7:6

**6**

**6**
  86:23,25
  89:16

**7**

**7**
  44:21 54:19
  61:5

**8**

**8**
  45:13 50:3
  54:19 80:19

**81:3,15**
**8/COM**
  81:13
**85**
  84:2 90:25
**870,000**
  51:7

**9**

**9**
  54:23 86:12
**90s**
  11:9 15:15

**A**

**abide**
  97:10
**ability**
  29:21 48:17
  84:10 89:23
**able**
  13:20 107:13
**abnormal**
  71:17
**aboard**
  43:18 45:23
  49:13,20
  73:23
**above**
  56:4 69:16
  97:14 99:23
  101:12
**absolute**
  94:11
**absolutely**
  64:24 96:13
  97:16
**ABYC**
  60:6 104:8
**accept**
  52:25 70:9
  101:21
**acceptability**
  31:1 32:20

**33:4**
**acceptable**
  16:17 22:2
  91:19
**acceptance**
  56:13 109:4
**accepting**
  92:24
**accident**
  45:4 52:13
**accidental**
  52:14,17,21
**accordance**
  60:5
**acknowledge**
  49:11,20
**acknowledgeme
nt**
  94:22
**act**
  10:19 111:7
  112:25 113:3
  116:12,14,
  17,24
**acting**
  15:5 44:6
  45:7,11,16,
  18,23
**action**
  24:10 29:5
  40:12,14,21
  55:15 116:20
**active**
  24:6
**actively**
  12:21
**activity**
  9:24 29:2,12
**actual**
  106:22
**Adam**
  58:13 85:23
  107:20 116:3
**add**
  84:8
**added**
  34:13

Eric Usher
November 19, 2021

addition
  9:22 65:13
additional
  24:19 25:10
  28:6 30:16
  32:4,6 34:14
  39:22 45:25
  58:14 66:12
  68:23 69:5,
  14 70:3,7,
  10,17,19,21,
  25 72:4
  73:3,5,14
  84:8 87:25
  88:9,10
  90:16 91:5
address
  6:7,10 34:10
addressing
  70:23
adequate
  22:1 46:20
  84:1
adjust
  43:25
adjuster
  50:22 96:20
adjuster/
surveyor
  43:24
adjusting
  92:6,11
  93:25 100:14
adjustment
  100:23
adjustments
  38:20
administering
  11:10
administrator
  68:24 95:3
admiralty
  54:21
advance
  58:19
advertisement
  13:8,11

advice
  34:5
advised
  39:11
advising
  69:3
affect
  33:3 103:12,
  24 104:5,15,
  17
affected
  25:21,23
  68:4,14
  103:15,18
affecting
  104:22
affirmative
  69:20 70:24
afraid
  87:9
afternoon
  117:5
age
  26:22 32:3
  37:6,14,17
  38:21 81:9,
  19
agency
  9:3,4
agent
  15:5
agents
  47:5,11
aggregate
  106:8
ago
  39:24 67:24
  68:10 70:20
agree
  28:18 29:19
  31:17 45:10,
  20,22 50:19
  52:10 56:11,
  15 74:24
  77:4,6
  78:10,14
  79:4,5,18

82:2 88:22
  98:5 103:11,
  23,25 104:21
  115:23
agreed
  43:6,11 52:3
  56:15 57:11
  69:12 103:1
agreement
  52:2 80:21,
  23 86:13,17,
  18
AGUILAR
  110:3
ahead
  107:13
airport
  29:14
alarm
  62:24
albeit
  34:3
alcohol
  31:18
alert
  113:10
Allan
  52:5 60:12
  72:11 86:23
  91:7 117:18
alleged
  42:24 99:9
Allied
  10:24
allow
  20:18 59:2
allows
  49:15 56:20
amend
  26:16 114:7
amended
  40:24 66:13,
  21 67:12
  114:9
amendment
  38:14

Americans'
  14:1
AMI
  11:23 20:1
  23:15 34:13
  35:21,23
  47:14 56:7
  58:14 66:2,
  11,18,23
  73:5,7 92:10
amount
  97:8 100:18
analysis
  26:5 40:3
  72:7
analyzed
  62:16
and/or
  29:4 75:22
  100:3 102:4,
  24 108:14
anger
  29:25
annual
  105:1
annually
  60:5
answer
  7:1 10:3
  30:22 59:1,3
  64:3 83:9
  108:2 110:3,
  7,22 111:6
answered
  90:18
answering
  80:4
answers
  46:25 68:17
  70:23
Anthony
  6:1,8
anybody
  58:6 76:12
  117:14
anyone
  14:4 27:3

Eric Usher
November 19, 2021

31:18 47:13
48:14 49:1
68:17 105:7
116:25
apologize
58:19 60:14
85:23
apparent
66:8
apparently
13:22
appeared
62:8
appears
34:3 51:14
61:23
appetite
10:15
applicable
20:15 36:13
37:7 54:20
92:12
applicant
23:3,7 24:8
32:14 88:2
106:6
applicants
31:24 89:20
application
14:21 18:4,
8,15,22,23
19:3 21:24
22:6,12,19,
22 23:1,2,20
29:10 31:25
32:1,14
48:8,9,18,22
68:18 69:9
75:23 84:22
85:15,16
86:7,9,14,
20,21,22
87:4,5,8,17,
19,23 88:1,
15,19 89:5,
12,15,19
90:14,21
91:15 105:20

applications
25:25
105:16,18,25
109:5
applied
10:25 11:1,
3,4,11,15,20
23:15
apply
30:6 43:11
72:2
applying
39:14 81:2
appoint
43:24 44:2
appointed
115:20
appreciates
21:14
approach
27:14 28:6
53:14
approached
83:24
appropriate
17:9 23:11
37:1 69:5
72:5 95:20
99:17 110:11
approval
18:5,15 19:3
47:16 48:16,
22 49:17
68:22 70:2
91:15
approve
40:13,24
56:4 70:6
approved
14:24 15:8
16:21 40:16
46:3,8,16
47:1 53:16
68:11 75:24
76:12,18
80:8,11
83:14 90:20

93:5 100:10
102:1
approximately
15:17 68:5
111:15
April
41:21
area
82:22 102:17
108:8
areas
7:19 102:13
106:18,21
108:12
arguably
63:8
argue
54:12
around
12:19 13:15
58:19 100:18
arrest
103:23
arrive
6:15
artwork
41:23
asked
20:24 30:18
46:19 73:13
83:25 84:8
89:11 96:20
asking
22:15 32:12,
13 53:15
83:11 96:13
110:24 117:9
asks
23:20 85:17
86:8
aspect
110:17
aspects
28:19
assess
9:10

assessed
30:21
assessing
28:22
assessment
25:9 51:2
assist
16:21,22
35:9
assistant
15:24 51:21
assume
77:12 95:24
assuming
114:1
assured
16:21,23
34:11 35:7,
12 52:17
55:22 57:9
97:5,18,20
98:2,8,11
103:2
assured's
35:8
assureds
73:3
attached
105:6
attaching
105:11
attend
13:19,20
14:4
attended
13:1
attending
12:22 13:16
attention
44:21 68:20
69:22
attorney
58:14 96:21
attorney-
client
96:13

attorneys
  114:11 115:4
attractive
  58:9
audit
  94:2
authorities
  23:12
authority
  55:25 97:7,
  14 99:24
  101:7,8
  102:2
authorized
  14:23 33:12
  42:3
automatically
  112:10
automobile
  68:5
available
  95:5 108:22
aware
  7:9 29:12
  56:9 66:7
  67:5,16
  93:13 101:23
  110:18
  113:6,17,25
  114:15,19,
  20,21,25
  115:11,17

---

**B**

B-E-R-I-C
  6:8
back
  6:22,24 34:4
  37:3 65:21
  73:10 75:3,
  12 76:21
  82:1 84:25
  102:22 116:9
background
  46:21 57:25
  68:25 84:10

89:9 110:14,
  20 112:8,15,
  17,18,25
  113:7,18,23
  114:1,5,16,
  18 115:1,18,
  20
backup
  95:20
bad
  29:20
Bahamas
  20:19 34:17
  87:13
bank
  12:6
base
  26:20 30:15
  36:24 37:4,7
based
  11:4 20:1,14
  25:11 26:10
  28:15 39:8,
  10 40:15
  46:15 64:16,
  22 72:7
  81:22 98:20
  108:1 110:14
bases
  63:3 65:22
  66:3,19
  106:10
basic
  18:7 21:25
  22:3 26:16
basically
  90:14 96:18
  112:22
basing
  61:3,15
  62:22
basis
  9:19 40:25
  97:20 104:7
  105:1 106:11
  112:13

basses
  55:5
Bates
  27:19 36:15
  44:12
bear
  93:4 104:11
  111:19
beautifully
  21:14
beginning
  102:25
begins
  74:14
behalf
  6:2 9:24
  10:19 17:8
  33:13 44:4,6
  47:13 69:11
behavior
  28:24,25
  31:5 32:18
believe
  7:18 10:5
  11:9 13:15,
  21 15:23
  18:6 19:17,
  24 20:25
  29:15,24
  36:6 40:5,6
  42:17,21
  49:4 50:12
  54:11 59:18
  62:16 63:2
  64:4 65:25
  68:3,13
  69:19 73:22
  87:18 88:15,
  18 92:1
  96:11 103:15
  109:15
  110:16
  112:10 115:6
believes
  37:1
below
  88:11

Beric
  6:1,8
besides
  7:23 27:3
best
  89:23
bets
  101:10
better
  62:16 102:17
big
  15:25
bill
  95:21
bind
  9:12 14:23
  17:8
binder
  57:16
binding
  31:25
bird
  8:19
birth
  90:2
bit
  67:19,20
  72:15
board
  33:18 34:23
  49:19 73:18
  79:13 80:12,
  14 83:15
  91:4
boat
  12:23 13:14
  25:17,19
  90:5
boating
  83:25 84:1
  85:20 90:5,6
boats
  32:7
book
  10:18 11:10
bottom
  22:5,15,25

Eric Usher
November 19, 2021

73:2

**Boulon**
44:2 45:14
47:5,22
50:3,7,23
60:11 62:17

**Boulon's**
49:24

**box**
30:10,13

**brackets**
80:23

**branch**
9:7

**brand**
115:14

**breach**
42:24 53:19
59:12,14
63:8 64:9,15
65:5,14
66:14,15
67:5,21
79:13 80:13
98:19,21
99:1,2,4,9,
16,20 101:9
103:3,5,6,7

**breaches**
64:8 98:23,
25

**break**
42:7 58:8
91:23
106:17,18
111:3 116:5

**bridge**
6:11 50:4,9
79:8

**brief**
42:12 69:2
116:8

**briefly**
12:4 59:9
61:1

**bring**
71:2

**broken**
106:21

**broker**
15:7 16:3,21
17:9,19
35:8,12
94:12,22

**broker/third**
95:3

**brokerage**
15:23

**brokers**
9:9 13:5
14:20,22
15:11 17:11,
22 18:5,17

**brought**
68:19 69:21

**Brown**
51:24

**built**
26:17 37:4

**bulk**
71:16

**burden**
52:16

**Burton**
26:6 27:3,6
28:1 30:11

**business**
6:18 9:8,9
10:15,18
11:11,16,18,
25 12:5,6,22
13:4,6
14:19,22
15:7,8,11,
14,25 16:18,
25 17:7,8,
12,21 25:6,7
109:7

---

**C**

**calculated**
38:13

**calculating**
37:10

**calendar**
105:3,13

**called**
6:2 8:7,11,
13,16 10:22
12:8,13
13:23 51:23
53:7 89:12
95:9,10
106:12

**cancelled**
24:2 55:16

**Cancer**
33:20 34:25

**captain**
33:17 34:22
43:14,15,17
44:24 45:2,
6,7,10,14,
16,18,22,23
47:6,7 49:4,
6,13,18,20
50:4,9,20
73:18,22
78:13 79:14,
18,25 80:9,
12,13 84:4,
23 85:13
91:3

**care**
104:21,24

**career**
20:22

**carefully**
114:13

**Caribbean**
14:17

**Carolina**
34:10

**carried**
60:8

**carry**
65:8

**case**
21:4 23:14

39:3 50:15
52:20 54:9
55:4,15,19,
23 57:4 80:6
92:16 94:22
98:18,20
99:1 103:3

**Casualty**
10:23

**cat**
36:11,13
106:22

**catastrophe**
106:12

**catch**
7:6

**caused**
54:13

**caution**
58:21

**certain**
28:25 37:17
50:1 56:16
57:6 59:15
115:22

**certainly**
13:1 14:12
15:15 25:23
46:20 47:1
51:19 104:9,
17,22 110:7

**certificate**
19:22 73:12

**certification**
13:23,24
14:3

**chain**
15:4

**change**
18:6 26:24
39:16,20
83:9

**changed**
10:9,11 18:9

**channel**
50:5 78:25
79:1,2 82:23

Eric Usher
November 19, 2021

chap
    51:23
character
    29:3
characterize
    72:6
characterizin
g
    47:10 115:13
charge
    24:19 25:7,
    15 30:16
    32:5 36:25
    39:22 40:1
    69:12,14,15
    70:7,9,10,
    17,19,25
    100:19
charged
    68:14 69:7
    70:21
charges
    36:10 43:8
chart
    77:13,16
    78:5 82:13
charter
    38:22 81:14
charting
    77:20 78:13
chase
    96:23
check
    110:20
    112:15
    113:1,7
checked
    60:5 62:3
    104:9
checking
    80:1
checks
    110:15
    112:18
    113:18
    114:1,5,18
    115:1,18,21

choice
    35:4,13
chronology
    67:3
circumstance
    56:12
circumstances
    31:21 80:5
    99:3 103:5
citation
    103:23
cited
    67:24
claim
    16:22 40:8,
    11 43:25
    50:24 52:3,
    16,20,25
    53:3,13,14,
    17,18,25
    54:3,7
    71:18,19
    73:7 92:8,11
    93:15,25
    95:11,25
    96:3,5,7,9
    97:2,5,8,11,
    18 98:2,3,7
    99:3,9,10,21
    100:3 101:3,
    22 102:14
    103:1,2,5,20
    112:11,21
    115:2,18,21
    116:16,23
    117:1
claimed
    114:3
claims
    7:25 9:15,
    16,25 16:22
    34:4 40:4,5,
    10 48:11
    50:22 51:14,
    18,19,25
    52:25 53:6
    54:19,20
    55:25 92:2,

21 93:1,4,7,
    12,18 94:7,
    15,20,25
    95:2,8,14,22
    96:25 97:7
    100:10,11,
    14,24 101:6,
    8,15,16,17,
    18 102:6,23
    104:25
    105:8,12
    109:9,10,11,
    14,17,22
    110:13,18
    112:4
    113:19,22
    114:17,23,24
    115:22,24
clarify
    74:2
clause
    35:5
clear
    10:22 116:1
clearer
    89:21
Clearly
    103:16
client
    7:4 96:11
    110:22,25
closed
    109:19
closure
    93:20
club
    11:22 14:14
co-negligence
    54:15
CO2
    62:13
coast
    34:17 37:20
    38:18 60:6
    87:12
code
    6:13 106:25

collect
    9:13 113:23
collective
    64:17 110:17
collision
    33:2
come
    65:21 71:13,
    15 72:2
comes
    107:15
command
    49:6 79:15,
    18,21
comments
    62:18
communicating
    16:23
communication
s
    94:7
companies
    23:4
company
    8:7,11,13,
    14,16,17,25
    9:18,23
    10:23 12:8,
    9,13,15
    18:21 28:2
    51:24
compensation
    9:19
complaint
    40:20,25
complete
    22:11 46:19
    64:22 66:25
    89:8
completed
    19:1 56:17
    62:22 63:4
    64:21 95:3
completely
    54:17 96:19
compliance
    56:20 59:15

Eric Usher
November 19, 2021

complicated
  71:24
complied
  35:2 45:24
  50:8 56:22,
  24 57:1
  59:23 61:24
  63:7 64:12,
  21 67:8
complies
  112:24
computer
  26:17,20
  37:5,9 38:11
Concept
  8:7,8,21,22
  11:2,15,19
  12:8,13,20
  15:6 17:13
  18:11 22:23
  34:3 36:16
  38:2 69:6
  80:17 81:11
  86:22 92:1,
  4,7
concern
  112:13,16
concerned
  25:2 42:18,
  23 64:4
  100:17
  108:12
  110:17
concerns
  99:16
concert
  51:20
concluded
  117:21
condition
  53:19 57:5
  98:19,21
  99:1 103:4
conditions
  57:21 73:14
  86:11

conduct
  44:3 57:25
  102:2
conducted
  115:7
confer
  110:25
confidential
  110:23
confused
  12:10
conjunction
  51:23 82:9,
  18
connected
  99:4 101:9
  103:6
consequence
  12:13 13:10
  14:2 105:8
consider
  30:3 31:22
  33:5 37:19
  47:15 55:12
  77:21 112:2
consideration
  30:4 40:3
  41:3
considered
  52:14 55:4
consisting
  51:2
constantly
  41:22
constitutes
  86:15
construction
  38:22
consultant
  44:3
Consulting
  44:13
contained
  61:6 93:1,12
  94:15,20,25
contains
  23:2 35:4

  102:24
contemporaneo
us
  93:19,24
contend
  62:21
contendere
  25:14
contending
  66:10
content
  19:1 53:14
contest
  24:10 90:12
contesting
  59:10
continuation
  56:13
continue
  10:18
continued
  13:17
continuing
  94:2
contract
  10:12 12:5
  86:15
contracted
  44:8
contribute
  54:8
control
  49:9 50:10
  74:10 75:8
  77:1 78:25
  79:7,22 80:2
  82:25
conversion
  109:7
convicted
  22:7 24:9
  25:13,15
  29:7 46:23
  67:24 90:11
  91:17
conviction
  25:3,5,11,

  12,21 29:17
  31:11 37:23
  38:25 39:21,
  23,24,25
  40:1,21,25
  42:1,4 59:16
  68:19 69:3,
  4,8,21 70:1,
  4,5,11,20,24
  71:14,19,22
  114:8
convictions
  24:15 25:4,8
  28:17 31:18
  37:25 39:1
  71:25 90:20
copies
  89:21 117:14
copy
  15:1 17:24
  18:1 19:8
  72:12 87:9
  89:15 91:8
  94:3,17 96:9
  117:18
Coral
  6:19,20
corporate
  7:13 40:18
  114:21
correct
  7:15 10:5
  11:6 14:18,
  20,21 15:10
  16:19,24
  17:2,3,16,20
  21:18 23:5,
  6,15,22,23
  24:10,11
  28:13 29:10
  31:1,5,19,20
  34:12,15,19
  35:8 37:16,
  18 38:19,23,
  24 40:22,23
  42:15 43:9,
  13,20 45:1,
  4,5,9,12

Eric Usher
November 19, 2021

47:7,9,22,23
48:1,4,5,19
52:15,18,19,
23 53:23
54:21,22
55:17,18
56:6 57:10,
14,18,20,23
65:6,7,9,10,
12,13 67:25
68:6,7,16
72:8,9,21,
22,24,25
73:8,25
76:1,6,10,
11,13,14,16,
17 77:2,17
78:6,11,12
79:19,20
81:24,25
82:13 84:14,
18 85:8,9,10
86:7 87:13,
15 92:14
94:6,24
96:1,10
97:23 98:22
101:6 114:19
115:25

**correlate**
26:24

**correspondenc**
**e**
94:4 95:11
96:6

**cosmetic**
63:11 65:1

**costs**
51:3

**counsel**
7:3 96:12
102:16
107:23 111:6
117:18

**count**
105:24

**couple**
86:19

**course**
7:1 12:11,15
50:2 60:1
65:13 78:22
89:21 96:11
111:22

**court**
21:14 35:7,
11 53:10
117:9

**courts**
35:6

**coverage**
9:12 34:7
53:5 56:11
59:7,10,22
61:4,15
62:22 63:3,
14 64:22
65:3,5,24
66:3,12,19,
24 68:11
70:10 87:21
89:2 92:24

**covered**
43:1,5
52:14,21
74:21 75:14,
17,19,22
76:9 84:19
85:2,5,6
86:3 88:19,
24

**COVID**
12:17

**created**
94:10

**Credit**
112:24 113:3

**crew**
45:16 103:8,
13,25 104:6,
15,23

**criminal**
24:9,10,15
25:3,4,5,8,
14 29:5,12
37:23,25

38:25 39:1
40:21,25
42:1,3 46:24
59:16 67:11
68:19 69:21
71:14,19
90:11,20
91:18
110:14,19
111:22,25
112:7,14,17,
18 114:8

**criteria**
13:25 18:7

**CROSS**
58:11

**CSR**
9:1 10:1,8,
16 11:22
14:4,14,16
15:8 16:10
17:5 18:15
21:20 22:21,
25 23:1,3
27:6 33:10
34:8 36:8
41:17 44:6,9
45:14 46:9
47:4,13,14
48:7,21,22
56:7,15
57:15,24
68:20 69:24
70:13,24
71:9,10 73:8
75:25 78:18
81:7 89:19
92:6,10,13,
21 93:2,11,
23 94:8 95:4
97:6 101:17
104:25
105:15
108:14
109:4,9
110:13,19
112:7,23
114:15

115:12,17

**CSR's**
21:16 51:25
55:25 99:8

**CSRYP/184540**
72:19

**CSRYP184540**
81:24

**current**
28:15 105:14

**customers**
34:5

**cut**
22:24

**CV**
91:19

---

**D**

**D's**
109:21

**Dallas**
8:12,14,15,
25 11:13
18:12

**damages**
42:25

**Data**
111:7
116:12,24

**date**
62:3 90:2

**dated**
41:21 49:24

**daughter**
29:19 39:13

**day**
54:15

**day-to-day**
71:16 114:23

**days**
47:17 48:3,
18 52:1
57:17 96:22,
23

**de-merger**

Eric Usher
November 19, 2021

8:20

**deal**
9:15 10:19
17:11 102:18

**deals**
65:19 71:16

**December**
105:7,12

**decide**
9:10

**decided**
10:14 41:23

**deciding**
112:25

**decision**
71:1 100:3,5

**declaration**
94:17

**declaratory**
40:12,13
66:5

**declared**
51:2 55:16
76:3

**declination**
56:11 65:3

**decline**
102:14

**declined**
24:2

**deductible**
43:10,11
51:4

**deemed**
24:22 63:8,
11 79:14

**Defendant**
6:2

**defenses**
42:23 43:6

**defined**
76:10 86:4
87:3,16
88:14,16

**definition**
49:7 74:7,9
75:3,6,17

76:21 77:9,
10,25 78:20
82:1,7,15,
17,18 83:11
85:5

**degree**
39:12 103:21

**delivered**
42:14

**demonstrate**
52:17

**denial**
41:1 55:5
59:6,7 61:3,
15 62:22
63:3,14
64:16 65:5,
23 66:3,4,
12,19,24
67:9,13,15,
17,20 98:20
100:2 109:13
110:17

**denied**
40:8,9 54:7
109:10,18,20
110:19

**denies**
110:14

**density**
106:25

**deny**
70:3 100:3
101:22

**denying**
64:22 65:24
89:2 97:1
103:20

**department**
16:23 93:7

**depending**
37:5

**depends**
70:4 81:9,19

**deposition**
7:5,16,17,
22,23 8:2,3

14:8 16:6,7
18:18 19:19
20:7 27:12
35:17 36:17
38:5 41:14
44:15 51:10
102:12
110:5,9
117:21

**depositions**
20:21 21:9,
12 58:21

**describe**
13:3 26:18

**designed**
107:7,8

**desired**
16:16

**detail**
85:18 99:15

**detailed**
75:23 84:20,
23 87:23
88:8

**details**
15:3 30:20
69:25 88:2
90:10,13
93:15

**detectors**
62:13

**determination**
84:9 92:25

**determine**
22:1 24:5,18
25:6,10
30:16 32:4,
19 39:25
53:2,18
69:4,15 72:4
83:22 84:11

**determined**
61:10 104:19

**determining**
26:24 69:7
70:9 101:21

**develops**
95:12

**deviate**
92:21

**diarize**
96:19

**diary**
95:10,13
96:16,17,18

**differ**
105:4

**different**
10:20 18:4,
16 41:18
48:23 49:1
78:1 79:22
86:19 91:12
92:17 108:6

**direct**
6:5 44:21
84:3 110:3,
21

**direction**
47:7 92:17

**directly**
47:4 88:7,11
96:15

**director**
8:23 51:20
93:4,8
101:15,16,17
113:22

**disclose**
114:7

**disclosed**
32:1 68:24
69:8 98:12

**discontinuati
on**
10:16

**discover**
53:4 69:25

**discovery**
63:22,25
66:9

**discretion**
70:16

Eric Usher
November 19, 2021

| | | | |
|---|---|---|---|
| **discuss** | **documents** | 101:14 104:4 | **enables** |
| 19:12 | 7:20 14:12 | 105:13 | 22:3 |
| **discussed** | 34:2 57:22 | 113:25 | **end** |
| 38:21 57:15 | 71:5 95:11, | **easier** | 54:15 |
| 65:9 | 14 96:14 | 21:2 | **endorsements** |
| **discusses** | **doing** | **easiest** | 86:15 |
| 54:19 | 6:17 9:17 | 107:2 | **engine** |
| **discussing** | 16:17 91:21 | **east** | 80:2 |
| 7:20 20:13 | 113:10 | 34:16 87:11 | **England** |
| 83:3 102:23 | **domestic** | **effect** | 12:18 |
| **discussion** | 29:8 | 12:17 28:11 | **ensure** |
| 58:4 85:22 | **doubt** | 29:20 | 17:19 |
| 116:19 | 28:2 50:16, | **effective** | **entered** |
| **dishonesty** | 17 | 57:17 | 59:25 107:9 |
| 31:12,14 | **downstairs** | **effectively** | **entire** |
| **dispute** | 80:1 | 9:6,17 53:2 | 9:17 86:15 |
| 35:5 | **drafted** | 64:8 81:10 | **entirely** |
| **distinction** | 81:11 | **egregious** | 91:18 |
| 24:16,20,24 | **driving** | 70:4 | **entirety** |
| **district** | 22:15 25:3, | **eight** | 32:20 |
| 35:7,11 | 15,21,23 | 62:10 | **entitled** |
| **document** | **drug** | **eighteen** | 36:25 81:20 |
| 8:3 14:6,8, | 31:18 | 61:23 63:1, | **Essentially** |
| 11 16:7,12, | **drunk** | 16 64:20 | 99:13 |
| 14 18:14,18 | 25:15 | **eighth** | **establish** |
| 19:19 20:7 | **DUI** | 81:5 | 29:1 39:24 |
| 21:21 22:14, | 22:8 25:21 | **either** | 53:25 68:22, |
| 18 26:4 | 32:1 67:24 | 15:5 31:24 | 25 84:10 |
| 27:10,12,15, | **DUIS** | 32:16 33:11 | **established** |
| 16,22 28:3 | 29:16 | 35:7 47:4 | 38:12 67:7, |
| 33:24 34:1 | **duly** | 52:25 76:10 | 10 115:6 |
| 35:15,17,20, | 6:3 | 92:24 | **estimate** |
| 22,25 36:14, | **duties** | **elected** | 51:7 |
| 17,20,22 | 9:6 | 10:12 | **evaluated** |
| 38:2,5,9,10 | | **electronically** | 25:25 |
| 41:9,14,24, | | | **evaluating** |
| 25 42:2 | **E** | 94:11 | 40:7 |
| 44:11,15,18 | | **element** | **evaluation** |
| 51:10,13 | **e-mail** | 31:14 | 95:4 |
| 59:24 72:15 | 21:19 | **eligible** | **event** |
| 88:14 93:5 | **earlier** | 17:6 | 14:14 17:9 |
| 95:10,17,18, | 34:16 36:23 | **emergency** | 38:12 39:22 |
| 20 101:15 | 37:4 41:5 | 61:22 64:20 | 42:19 49:15 |
| **documentation** | 57:16 60:13, | 104:13 | 55:10 63:11 |
| 9:13 19:23 | 19 71:7 | **employed** | 68:24 70:11 |
| **documented** | 73:13 74:5 | 8:6,8 | 71:12,14 |
| 19:16 20:14 | 79:6 82:12 | | 80:10 90:15 |
| | 89:1 100:8 | | |

Eric Usher
November 19, 2021

events
12:24
evidence
77:4
ex
55:8
exactly
15:3 99:15
100:16
EXAMINATION
6:5 58:11
examined
6:4
exceed
34:17
exceeds
97:8
Excellent
91:20
exceptions
92:15
exclude
53:18
excluded
53:1 87:21
exclusion
66:25 89:3
exclusions
52:12
exemption
13:24
exhibit
8:1,3 14:6,8
16:5,7
18:15,18
19:8,18,19
20:6,7 21:20
22:19,20,21
26:6 27:11,
12 28:10
33:14,22
35:16,17
36:3,15,17
38:4,5

97:7 112:13
113:10
116:18
41:10,14
44:11,15
49:24 51:1,
9,10 52:6
59:25 60:14,
18,20,25
61:21 63:20
72:12 86:10,
23,25 88:17
89:16 91:8,
11,25 93:12
96:25
exhibits
25:25
117:16,17,19
existed
8:22
expect
93:23 96:2,5
113:9
expectation
92:23
expected
20:15 98:11
expenses
95:21
experience
72:8 83:25
84:1,6 85:20
90:6 91:12,
13
experienced
39:15 103:16
Explain
36:22
explanation
97:20
export
17:12
exposed
10:15 42:4
exposure
50:24 51:6
106:25
exposures
9:16 106:9

expressed
64:9
expression
87:5
extent
18:9,11 71:3
83:22 84:11
108:13
extenuating
31:21
extinguisher
60:2 62:23,
24
extinguishers
61:16,19
64:9 65:19
104:5
extinguishing
66:16

**F**

face
89:6
fact
31:4 56:12
98:10,13
100:6 114:25
factor
37:14 55:2
factors
26:24
facts
37:10 45:20
100:7
fails
88:2
failure
64:22 65:8
66:25 114:7
fair
13:7 55:7
59:4 72:6
85:14 95:25
110:6 112:24
113:3

fairly
34:5
fall
116:24
familiar
16:12 18:21,
23,25 19:14
21:21 35:23
36:2,20 38:9
41:19 49:23
74:19 79:2
familiarize
60:25
FAQ
48:14
FAQS
48:12
far
25:2 64:4
67:2,16
93:13 100:17
106:24
110:16
February
6:21 16:11
44:14,25
47:4,25
49:24
Federal
35:6 54:21
fee
9:21,22
73:12 95:21
fees
36:11
feet
37:12 91:2
felony
22:7 23:5
24:17,21,23
felt
12:12
fewer
9:25
field
44:5 59:24
62:18 67:6

Eric Usher
November 19, 2021

111:19

**fifteen**
25:24 29:9,
21 30:3
39:13 41:5
68:5,10
96:22

**fight**
108:18

**file**
7:24,25
38:15 67:2
93:15,18
94:5,7,10,
15,20,25
95:9,15,22
96:3,5,9
112:11

**filed**
40:12 55:15

**filing**
40:13,24
66:22 117:23

**final**
95:24

**financial**
14:25 102:2

**find**
64:14 75:17

**finders**
100:6

**fine**
91:23

**finish**
58:24,25
59:3 102:23
110:10

**fire**
33:1 60:1,2,
4 61:16,18,
19,22 62:23,
24 64:5,9,
19,20 65:15,
19 66:15
104:3,4,8,13

**first**
6:3 21:16

22:5 36:3
38:8 40:11
57:15 66:19
72:17 76:15
87:3 90:2
91:11,21
93:18 97:17
99:7

**five**
12:16 17:17
24:3 46:23
62:12 81:18

**five-minute**
111:2 116:5

**fixed**
9:21,22
64:19

**flight**
7:5

**flip**
73:1 75:10

**Flipping**
73:10

**Florida**
11:23 12:1,
3,4,18,22
14:17 17:1,
4,14,16
20:1,4,10,
14,16,20
21:4 23:3,7,
8 34:13,17
35:11 36:5,
11 37:20
38:18 42:17
87:12 107:4,
10,15,18
108:14,23

**follow**
92:25 93:10,
11 101:2

**follow-up**
58:16 108:1
110:1 116:6

**following**
105:10

**follows**

6:4 22:6

**foot**
84:2 90:25

**forget**
60:14

**Forgive**
116:12

**form**
15:9 18:8,24
21:24 22:12,
22,23 23:1,2
35:4 41:17,
18,19,20
46:19 48:9,
11 56:19,20
75:23 81:7,
23 84:22
85:15,16,20
86:7,9 87:5,
8,23 88:15,
20 89:19
90:15 95:2
104:20
105:20

**formation**
12:9

**formed**
12:7

**forms**
18:4 85:16

**Fort**
12:23 13:9
106:20

**fortuitous**
42:19

**fortuity**
52:13

**forward**
77:14 78:5

**found**
28:3

**Foundation**
115:3

**four**
13:16 81:10
90:5

**fourth**
39:12 103:21

**frankly**
96:21

**frequency**
71:18

**frequently**
20:24 30:20
31:23 32:3
83:19 105:20

**Friday**
6:16

**fuel**
38:21

**full**
86:13 97:20

**Fund**
36:12,13

**future**
74:1

--------

## G

**G-I-L-H-O-O-
L-Y**
33:11

**game**
110:6

**gave**
69:2 78:25
113:22

**general**
9:3,4 64:11
65:22 86:11
95:18 102:6
106:11,21

**generally**
65:4 108:25
115:11

**gentleman**
53:7

**geographic**
106:15

**geographical**
87:11

Beric Usher
November 19, 2021

| | | | |
|---|---|---|---|
| **geographically** | 19:8 21:5 | 7:14 9:1,5, | **Guard** |
| 106:5 | 23:16 29:23 | 15,20 10:1, | 60:6 |
| **getting** | 41:6,11 | 8,12,13,17 | **guess** |
| 30:22 110:1 | 42:20 43:2 | 11:12 15:6 | 16:1 102:15 |
| **Gilhooly** | 46:5,10 | 17:6,8,13 | 104:13 |
| 33:11 | 47:8,10 | 21:16 33:13 | 107:10 |
| **give** | 50:11 53:21 | 40:10,16 | 111:18 |
| 10:2 27:17 | 54:10 55:6 | 43:21,24 | **guidance** |
| 30:8 42:9 | 56:8,18 | 44:7 51:16 | 27:17 38:14 |
| 51:1 53:4 | 63:17,20,24 | 52:1 53:6,14 | 70:14 93:6 |
| 74:16 90:10, | 79:10 80:4 | 55:11 56:1, | **guide** |
| 12 111:19 | 85:21 99:11, | 4,15 59:10, | 36:16 37:22 |
| 112:5 | 22 107:20 | 20 61:14 | 71:6 |
| **given** | 108:4,15,19, | 62:22 64:21, | **guideline** |
| 20:21 21:15 | 25 109:25 | 25 65:23 | 37:2 |
| 47:2 58:20, | 110:10,21,25 | 66:1 69:11 | **guidelines** |
| 21 | 111:4 113:20 | 78:18 92:18, | 26:13,15 |
| **giving** | 115:3,13 | 20 93:6 94:8 | 28:6,9 30:25 |
| 80:2 | 116:1 117:7, | 95:19 97:9, | 31:3 71:4 |
| **glanced** | 15 | 12,15 99:16 | 101:2 |
| 39:7 | **good** | 100:4,7,9,22 | **guides** |
| **Global** | 6:22 42:10 | 101:11,12,24 | 28:16 |
| 18:16 19:1,5 | 74:20 97:19 | 102:1,7 | **guilty** |
| **goes** | **Gotcha** | **greater** | 39:12 68:9 |
| 29:3 80:22 | 108:10 | 9:25 | **gulf** |
| 87:22 105:2 | **govern** | **ground** | 37:20 38:17 |
| **going** | 97:13,15 | 99:2 103:4 | **guy** |
| 7:11 8:1 | **governed** | **grounded** | 101:16,18 |
| 9:11 12:6 | 116:16 | 45:24 | |
| 25:10 37:3, | **governing** | **grounding** | **H** |
| 22 40:1 | 71:9,22 | 32:24 42:16, | |
| 41:18 42:6,8 | **GPS** | 18,25 43:19 | **H-A-R-R-A-G** |
| 48:23 51:25 | 106:13,22 | 45:8,11 | 6:12 |
| 54:12 59:2 | 107:1,8,9,12 | 47:17 48:3 | **H-A-R-R-O-G-** |
| 69:7 70:21, | 108:7 | 49:21 54:4, | **A-T-E** |
| 24 74:12 | **Grant** | 8,14 74:2 | 6:12 |
| 75:10,12 | 44:3,6,13 | **groundings** | **hailing** |
| 82:20 85:17 | 45:2,6,14 | 32:22 | 20:4 |
| 86:8 89:22 | 47:5 60:10, | **grounds** | **half** |
| 91:22 92:16 | 13,25 61:5,9 | 54:2,4,7 | 100:19 |
| 93:25 | **Grant's** | 65:2 98:2,8 | **hand** |
| 100:14,18 | 44:9,23 | 103:2 | 86:25 91:7 |
| 108:21 | **granted** | **Group** | **handle** |
| 110:21 | 13:11 | 10:24 15:12 | 10:18 |
| **GOLDMAN** | **gratia** | 19:6 | **handled** |
| 6:25 10:2,5 | 55:8 | **guarantee** | 40:10 |
| 12:25 15:20 | **Great** | 64:24 | |

Eric Usher
November 19, 2021

handling
  34:5 48:11
  93:19 100:10
  114:24
happened
  10:16 45:3
  69:1 99:13,
  14 111:12,
  14,16 115:22
happening
  48:18
happy
  42:8 58:23
hard
  89:22
hazard
  111:17
heading
  96:16
hear
  10:3
heard
  59:6 96:22
helm
  45:7 47:6,19
  49:9 50:10
  74:11 75:8
  77:2,5 78:1,
  2,17,19,21
  79:4 83:14
  84:16 103:12
helmsman
  45:18
help
  21:15 53:10
hey
  92:15
HG
  6:14
higher
  30:21
highlighted
  47:18 112:14
highlighting
  53:15
history
  8:10 89:10

hold
  75:11 110:4
holder
  45:15,17
home
  6:19,20,22
  20:3
Homestead
  106:19
hope
  116:1
hour
  42:7
house
  7:5 15:23
hurricane
  36:11
  106:14,24

I

idea
  15:21 37:9
  102:6
identical
  12:12 18:8
  89:17
Identificatio
n
  8:4 14:9
  16:8 18:19
  19:20 20:8
  27:13 35:18
  36:18 38:6
  41:15 44:16
  51:11
identified
  54:2 87:20
  110:5
identify
  54:20 72:17
illegible
  89:15,23
imagine
  93:3,9 102:8
immediately
  18:25 26:2

60:9
impediment
  53:3
important
  31:12,13
  58:24 64:5
impossible
  72:1 112:5
inactive
  12:15
inadvertent
  40:4 41:4
inappropriate
  113:7,11
inception
  55:16
incident
  29:13 30:2
  31:15 33:6
  50:21 69:1
  73:24 74:1,2
  78:11 79:19
  101:10
  103:24
  113:17
  114:1,14
incidents
  32:10
include
  37:14 38:20
  40:25 66:6
  78:18 86:4
  88:2 94:11
  95:13 96:6
included
  36:10 37:11
  95:22 96:3
includes
  48:17 102:13
including
  32:3 62:24
  90:4
incompetent
  54:17
inconsistency
  49:11,14

incorporate
  114:7
incorporated
  12:11 20:19
  67:8
incorporates
  86:13
increase
  68:15 70:14
  71:23
incurred
  105:8,13
indeed
  59:24 70:3
  116:22
indemnity
  15:1
independent
  9:9
index
  95:13
indication
  22:4
individual
  28:15 32:3
  38:17 80:3
  83:23 111:9
  112:15
inform
  47:13
information
  9:14 15:4
  16:16 22:1,
  3,6,9,10,12
  26:10 32:13
  39:9,10
  46:21 89:10,
  12,24 95:5
  96:10 102:7
  106:5 108:6,
  22,24 109:1
  110:9,23
  111:8 116:25
informed
  48:6
infraction
  55:11

Eric Usher
November 19, 2021

initial
  52:16 66:6,
  14,20
initially
  8:11 25:23
initiating
  66:17
inquiry
  7:19 102:13
  108:12
instance
  78:23 84:12
  99:14,18
  104:21
  109:24 114:6
instances
  93:9 99:14
  113:6
instruct
  92:20
instructed
  92:18
instructions
  15:3 16:10
  18:10 58:20
insurance
  7:14 9:8,18
  15:1,12
  18:16 21:25
  23:4 24:2
  25:24 32:15
  35:20,24
  36:4 39:14
  56:13 68:5
  86:14 88:17
  89:5,13,20
  105:16
insure
  22:11 56:16,
  23 57:11
insured
  15:5,18
  32:21 34:14
  48:6,24
  52:20 55:20
  56:21 58:14
  70:6 72:23

73:5 86:5
90:9 94:12
107:4 108:23
110:20 111:9
115:2
insureds
  112:8,19
  113:1,18
  114:2,16
  115:1,18
insurer
  10:20,21,22
  11:16 17:7
  24:7 26:14
  36:24,25
insurers
  11:17 76:1,2
insuring
  80:21,23
  86:13,17
intention
  55:1 84:15
interest
  13:24 14:1,2
interested
  22:9,10
  24:14 32:15
  105:21
internal
  26:13 27:16
  38:10 51:14
  71:1,5,8
  93:5 101:15
interpretatio
n
  48:23 49:1
  85:14
interrogatori
es
  63:18
interviewed
  45:3
introduction
  21:12
investigating
  92:7

investigation
  44:4 112:16,
  17 113:19
  114:10,24
  115:21
investigation
s
  57:24,25
  92:12 114:16
  115:4
investigators
  113:9,12,15,
  18 115:1,5,
  17,20
involved
  8:24 12:5
  27:3 40:11
  41:4 46:22
  90:1,9 91:16
  114:23
  116:23 117:1
involvement
  21:16 26:25
  40:7,17
involving
  29:6,13
  31:12 39:12
inward
  94:4 96:6
Island
  42:17
isolation
  65:15
issue
  9:11,13
  29:25 54:16
  63:12 70:2
  71:11 72:20
  74:25 83:19
  91:6 105:24
  111:22,25
issued
  17:15 33:10
  34:2 36:4
  47:22,24
  48:2 57:15,
  17,19 67:4
  86:15 112:3

issues
  53:4,13,15
  91:2
issuing
  70:3
item
  64:5 85:11
  94:17 95:2
  96:15 98:13,
  18
items
  38:20,23
  43:5,12
  56:16 57:8,
  11,12 59:20,
  23 60:7,10
  61:2,14
  62:19,21
  63:4,15
  64:18,23
  65:9 66:1
  67:1 96:2
  104:20

_____

J

January
  28:10 105:6,
  11
job
  9:17
Joe
  15:23 16:11
join
  102:20
judgment
  66:5 111:25
July
  33:20 34:25
  107:18
jumping
  58:19 103:2
June
  11:3
Jupiter
  106:20

Eric Usher
November 19, 2021

**K**

keep
  7:3 42:8
  91:22 93:24
  105:23
  106:15 108:6
Kelley
  6:6 7:10,12
  8:1,5 10:4,7
  13:12 14:10
  16:4,9 18:20
  19:10,11,21
  20:9 21:8
  23:19 27:14,
  20,24 28:8
  30:1 35:19
  36:19 38:4,7
  41:8,12,16
  42:6,11,13,
  22 43:4
  44:17 46:7,
  12 47:12
  50:14 51:12
  52:7,9 53:22
  54:18 55:14
  56:10 57:3
  58:3,5,17
  60:16 71:7
  72:13 73:13
  86:24 91:9
  102:12,20
  108:11
  117:9,12,13,
  20
key
  106:19 108:8
Kids
  20:1 23:15
  34:13 35:21,
  23 47:14
  56:7 58:14
  66:2,11,18,
  23 73:5,7
  92:10
kind
  29:2 37:24

112:6
kinds
  28:25
Kingdom
  6:13 102:2
  111:8 116:12
knew
  47:5
know
  7:8,11 11:8
  46:6,11
  55:24 58:21
  59:1 71:1
  90:22 92:15
  100:25
  107:20 108:2
  109:14
  111:15
  113:2,3,21
  117:11
knowledge
  101:20
knowledgeable
  103:17
known
  68:8
Kolisch
  15:12,22,23
  16:11,15,20
  19:7 21:17,
  19,25 35:20,
  24 42:14
  47:14 94:23
Kutner
  45:7,17 46:8
  47:6 49:21
  50:10 78:16
  79:1,4
  89:11,17
  91:5,13
  103:11,16
Kutner's
  46:13 89:3,7

———————

**L**

Lacey

51:20
lakes
  7:14 9:2,5,
  15,20 10:1,
  8,12,13,17
  11:12 15:6
  17:6,8,13
  21:16 33:13
  40:10,16
  43:21,24
  44:7 51:16
  53:6,15
  55:12 56:1,
  4,15 59:10,
  20 61:14
  62:22 64:21,
  25 65:23
  66:2 69:11
  78:18 92:18,
  20 93:6 94:8
  97:9,12,15
  99:16 100:7,
  9,22 101:11,
  12,24 102:1,
  7
Lakes'
  52:1 100:4
language
  49:8 60:3
  64:7,10
  65:18
lapse
  25:11
largely
  81:19
Lassiter
  6:3 11:23
  23:15 29:6,
  13 34:10
  38:8 39:11
  46:1 47:14
  66:2,11,18,
  23 72:23
  75:20,22
  76:10 83:24
  84:12 85:9,
  13,19 86:4,5
  92:10 103:22

107:24
  116:25
Lassiter's
  31:7 63:25
  68:9 98:21
late
  7:11
Lauderdale
  12:23 13:9
  106:20
law
  23:4,8 36:5
  54:20,21
lawsuit
  66:17,22
leak
  62:7
leaking
  62:8
leaving
  88:19
left
  28:14 72:3
  98:1,6
legal
  40:15 53:16
  99:18 100:3,
  4
length
  26:23 37:11
lengths
  90:7
Leon
  33:11
letter
  47:21,24
  48:2 56:20
  66:4 67:9,
  15,17
level
  33:4
levy
  25:10
license
  15:2 17:10,
  12 45:15,17
  46:16

Eric Usher
November 19, 2021

licensed
  33:17 34:22
  39:15 43:15
  73:17
life
  94:4
light
  112:16
lightning
  33:1
likewise
  59:2
limit
  23:24
limitation
  24:12,14
limited
  8:14,17,25
  12:8,10,11,
  14
limits
  20:17
line
  9:7 17:4,14
  26:14
lines
  15:2 17:1,7,
  10,12 36:5,
  11,24
list
  27:21 57:5,8
  59:23 61:6,
  13 91:13
listed
  38:23 60:9,
  10 62:20
  64:19 73:5
  80:20 89:4,
  18
listen
  114:12
lists
  91:11
literally
  62:18 95:10
litigation
  33:23 35:10

67:18 72:21
74:25 111:10
115:7
little
  42:6 67:19,
  20 68:1
  72:15
live
  109:19
loading
  37:17
located
  102:9,10
  106:6,7
  107:14,17
location
  26:22 37:6,
  19 106:9,13,
  15,23 107:8,
  9
locations
  107:12
log
  30:17
London
  102:10
long
  7:8 8:8 11:7
  15:14,16
  27:8 39:24
  70:20 108:4
longer
  51:24
look
  9:14 18:7
  28:23 31:4,
  11 32:2,7
  33:5,6 53:17
  75:16 80:21
  84:25
  109:16,21
  112:13
looked
  86:19
looking
  28:22 29:1
  31:17 38:15

60:20 61:21
82:16 86:1
97:1 99:7
102:11
loss
  29:1,2,25
  32:7 33:1
  34:14 43:22
  46:22 51:2
  52:17,21
  53:1 54:9
  57:25 90:9,
  19 92:12,20
  93:25 95:21
  112:8 114:3,
  15
losses
  23:22 32:15,
  18,25 33:2
  71:12 86:5
  91:17
lot
  12:7 20:23
  29:3 90:1

_____

**M**

made
  9:23 39:20
  50:15 57:5
  97:5,18
  98:2,7 103:2
  115:2,18
magazine
  13:11
maintain
  49:18
maintaining
  59:21 61:2
maintenance
  93:15
major
  16:3 32:24
majority
  8:13 21:6
make
  24:16,20,24

25:9 48:9
50:23 52:1
82:7 92:15
100:18
104:11
110:11
112:24
making
  26:12 32:14
  92:23,25
  97:15 114:2,
  16
manage
  9:16
managed
  20:1
management
  9:21,22
  93:20 96:16
managing
  9:3,4
manual
  17:21,24
  27:24 51:15,
  18,22,25
  54:19 55:25
  71:3 92:2,
  16,21 93:1,
  12 96:25
  100:11 101:6
  102:23
manufacturers
  90:7
March
  60:18
Marco
  42:17
marina
  106:25
marine
  15:12 19:1,6
  21:25 35:20,
  24 42:14
  44:2,13
  102:5 108:13
mariner
  39:16

Eric Usher
November 19, 2021

| | | | |
|---|---|---|---|
| mariner's | maximum | meeting | 93:4 111:19 |
| 46:16 | 69:18 | 13:5 | 113:22 |
| Mariners | Mcneil | meetings | minimum |
| 12:23 13:9, | 23:17 27:19, | 6:18 | 69:12,17 |
| 14 | 22,25 52:5,8 | member | 94:11 |
| mark | 58:7,10,12, | 26:11 45:16 | minor |
| 8:1 14:6 | 13 60:12,21, | 103:8,13,25 | 32:22 33:2 |
| 16:5 18:14 | 23 63:19,22 | 104:6,15,23 | 55:10 62:6 |
| 19:18 20:6 | 64:1,2 | members | 64:15 65:1 |
| 27:10 35:15 | 72:11,14 | 28:5 | minute |
| 36:14 38:4 | 79:17 80:15 | memory | 74:12 |
| 41:9 44:11 | 85:24 86:23, | 50:2 90:1 | minutes |
| 51:8,19 | 25 87:2 | mention | 42:10 74:16 |
| marked | 91:7,10 | 40:21 41:25 | 91:22 |
| 8:3 14:8 | 99:19,25 | mentioned | mischaracteri |
| 16:7 18:18 | 102:15,21 | 14:19 16:25 | zing |
| 19:19 20:7 | 107:25 | 34:16 36:23 | 11:14 |
| 21:20 22:19 | 108:5,17,21 | 45:25 83:13 | misdemeanor |
| 27:12 28:9 | 109:3 110:4, | 111:6 116:11 | 24:17 39:12 |
| 30:10,13 | 12,24 111:2, | merged | 65:11 67:22 |
| 33:22 35:17 | 5,13 113:24 | 8:16 | 68:9,10 |
| 36:17 38:5 | 115:9,10,14, | merits | 71:21 103:21 |
| 41:14 44:15 | 16 116:2,4, | 95:4 | mislead |
| 49:23 51:10 | 9,10 117:3, | met | 55:1 |
| 52:5 60:15 | 16 | 44:24 45:2 | misquoting |
| market | mean | 48:24 | 116:13 |
| 11:23 | 26:8 32:9 | MGA | misrepresenta |
| marketplaces | 63:20 65:17 | 9:18 | tion |
| 14:17 | 77:12,16 | MGA's | 23:4 42:24 |
| markets | 78:4 82:12, | 9:19 | 98:13,15 |
| 11:24 | 19 98:3,4 | Michael | misrepresenta |
| master | 101:17 105:2 | 44:3,6,13 | tions |
| 39:16 45:7, | 111:17 | 45:17 46:8 | 54:23 |
| 11,15,16,17 | meaning | 47:5,6 | missing |
| 79:6 83:15 | 82:3,4 | 60:10,13,25 | 34:4 |
| material | meanings | 61:9 | misunderstood |
| 18:6 24:22 | 82:11 | Michigan | 100:8 |
| 29:24 31:4 | means | 107:15 | mitigating |
| 56:13 98:10, | 9:8 26:9 | mid | 55:2 |
| 14 114:20 | 33:3 74:10 | 15:15 | mitigation |
| matrix | 75:7,19 | Mike | 43:8 51:3 |
| 26:16,20 | 76:25 85:6,9 | 45:7 | mode |
| 37:9 | 103:1 | miles | 107:9 |
| matter | meant | 20:18 34:18 | modeling |
| 53:5 70:20 | 70:12 | mind | 106:12,22 |
| 93:20 111:11 | meet | 7:4 60:22 | moderated |
| 112:7 116:21 | 98:2,3,7 | 79:21 82:25 | 37:5 |
| | 103:1 | | |

Beric Usher
November 19, 2021

| | | | |
|---|---|---|---|
| **moment**<br>  10:2 40:12<br>  104:11 111:1<br>**moments**<br>  60:24<br>**money**<br>  12:7<br>**monitor**<br>  9:16 106:8<br>**mooring**<br>  106:13,23<br>**move**<br>  77:19 78:8<br>**movements**<br>  94:3<br>**moving**<br>  59:3 77:14,<br>  18,21 78:5,<br>  10,14<br>**multiple**<br>  83:19 90:15<br>**murder**<br>  24:25<br><br>――――――<br><br>**N**<br><br>**name**<br>  6:7,8 12:12<br>  27:22 58:13<br>**named**<br>  24:9 47:19,<br>  20 48:10,13,<br>  22,24 49:2,<br>  3,16 50:8<br>  54:16 59:12,<br>  19 65:6<br>  66:14,24<br>  67:5 74:5,7<br>  76:16 83:5<br>  84:13,17,20,<br>  21,23 88:2,<br>  5,12,13,16,<br>  23 89:2,25<br>  91:5<br>**national**<br>  13:23 14:1 | **nature**<br>  25:5,11<br>  29:13 65:1,2<br>  99:15 108:12<br>**Nautilus**<br>  57:24<br>**navigate**<br>  33:19 34:25<br>  74:10 75:7<br>  77:1,8,9,11,<br>  12,16,24,25<br>  78:1,4,8,19<br>  79:1 82:3,5,<br>  12,14,15,17,<br>  24 87:3,16<br>**navigated**<br>  79:3 87:6,10<br>**navigating**<br>  20:15 33:18<br>  34:23 43:18<br>  45:24 49:13<br>  50:5 73:19<br>  77:13,15,21<br>  78:7,15,16<br>  82:20,22<br>**navigation**<br>  34:16 38:17,<br>  21 63:7<br>  64:12 82:9<br>**navigational**<br>  20:17<br>**Nebraska**<br>  11:5,8<br>**necessarily**<br>  93:7 107:16<br>**necessary**<br>  28:3 111:4<br>**need**<br>  53:10 74:18<br>  78:18 84:12<br>  91:23 101:2<br>  110:9<br>**needed**<br>  12:12<br>**needs**<br>  68:19 | **negligent**<br>  98:15<br>**negotiated**<br>  10:19<br>**Neil**<br>  26:6 27:3<br>**net**<br>  9:23<br>**never**<br>  7:11 63:21<br>**newer**<br>  28:5<br>**Nick**<br>  51:24<br>**NIE**<br>  13:23<br>**nineteen**<br>  21:2 111:21<br>**nolo**<br>  25:13<br>**nominal**<br>  68:15<br>**nondisclosure**<br>  40:4 41:4<br>  56:12 59:16,<br>  19 65:11<br>  66:7,21<br>  67:11,21<br>  98:10,24,25<br>  103:21<br>**nondisclosure<br>s**<br>  54:23<br>**nonrenewal**<br>  24:6<br>**nonsense**<br>  82:7<br>**normal**<br>  39:18 68:21<br>  80:5<br>**Norman**<br>  43:14,17<br>  44:24 45:6,<br>  10,15,22<br>  47:7 49:4<br>  50:20 76:16,<br>  18 84:23 | **North**<br>  6:13 34:10<br>**note**<br>  102:18<br>  108:11<br>**noted**<br>  61:20 62:2<br>**notice**<br>  7:16,23 8:2<br>  41:21 43:21<br>  66:2,11,18,<br>  23 80:18<br>  102:12<br>  107:23 110:5<br>  117:23<br>**noticed**<br>  47:18<br>**notification**<br>  93:20 94:12<br>**November**<br>  33:20 35:1<br>  107:18<br>**number**<br>  21:13 27:19<br>  38:20 48:12<br>  61:23 62:1,<br>  9,10,25<br>  63:1,15,16<br>  64:19,20<br>  71:25 72:18<br>  81:18 103:3<br>  105:15,24,25<br>  106:2 108:13<br>  109:11,17,<br>  21,22 110:13<br>  112:6 115:3<br>**numerical**<br>  105:23<br>**numerous**<br>  6:18 31:24<br><br>――――――<br><br>**O**<br><br>**O-S-P-R-E-Y**<br>  8:19<br>**object**<br>  33:2 |

Eric Usher
November 19, 2021

| | | | |
|---|---|---|---|
| **objected**<br>108:15<br>**objection**<br>10:2 12:25<br>15:20 21:5<br>23:16,17<br>29:23 41:6<br>42:20 43:2<br>46:5,10<br>47:8,10<br>50:11 53:21<br>54:10 55:6<br>56:8,18<br>63:17 79:10<br>99:11,22<br>102:18,20<br>110:21<br>113:20 115:3<br>**objections**<br>110:11<br>**obtain**<br>13:22 14:2<br>**obviously**<br>18:23 32:9<br>41:23 83:16<br>98:23<br>**occur**<br>42:16<br>**occurred**<br>21:3 32:2,4<br>58:1 69:1<br>73:24<br>**offense**<br>24:9,21,22,<br>25 25:14<br>29:8 30:18,<br>19,24 32:2,4<br>46:24 67:11<br>90:12 91:18<br>**offenses**<br>29:16<br>**offer**<br>9:11<br>**offers**<br>9:9,10<br>**office**<br>9:7 12:2,4 | 37:3 38:13<br>**offices**<br>17:13 44:19<br>114:11<br>**offshore**<br>20:18 34:18<br>**okay**<br>6:15 27:25<br>61:13,25<br>62:5,11,15<br>63:3,13<br>65:4,22<br>70:13 72:23<br>74:5,8<br>75:10,22<br>76:21 77:4<br>80:16,25<br>83:21 84:2<br>86:19,25<br>87:14 90:3,<br>24 98:12<br>99:7 102:9<br>103:11 104:3<br>105:22<br>111:5,14<br>**Omaha**<br>11:4,7<br>**once**<br>7:11 52:3,24<br>69:25<br>**one**<br>11:24 13:20<br>14:12,13<br>15:11 17:18<br>18:16,25<br>23:1 26:2<br>33:5,6 47:20<br>48:6,13 49:3<br>55:10 56:2<br>60:1,16,18,<br>19 61:16<br>63:8 64:9,14<br>82:3,4 84:22<br>85:21 96:4<br>102:12<br>104:11,20<br>105:6 106:10<br>108:1,4 | 110:1,17<br>111:21 115:3<br>116:11<br>**ones**<br>60:1 61:10,<br>11,12 62:20<br>106:15 111:9<br>**ongoing**<br>10:15 11:19<br>**onsite**<br>62:13<br>**operate**<br>48:14 74:9<br>75:3,7<br>76:12,25<br>77:12 78:20<br>80:2,8 82:1,<br>8,10 83:23<br>84:1,3,7,11,<br>13 85:17,19<br>86:8 88:20<br>100:13,14<br>**operated**<br>39:15 74:21<br>75:2,13 76:9<br>83:6 85:2,12<br>86:2 88:18<br>90:8,23 91:1<br>**operating**<br>15:3,9 16:10<br>18:10 49:9,<br>22 50:20<br>69:23 74:10<br>75:7 77:23<br>79:16 80:11<br>82:2,19,20<br>83:12 84:15<br>86:6 111:20<br>**operation**<br>11:7 35:2<br>49:7 57:2<br>74:9 76:25<br>82:2,6<br>**operations**<br>75:7<br>**operator**<br>23:21 24:9<br>28:23 46:3, | 8,16 47:19,<br>20 48:10,13,<br>22,25 49:2,<br>3,5,16,17,19<br>50:8 54:12,<br>16 59:13,19<br>65:6 66:15,<br>25 67:5<br>74:5,7 76:3,<br>16,18,22<br>80:7,8,10<br>83:1,3,5,13,<br>17 84:9,13,<br>17,20,21,23<br>87:20,25<br>88:3,5,12,<br>13,16,23<br>89:2,9,13,18<br>90:16,21<br>91:6<br>**operator's**<br>46:19<br>**operators**<br>29:4 32:8<br>83:20 87:23,<br>24 88:7,8,9<br>89:25 90:15<br>**opinion**<br>40:15 50:7<br>53:16 99:18<br>100:3,4<br>**opportunity**<br>13:22 42:9<br>47:2<br>**opposed**<br>12:18 18:12<br>65:16 105:3<br>**opted**<br>81:23<br>**option**<br>55:8 81:21<br>**order**<br>9:12 17:12<br>67:19 77:24<br>78:8 112:7,<br>18,25 113:7<br>**ordered**<br>114:16 115:4 |

Eric Usher
November 19, 2021

ordering
113:18
115:1,17
117:12

original
40:20

originally
38:16

Osprey
8:16,17,19,
21 11:12
18:12

outline
59:9

outreach
21:17

outside
95:21 107:22

outstanding
63:15

outward
94:4 96:6

overview
51:17

owned
8:13 19:25
25:19 90:8

owner
8:24 23:21
28:23 29:4,
21 32:13
49:16

owner-
operator
28:20 30:25

owners
20:1

ownership
11:19 90:5

owns
11:15

P

P-A-T-E-L-E-Y
6:11

p-h
53:8

p.m.
7:6 117:22

page
22:5 23:2
33:14 35:4
36:3 38:8,23
44:21 45:13,
25 49:12
50:3 51:1
54:23 55:25
61:5,19
73:1,2,10,15
74:13 75:4,
10,11,12,16
76:7,15,22
80:22 83:2,
12 84:25
85:6,11
86:1,11
87:8,22 88:4
89:14,15,25
91:11 93:14
94:17 96:15,
24 99:12

pages
14:13 34:4
36:1 54:19

paid
17:15,19
45:16 54:1
73:11 95:25
113:13

paragraph
54:24 74:18
86:12 88:18

parameters
107:21

paraphrasing
83:16 116:13

parcel
114:10

Pardon
41:11

parking
24:21,22,25
25:2

part
16:20 17:14
32:19 50:22
78:7 85:16
97:17 99:7
113:19 114:9
115:21,23,24

particular
9:7 23:14
27:1 28:9
34:21 39:6
52:11 78:22
81:1 92:20
102:5 116:17

parties
35:5

party
95:3 116:19

past
22:16 23:22
32:7

Pateley
6:11

pattern
31:9 33:7

patterns
28:23 31:4
32:17

pay
53:3 98:5,7
99:9 101:3
103:1

payee
34:14

paying
68:4

payment
52:1 56:5
95:24 100:23

payments
94:3 95:19

pays
104:25

pending
73:7

people
13:21 33:12

37:3 93:6
109:14
116:22,23

percent
17:17 21:11
109:12 112:5

percentage
21:10
109:11,12,22

percentages
19:2

Perfect
91:20

perform
9:6

performed
59:21 61:3

period
16:2 24:4
66:8 71:25
87:10 105:9

permit
85:18

person
26:9 38:15
47:19 53:6
70:9 75:17,
19,22,23
76:2 84:19,
22 85:6
92:25 113:8
117:1

personal
25:9

personally
25:9 38:1
39:2 42:5
71:20

personnel
93:23

persons
74:21 75:14
76:9 85:2,5
86:3 88:19,
24

Petersburg
34:13

Eric Usher
November 19, 2021

phase
 112:19
photocopying
 22:25
photographic
 50:2
phrase
 53:24
physical
 49:8 74:10
 75:8 77:1
 79:22 82:25
physically
 77:19
picking
 98:1,6
place
 17:19 112:23
plaintiff
 108:14
plaintiffs
 117:15
plan
 7:8 106:12
pleaded
 24:10 90:12
pleading
 68:9 114:9
pleadings
 66:5,6,10,
 13,14,20,21
 67:12 114:7
please
 6:7 27:23
 58:23,25
 74:13 75:6
 87:1,24
 90:10,12
 104:11
pleasure
 80:19,23
 81:4,16
pled
 25:13 39:12
plot
 77:13,16
 78:5 82:12

plotting
 77:20 78:13
point
 31:25 77:18,
 19 78:9,10,
 11 79:5
policies
 16:1,2 33:9,
 13 56:7
 70:13,22
 71:8 81:8,
 10,11 83:19
 93:1 99:20
 100:10,23
 101:2,20,25
 102:13
 108:13 109:7
 112:3,23
 114:17
policy
 9:13 11:23
 12:21 17:15
 20:18 22:11
 34:2,7,8,11,
 21 35:4
 42:14 43:1,
 6,9 46:1
 47:15,20
 48:10,11,13,
 17 49:2,8,12
 52:1,10,11,
 22,25 53:19
 54:25 55:16
 57:19,21
 58:15 59:8,
 11 60:3 63:5
 64:7,10
 65:14,18
 70:2,3,8
 71:22 72:12,
 17,19,20
 73:8,11,15
 74:14 75:17
 76:15 77:10
 80:16,19,22
 81:1,2,3,5,
 13,15,17,20,
 23 84:18

85:16 86:10
 87:10,21
 88:5,12,13,
 16,17 99:8
 114:3 115:2,
 19
poor
 87:9
port
 20:3,4
portside
 62:7
position
 15:4 48:7
 63:11
possibly
 7:6 23:8
post
 68:24 112:21
post-accident
 110:14,19
potential
 50:24
potentially
 110:22
PPO
 81:3
PPV
 81:15
practice
 112:7
preceding
 12:21
preclude
 33:4
prejudice
 55:9,12
preliminary
 44:13
premiere
 81:17,20
premium
 9:14 24:19
 25:7,10
 26:1,21
 27:1,4 30:9,
 15,16,21

32:5,6 33:3
 36:7,10
 37:10 38:13
 39:8,16,20,
 22 55:19,22
 68:4,15,23
 69:5,7,14
 70:3,7,10,
 15,18,20,21,
 25 71:23
 72:4 73:11
premiums
 9:25 25:24
 69:12
prepare
 7:22
prepared
 7:1 26:9
 44:5 51:18,
 22,23 80:16
 81:12 92:4
 95:8
presence
 14:16
present
 50:4
presentation
 16:22
presented
 23:21 26:10
 52:20 100:7
pretty
 18:8 69:14
previous
 24:6 32:10,
 12,16 46:22
 58:20
previously
 21:19 22:19
 49:23 79:3
 90:8,23
 103:1
Primarily
 20:20 62:23
primary
 61:16

principal
  100:21
principle
  28:18 60:1
  64:5 106:13
prior
  8:25 35:2
  57:1 63:7
  64:12 65:11
  66:17,22
  68:21 69:21
  70:24 86:18
  89:10 103:23
  113:17
  114:1,14
Privacy
  111:7
  116:12,24
private
  80:19,23
  81:4,16
privilege
  96:12,14
probably
  11:25 19:7
  20:19 27:5
  32:23 39:7,
  18 41:20
  91:22 104:7
  107:6 112:4
procedure
  68:21 69:24
  71:22 114:5
procedures
  48:12 70:13,
  22 71:9
  92:6,12
  93:1,10,11
  99:21 100:23
  101:21,25
  102:14
  112:23
proceed
  22:11 25:6
  40:2 56:23,
  25 64:16
  70:2

proceeding
  53:3
process
  14:25 22:25
  50:22 67:17
  78:7 115:24
procuring
  13:4
producer
  15:25 18:7,
  16 19:4
producers
  18:5
professional
  15:1 33:17
  34:22 43:15
  73:17
profit
  9:23 10:1
program
  11:22 13:14
  17:1,4,14
  22:2 111:20
prohibiting
  59:22
promulgate
  112:17
pronounced
  8:18
proof
  95:21,24
properly
  39:8
Property
  10:22
proposed
  48:14
propounded
  63:22
prosecute
  23:8,10
prosecution
  23:12
prospective
  109:15
provide
  15:2 16:14

  22:4 26:15
  49:7 66:23
  72:11 89:9
  107:11
provided
  22:6 27:17
  37:2 44:9,
  19,24 51:16
  61:7 66:2,
  11,18 71:4
  76:2 82:18
  109:2
provides
  21:25 28:5
  94:2 106:22
providing
  16:15 28:17
  36:23 69:11
  85:19 90:22
  91:16 94:3
  97:19
provision
  48:25
provisions
  86:16 104:8
provisos
  102:4
public
  29:20 39:13
  103:8,13,25
  104:6,16,23
  111:11
  116:21
pump
  61:22 64:20
  104:14
purchase
  11:20
purchased
  8:15 11:2
purely
  64:6,16
  70:16 71:11
  91:3
purpose
  13:4,5 36:22

purposes
  9:15 28:4
pursuant
  36:4
put
  26:18 34:20
  95:14 107:3
PYP
  81:17,18

———————

Q

qualifications
  46:20 89:4,8
  90:6
qualify
  91:14
quality
  44:2,12
qualms
  89:3
question
  20:24 22:14
  23:20 24:1,8
  30:22 31:3
  35:14 58:22,
  25 59:1,3
  62:19 68:18
  90:19 108:1,
  17,19,20
  110:1,10
  114:12
  115:9,11,15
  116:11 117:2
questioned
  71:7
questioning
  7:8
questionnaire
  89:9
questions
  7:2 22:13
  32:9,12
  46:25 47:3
  48:14 58:16,
  17,18 89:17

Beric Usher
November 19, 2021

90:14,17,18
107:21
117:4,6
**quick**
116:5
**quicker**
52:4
**quite**
20:24 96:21
**quotation**
26:7,10
33:14,16
**quotations**
9:11
**quote**
21:20 26:4,
11,12 54:25
57:15 105:19
**quotes**
105:24 109:7

**R**

**raised**
58:17
**range**
37:15
**rate**
36:25 37:4,7
38:3,12 39:5
41:12 68:4
69:17 109:4
**rated**
38:16
**rates**
25:22 28:16
36:24 69:18
**rating**
26:13,16,21
28:14 36:16
37:22 38:20
41:17 72:2
**read**
74:18 75:6
82:17 89:22
107:7,8
117:8,10

**reading**
117:23
**reason**
40:17 42:7
50:16,17
53:25 66:12
67:20 97:19
98:20 102:11
103:20
**reasonable**
23:25
**reasoning**
109:15
**reasons**
59:10,17
65:4,23
66:24 109:13
**recall**
26:3 60:10
67:2 83:18
89:6 111:9,
21 112:1
114:6 116:13
**receive**
9:8,12 43:21
81:20
**received**
9:21 53:17
57:4,8 63:21
95:17
105:18,25
107:23
**receives**
105:16
**recent**
70:5 103:20
**recess**
42:12 116:8
**recite**
61:1
**recognize**
14:11 19:22
20:10 22:21
27:15 33:24
35:22 44:18
51:13

**recommendation**
50:23 61:23
62:1,12,25
64:15,19
92:24 97:15
104:14
**recommendations**
35:2 56:21,
24 57:6
59:15 61:6,
10 62:6 63:6
64:11,25
65:16 67:7
97:13
**recommended**
60:7 65:8
66:25
**reconciliations**
57:1
**record**
29:1 58:3,4
61:2 72:18
85:21,22
93:19,24
102:18
108:11,16
111:11,22,25
116:9,22
**records**
32:7
**refer**
23:11 28:3,7
30:12 33:14
86:20
**reference**
37:23 74:1
**referenced**
60:13 74:5
83:12,17
85:11 86:9
**references**
14:14 87:11
**referencing**
116:14

**referral**
12:6 101:13
**referred**
15:2 25:8
37:25 39:1
42:5 53:5
56:20 60:10
71:19 88:17
**referring**
10:25 36:3
82:8 88:18
89:14 113:12
115:8
**refers**
49:12 86:21
**refuse**
98:1,7 99:9
102:25
**regarding**
23:4 42:24
68:18
**region**
106:11
**regionally**
106:16
**registered**
20:14
**registration**
20:10
**regularly**
57:24
**regulation**
60:6
**regulations**
60:6
**regulatory**
102:3
**reject**
97:4,18
**rejecting**
54:2 92:24
97:1,11
**rejection**
97:21 99:2
103:4
**relate**
63:4 102:5

Eric Usher
November 19, 2021

related
   10:24  42:25
   53:13  99:10,
   21
relates
   63:14  65:6
   71:21  101:7
   103:7,19
relating
   96:6  100:23
   105:13
relationship
   9:1  10:8,17
release
   111:8
releasing
   116:25
relevant
   30:3
remained
   79:7
remedied
   104:20
remember
   21:2  73:20
   79:9  82:16
renew
   10:12
renewals
   109:8
renewed
   24:2
renotice
   110:8
repaired
   57:13
Repeat
   108:19
repetitive
   78:3
rephrase
   58:23
report
   9:15  44:13,
   22,23  45:13
   49:24  50:3
   51:1  104:14

106:22
107:6,11
109:17
reported
   45:14
reporter
   10:3  21:14
   53:10  117:8,
   9,12,14,17
reporting
   9:14  112:25
   113:3
reports
   44:9  50:3
   112:8
representative
   7:14  40:19
   114:22
represents
   93:19
request
   47:16  86:16
   87:24  113:22
requested
   46:18  49:17
   114:2
require
   48:23  56:19
   93:23
required
   38:14  48:8
   89:8
requirement
   50:8
requirements
   48:24
requires
   35:5
reread
   7:24
reservation
   47:21,24
   59:7  67:3,4
reserve
   50:23  94:3
   101:12

resides
   35:7,8
respect
   55:5  93:25
respective
   114:17
respond
   56:25  108:25
responded
   63:23
responds
   69:20
responses
   63:17,24
responsibilities
   16:20  17:18
responsive
   96:19
rest
   80:1
result
   9:24  32:2
resume
   46:13,15
retain
   9:18
retention
   109:8
retroactive
   47:16  48:7,
   18,21
return
   7:4  16:16
returned
   55:20,22
Revel
   47:5  60:11
   62:16
reverse
   77:14
review
   16:15  46:15
   61:13  101:6
reviewed
   7:19  39:5
   46:13  100:10

reviewing
   7:23  91:13
   92:7  102:22
revised
   28:10  67:13,
   14,16
revisit
   110:7
Reynolds
   6:2  29:6
   72:23  75:19,
   22
Richard
   110:4
right
   60:21  62:19
   64:1  66:22
   69:22  75:2
   76:15  78:1
   83:3  84:4,16
   101:12
   104:12
   107:25  108:8
rights
   47:21,24
   59:7  67:3,4
rise
   53:4  69:2
   112:16
   113:22
risk
   19:14  22:2
   27:1,4,18
   28:6,7,12,
   14,19  31:17
   32:20,23
   38:16  39:6
   42:3  98:10,
   14  100:18
risks
   8:7,9,12,17,
   21,22,24
   11:2,15,20
   12:8,14,20
   15:17  18:11,
   12,13  22:23
   28:22  34:3
   36:16  52:11,

12 69:6
80:17 81:11
86:22 92:2,
4,7 105:5,11
Risks'
38:3
room
116:23
Roughly
21:11
rules
100:13,15
run
110:20
Russick
43:15,18
44:24 45:2,
6,10,15,23
46:3 47:7
49:4 50:4,9,
15,20 73:23
76:16,18
77:5 78:13,
24 79:18
84:24 85:13
103:12,17

S

S-E-N-S-I-B-
A-R
53:12
safety
103:7,13,15,
18,24 104:5,
8,10,15,17,
22
salon
80:1
salvage
43:7 51:3
Sara
51:20
satisfied
56:22 98:14
saying
84:5 114:4

116:21
says
22:25 31:3
55:25 73:17
74:20 75:2,
12 76:25
77:25 80:21
83:5 85:1
86:1 87:19
88:4,11
90:16 92:16
93:18 94:10
95:16,19
97:4,17
98:1,18
schedule
7:9 73:2
75:12
scheduled
33:19 34:24
35:3 73:18
74:15,21,24
75:9,13 76:3
77:2 83:4,6
85:1,12 86:2
scope
111:19
search
107:9
season
106:14,24
107:12,15,16
Seattle
29:14
second
54:24 80:6,8
83:13,17
85:21 89:18
98:13
secondhand
32:11
seconds
74:18
section
86:12 88:22
89:13 93:14,
16 97:1,17

101:7 102:22
secure
14:25
Sedgwick
43:25 44:8,
20 60:11
see
20:2 31:14
37:22 63:24
73:3 74:14,
22 75:14
76:5,23
80:25 83:7
85:3,7 87:7
88:6 93:16,
21 94:5,13,
18 95:6
97:2,22
98:8,16 99:5
103:9 109:17
seek
53:16 99:17
100:3
seeking
32:17 111:24
select
113:15
selection
28:14
seminar
12:23 13:9,
16,18
seminars
12:22 13:2
send
67:14,16
96:23 117:17
sender
26:6
senior
72:3
Sensibar
53:7,10
102:8
sentence
93:18

separate
100:15,22
101:1 106:10
seriousness
39:25
service
35:9
servicing
104:13
set
26:1 36:7
39:8 58:18
100:15,22
101:2,25
setting
26:25 27:4
settle
98:5
settlement
55:9,13
99:23
seven
47:17 48:3,
18
seventeen
10:14
several
54:2 67:24
68:1 110:2
severe
40:1
shape
104:20
share
9:23
sheet
38:3 39:5
41:13
sheets
87:25 88:10
90:16
SHMILY
19:13,16,23
20:11 74:25
76:8 79:7
show
12:23 13:14

Beric Usher
November 19, 2021

14:6 16:5
18:14 19:18,
25 20:3,6
22:18 27:10
33:22 35:15
36:4,7,14
38:2 41:9
44:11 51:8
52:25 60:12
**showed**
52:21
**showing**
60:22
**shown**
26:4 54:25
**shows**
26:6 29:25
77:5
**side**
109:9
**sighted**
62:14
**sign**
16:16 33:9,
12
**signed**
15:9 16:11
34:8 86:21
**signing**
117:23
**similar**
12:24 41:24
43:8 51:3
**Simms**
51:20
**simple**
109:16
**simply**
64:6 71:11
89:4 91:3
105:23
**single**
112:11
**singling**
92:10
**sinking**
42:16,19,25

54:5,8
**sir**
59:5
**sit**
63:13
**situation**
78:23
**sixteen**
37:15
**size**
71:18 80:7
**slash**
23:1 81:3
**slightly**
22:24
**small**
15:22
**smaller**
19:7
**sole**
70:9,16
**solicit**
12:21
**sort**
21:9
**sorts**
102:3
**sought**
89:24
**sounds**
58:9
**south**
33:20 34:25
**southeast**
106:16
**space**
88:8
**spanking**
29:19 31:14
39:13
**speaking**
58:25 62:20
65:4
**special**
8:7,9,12,17,
21,22,24

11:2,15,20
12:8,10,14,
20 18:11,12
22:23 34:3
36:16 38:3
80:17 81:11
86:22 92:2,
4,7
**Specialty**
69:6
**specific**
22:12 48:16
56:23 60:3
64:6 65:14,
18 80:13
82:22,23
106:12,24
109:1
**specifically**
45:25 48:12,
15 49:2
66:24 70:23
82:8 85:17
86:4,8 87:22
88:20 102:13
**specifics**
81:22
**speed**
38:22
**spend**
12:18
**sponsor**
13:13
**sponsored**
13:19
**sponsoring**
13:15
**sponsors**
13:8,10
**sponsorship**
13:17
**Spring**
10:22
**Springs**
6:19,20
**St**
34:13

**stabilizer**
62:7
**staff**
8:23 27:17
28:5 71:1,4,
16
**stage**
40:17
**stamps**
36:15 44:12
**standard**
30:6 69:23
71:9 80:19
81:3,7,13,15
114:4
**standards**
97:10
**standing**
84:4
**stands**
80:18 81:2
**start**
16:17 59:1
61:5 102:25
115:14
**started**
13:15
**starting**
107:22
**starts**
26:20
**state**
12:1,2,4,18
20:16 21:4
48:13 106:17
107:4,10
**statement**
14:25 34:6
50:15,16,18,
19 97:24
99:8 104:1
**states**
6:15 14:16
35:6,11
49:2,8 60:3
88:20 106:16

Eric Usher
November 19, 2021

statistics
  105:15
  110:13
status
  109:17
steer
  77:12 78:21
steering
  77:23 78:17
  82:21
Steven
  53:7 102:8
stock
  8:15
stray
  107:22
stressed
  101:14
strictly
  85:15 105:17
strike
  33:1
strong
  14:16
strongest
  11:24
structural
  8:20
structure
  26:22 72:2
structures
  69:17
Stuart
  106:20
subjective
  72:7
submerged
  33:1
submit
  15:9
submitted
  39:9,10
  47:17 69:3
  70:1 75:24
  97:9 112:9
submitting
  68:22

Subsection
  74:14 75:4
  76:8,22 85:6
  86:1
subsequent
  32:1 36:1
  38:15 67:10
  100:4 110:8
subsequently
  11:17 66:21
  67:6
suffered
  32:21
Suffice
  111:11
sufficient
  65:2 97:19
sufficiently
  54:13
suggested
  39:17 55:11
  62:3
suggests
  88:9
summary
  95:2,8
  106:11 107:3
  111:25
supervise
  49:19
supervising
  49:21
supervision
  84:3
suppose
  77:15 82:4
supposed
  30:11
suppressant
  60:2,4 61:18
  64:5 65:15,
  20
suppression
  61:20 104:3,
  8
sure
  13:3 64:4

97:10 102:1
104:12
112:24
114:18 115:7
surplus
  15:1 17:1,4,
  6,9,12,14
  26:13 36:5,
  11,24
surprise
  101:4,24
survey
  44:5,13
  56:16 57:4,8
  59:21,24
  60:7,13,19
  61:1,7,8,20
  62:13,21
  63:4,15
  64:18,23
  65:8 66:15
  67:1,6
surveyor
  61:7 62:2
  63:6 96:21
surveyor's
  35:1 61:10
  62:18 64:15
surveys
  60:16
suspect
  100:16
suspensions
  90:4
sworn
  6:3
synopsis
  69:2
SYP/8/PPO
  80:18,24
system
  26:17 41:22
  62:24 64:20
  96:17,18
  101:13 104:3
systems
  60:2,4

61:18,20
62:23 65:15,
  20 102:3
104:9

_____

          T

T.L.
  8:11,13,15,
  25 11:12
  18:12
tagged
  60:5 62:4
  104:5,9
tags
  62:2
take
  31:17 40:3
  41:3 42:7
  58:7 60:24
  63:10 83:14
  111:2 116:5
taken
  42:12
  104:21,24
  116:8
taking
  7:17 28:11
  48:7 80:1
talk
  30:25
talked
  71:6 72:15
  103:6 104:4
  108:7
TANNER
  117:6,18
tax
  17:19
taxes
  17:15 36:11
team
  21:20 26:2,
  11 40:10
Technically
  95:16

Eric Usher
November 19, 2021

tell
  6:7 33:15
  45:6 48:15
  50:7 61:1,14
  73:10 89:24
  92:19
  107:16,17
  110:7
telling
  101:16,17
tells
  85:20
temper
  29:25
temporary
  57:16
ten
  15:19 23:22,
  24 42:10
  90:9,19
  91:17
ten-minute
  58:8
ten-year
  16:2
term
  77:8 78:19
  87:3,16
  88:13,16,23
terms
  9:11 22:4
  57:21 73:14
  106:8,24
testified
  6:4 79:6
  92:1 108:1
  113:25
testify
  59:6 102:17
testimony
  21:1 37:4
  63:14 64:18
  68:3,8,13,17
  69:19 73:22
  79:9 85:25
  89:1,6 100:9
  101:14

text
  95:18
Thank
  18:3 52:8
  117:3,4
thing
  8:10 18:9
  29:20 90:2
  109:16
things
  31:11
think
  7:10 11:14,
  25 15:18
  16:1 20:17
  21:6 23:25
  41:11 43:9
  49:14 55:7
  58:20 60:20,
  21 67:13
  77:4 78:3
  82:9 84:1
  92:16 95:9,
  10 99:17
  103:17,19
  104:7 112:12
  116:4
third
  98:18 103:19
thirty
  52:1 57:17
  91:22 96:22
  111:20 112:3
Thirty-eight
  52:7
Thirty-five
  41:12
Thomas
  51:19
thought
  100:9 109:25
  110:6
three
  22:16 32:22
  57:22 65:4,
  22 66:1
  103:3 109:12

time
  11:18,22
  12:17,20
  15:16 24:12,
  15 25:11
  28:11 43:19
  45:2,3,8,11,
  23 48:2
  49:5,21
  50:21 58:5,
  22 66:7
  67:4,18
  70:8,23
  73:23 78:11,
  14 79:15,19
  110:8 117:4
timely
  43:21
times
  49:19 91:4
  111:15,21
tired
  78:25
today
  7:13,20
  19:12 20:13
  59:6 60:14
  62:20 63:13
  71:7 72:16
  73:13 74:3
  114:15
told
  101:1,5
ton
  45:15,17
top
  18:11 22:24
total
  73:10 109:16
touch
  84:5
track
  104:25
  105:15,18,25
  106:2,5,15
  107:2 109:4,
  9,13 110:13

trail
  94:2
training
  28:4
transact
  17:7
transacting
  13:6
treating
  34:5 116:16
trial
  21:1 111:21
Tropic
  33:20 34:25
true
  56:2 97:24
try
  52:25
trying
  20:23 24:5
turn
  73:15 74:13
  93:14 96:24
  100:18
turning
  82:1 83:2
  102:22
twelve
  12:19 21:6
  62:1,25
  63:16 64:19
twenty
  16:1
twenty-four
  27:9 28:2
twenty-year
  37:15
two
  15:24 28:18
  32:21 33:6,
  12 57:11
  60:16 64:8
  66:19 71:12
  82:10 87:24
  88:8 98:23,
  25 106:10
  108:6 109:6

Beric Usher
November 19, 2021

112:5

**two-year**
105:9

**type**
24:24 26:19
81:9

**types**
81:10

**typically**
69:23 89:19

---

**U**

**U-S-H-E-R**
6:9

**U.S.**
16:10 18:10
19:16 20:13
60:6

**U.S.A.**
34:17 37:20
38:18 87:12

**UK**
116:17

**ultimate**
100:2

**ultimately**
28:14 33:9
44:8 47:21
81:23 95:25
104:19

**unable**
14:2

**unambiguous**
82:10

**unclear**
61:11

**underlying**
71:4 99:21
101:9

**understand**
17:16 40:20
58:22 65:5
73:9 76:7
85:25 89:1
98:12,19
99:8

**understanding**
29:5,7
43:14,17
67:23 108:2
109:1

**understood**
69:19 100:9
110:10

**underwriter**
28:15 38:12
42:2 68:23
72:3

**underwriters**
11:3,4,20
69:10

**underwriting**
7:24 8:16
11:11 26:2
27:24 38:3
39:5 51:22
68:25 71:3,
6,9,17
105:2,5,9,
10,14 109:23
112:19
115:24

**underwritten**
10:13

**unexpected**
52:14

**unfamiliar**
78:24

**unforeseen**
52:13

**unfortunate**
33:6

**unintentional**
41:4

**United**
6:13,15
35:6,11
102:2 106:16
111:8 116:12

**unnamed**
54:12

**unqualified**
54:13

**unreasonable**
63:10

**unreasonably**
97:4,18

**unusual**
71:17

**update**
96:23

**updated**
41:22

**USCG**
45:15,17

**Usher**
6:1,9 58:7,
13 60:12,24
64:3 72:11
85:25 87:1
91:8

**utilize**
113:9

**utilized**
101:21
102:14

---

**V**

**valid**
53:17

**value**
26:19 43:6,
12 51:3

**variable**
38:22

**varied**
86:17

**various**
12:22 86:16

**vast**
72:1

**veracity**
50:17

**verbiage**
104:12

**version**
80:19 81:3,5

**versus**

24:25

**vessel**
19:12,16,25
20:11,13,18
21:17 22:3
26:16,19,22,
23 28:19
29:4,10
32:10,11,13,
16 33:18,19
34:23,24
35:3 37:8,
11,15,17
38:22 39:14
41:17 43:7,
18 45:23,24
46:4,9,17
48:15 49:5,
9,10,13,22
50:5,8,20
56:16,23
57:2,5,12,13
63:7 64:12
73:18,23
74:2,11,15,
21,24,25
75:9,13
76:4,8,12,19
77:2,5,13,
21,22,24
78:2,5,10,
14,15,16,17,
22,25 79:5,
15,16,19,21,
22,25 80:2,
3,7,9,11
81:9,19,22
82:6,21,22,
24,25 83:5,
6,14,15,17,
23 84:2,3,7,
11,14,15
85:1,12,17,
19 86:2,6,8
87:14 88:21
90:25 103:8,
13,18,25
104:5,10,15,
18,23 105:21

Eric Usher
November 19, 2021

106:7,23
107:14
**vessel's**
106:13
**vessels**
9:16 15:17
32:16 81:14,
16 90:7,23
91:1,12,14
106:1,2
107:4,17
108:14,23
**veto**
56:21
**view**
26:16 99:12
102:6
**violated**
23:8
**violation**
25:1,2
**violations**
22:15 90:4
**violence**
29:8
**virtually**
40:18
**virtue**
13:10 50:9
**visit**
102:16
**void**
55:16
**Volney**
57:4 61:8
104:14
**VPO**
81:18

--- W ---

**W-O-O-D-R-O-Y-D**
6:10
**waive**
117:8,10,11

**waived**
117:24
**want**
6:25 31:18
32:23 42:7,8
58:7 60:17
88:9 90:22
92:19 104:11
107:1 110:6
114:12 116:4
117:10,14
**wanted**
48:21 84:13
100:19 107:3
**warning**
23:3,14 48:9
88:4,11
**warrant**
65:3
**warranted**
60:4 73:17
74:15,20
75:13 76:8
83:4,6 85:1,
12 86:2 91:3
**warranties**
33:15 34:20
66:15 73:14
**warranty**
33:17,19
34:22,24
35:1 42:24
45:25 47:15
49:12 57:12
59:12,14
60:3 63:5,6,
9 64:6,10,11
65:6,14,19
66:16 67:21
76:7 79:13
80:13 83:2,
12 84:25
85:11 86:12
98:19,21
99:1,3,10
101:9 103:3,
5

**waters**
20:15 87:6,
10
**way**
17:7 53:18,
24 102:17
104:20
107:1,2,6
111:7
**ways**
108:6 109:6
**website**
14:14,16
**weeks**
12:19
**weighed**
60:5 62:3
**went**
37:10
**West**
106:19
**wheel**
84:5
**whichever**
107:1
**whim**
70:17
**wind**
10:15
**windstorm**
107:12,15
**winter**
107:16
**witness**
6:2 13:1
15:21 21:6
23:18 28:1
29:24 41:7
42:10,21
43:3 46:6,11
47:9 50:12
54:11 55:7
56:9,19 58:9
79:12 80:5
85:23 99:12,
23 111:6
113:21

116:3,7
117:11
**Woodroyd**
6:10,11
**word**
78:4 82:3,9,
10,14,15,17
**wording**
52:10 77:10
80:22 81:1,5
**words**
97:14
**work**
17:5 19:5
20:23
**working**
6:18 27:6
**write**
25:6 42:3
70:6 106:1,3
**writing**
76:3 81:8
**written**
16:25 66:2,
18,23 68:11
70:8,14
97:20
**wrong**
89:7

--- Y ---

**yacht**
9:8 11:16,
18,22 14:14
28:19 29:21
80:19,23
81:3,8,13,
15,17,20
84:6
**yachts**
12:7
**year**
10:9 12:19
13:20 14:4
16:2 105:2,
3,5,6,7,9,

Eric Usher
November 19, 2021

10,14,16
109:10,23
**year's**
13:17
**years**
10:14 11:12
12:16,21
13:13 15:12,
19 18:5
22:16 23:22,
24 24:3
25:24 27:9
28:2 29:9,21
30:3 39:13
41:5 46:23
67:24 68:5,
10 90:5,9,19
91:17 111:20
112:3
**Yorkshire**
6:13

---

**Z**

---

**zip**
6:13 106:25